John L. Amsden, Esq.
Justin P. Stalpes, Esq.
Sydney E. Best, Esq.
Conner C. Bottomly, Esq.
BECK AMSDEN & STALPES, PLLC
610 Professional Drive
Bozeman, MT 59718
T: 406-586-8700 / F: 406-586-8960
amsden@becklawyers.com
justin@becklawyers.com
sydney@becklawyers.com
conner@becklawyers.com

*Attorneys for Plaintiffs*

\* \* \* \* \* \* \*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA, MISSOULA DIVISION

\* \* \* \* \* \* \*

| | |
|---|---|
| TODD F. STEVENSON, an individual on behalf of himself, and as grantor of the Todd Stevenson 2013 Irrevocable Family Trust and the Todd F. Stevenson Irrevocable Life Insurance Trust; TERRI L. STEVENSON, an individual on behalf of herself, and as grantor of the Terri L. Stevenson 2016 Irrevocable Family Trust; TODD J. STEVENSON, an individual; and JOSEPH D. STEVENSON, an individual on behalf of himself, and as grantor of the Joseph D. Stevenson Irrevocable Life Insurance Trust; JANETTE KRUTZFELDT JONES, on behalf of and as trustee for the Todd Stevenson 2013 Irrevocable Family Trust, the Todd F. Stevenson Irrevocable Life Insurance Trust, the | Case No. 9:24-cv-00109-DLC<br><br><br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND JURY DEMAND** |

Terri L. Stevenson 2016 Irrevocable
Family Trust, and Joseph D.
Stevenson Irrevocable Life Insurance
Trust; and STEVENSON AND SONS
FUNERAL HOMES,

               Plaintiffs,

      v.

MASSACHUSETTS MUTUAL
LIFE INSURANCE COMPANY;
THE PENN MUTUAL LIFE
INSURANCE COMPANY; THE
PENN INSURANCE AND
ANNUITY COMPANY; SUMMIT
FINANCIAL GROUP; GP
CAPITAL PARTNERS LLC; THE
BURGESS GROUP, INC.; JOSHOA
Q. GARDNER, an individual; LAKE
FOREST BANK & TRUST CO.,
N.A.; SUCCESSION CAPITAL
ALLIANCE; and JOHN DOES 1–5;

            Defendants.

Plaintiffs, by and through their counsel of record, file their First Amended

Complaint as follows.

## INTRODUCTION

Plaintiffs are third-generation Miles City funeral home professionals. With the

help of Plaintiffs and their family business, thousands of Montanans have laid their

loved ones to rest with dignity and peace. This lawsuit is about Plaintiffs' effort to

protect their legacy and pass the family business to the next generation, and how Defendants thwarted that effort by directing Plaintiffs down a path of financial ruin.

Through misrepresentation, omission, or plain professional incompetence, Defendants convinced Plaintiffs to place their family's savings into financial structures known as premium financed life insurance. The premium financed life insurance structure is a risky, volatile, and highly complex financial scheme that combines highly priced life insurance policies and borrowing to fund their premiums. Under the premium financed life insurance tripartite paradigm (comprised of insurer, premium financing companies, and insured), there is no policy without a loan, and no loan without the policy.

In this case, Defendants disguised the dangerous premium financed life insurance structure as responsible, safe, and tax-friendly estate planning tools. With initial cash outlays from Plaintiffs, Defendants promised each Plaintiff's respective life insurance policy or policies would pay for themselves in two steps: (1) funding for premiums would be arranged by and borrowed from premium finance companies; (2) some of the initial outlays of Plaintiffs' cash would be invested and earn returns that would not only pay back the premium finance professionals and lenders, plus interest, plus fees, but also steadily increase the value of the policies themselves.

What Defendants didn't tell Plaintiffs—an eastern Montana family of fiscally conservative, investment-risk-averse, financially unsophisticated morticians—is the premium financed "pay for itself" structure is anything but as Defendants promised. Instead, when interest rates rose from historically low levels, depressed returns on the invested initial cash outlays could not keep up paying back the premium loans, interest, and service fees. Plaintiffs quickly and irreparably found themselves pulled deep underwater.

The financial catastrophe into which Defendants led Plaintiffs could have been avoided had Defendants conducted any sort of reasonable financial analysis, especially considering that Plaintiffs' stated purpose was not to get rich, but to estate plan. For example, Defendants should have: determined whether the life insurance products were appropriate for Plaintiffs in the first instance; determining whether the life insurance products, if appropriate for Plaintiffs, were appropriately sized for suitable death benefits, policy types, and premiums; determining whether premium financing was an appropriate and necessary program through which Plaintiffs could pay for the life insurance products; looking back sufficiently far to produce and provide to Plaintiffs an accurate picture of interest rate trends and the impact of those trends if they continued into the future; and whether Plaintiffs' risk-tolerance would cause such a high-risk undertaking to be unsuitable.

But Defendants didn't do any of that. The premium financed structure was pushed on Plaintiffs, not because the structure was suitable and safe for Plaintiffs and their goals, but because the paradigm afforded Defendants the otherwise unavailable opportunity to procure and sell the largest policies and earn the largest commissions. But for Defendants' misrepresented, omission-laden, and repeated pitches on the tripartite premium financed structure, Plaintiffs would have avoided the scheme altogether and advanced their estate planning goals through appropriate financial tools.

## PARTIES

### I.    Plaintiffs[1]

1.    Todd F. Stevenson ("Todd"), individually and as the grantor of the Todd Stevenson 2013 Irrevocable Family Trust and the Todd F. Stevenson Irrevocable Life Insurance Trust, resides and is domiciled in Miles City, Montana. Thus, Todd is a citizen of the state of Montana.

2.    Terri L. Stevenson ("Terri"), individually and as the grantor of the Terri L. Stevenson 2016 Irrevocable Family Trust, resides and is domiciled in Miles City, Montana. Thus, Terri is a citizen of the state of Montana.

---

[1] Throughout this First Amended Complaint, Plaintiffs are collectively referred to as "Plaintiffs" or "the Stevenson Family."

3.    Todd J. Stevenson ("T.J."), individually and as the owner of one or some of the policies described herein, resides and is domiciled in Miles City, Montana. Thus, T.J. is a citizen of the state of Montana.

4.    Joseph D. Stevenson ("Joe"), individually and as the grantor of the Joseph D. Stevenson Irrevocable Life Insurance Trust, resides and is domiciled in Miles City, Montana. Thus, Joe is a citizen of the state of Montana.

5.    Janette Krutzfeldt Jones ("Jones") is an individual who resides and is domiciled in Miles City, Montana, and who brings claims on behalf of and as trustee for the Todd Stevenson 2013 Irrevocable Family Trust, the Todd F. Stevenson Irrevocable Life Insurance Trust, the Terri L. Stevenson 2016 Irrevocable Family Trust, and Joseph D. Stevenson Irrevocable Life Insurance Trust. Thus, because Jones is a citizen of the state of Montana, so too are the trusts for which she is a trustee.

6.    Stevenson and Sons Funeral Homes is a Montana corporation with its principal place of business in Miles City, Montana. Thus, Stevenson and Sons Funeral Homes is a citizen of the state of Montana.

## II.    Defendants

7.    Defendant Massachusetts Mutual Life Insurance Company ("Mass Mutual") is a Massachusetts Corporation, with its principal place of business in

Springfield, Massachusetts. Thus, Mass Mutual is a citizen of the state of Massachusetts.

8.      Defendant The Penn Mutual Life Insurance Company ("Penn Mutual") is a Pennsylvania Corporation, with its principal place of business in Horsham, Pennsylvania. Thus, Penn Mutual is a citizen of the state of Pennsylvania.

9.      Defendant The Penn Insurance and Annuity Company ("Penn Annuity") is a Delaware Corporation, with its principal place of business in Horsham, Pennsylvania. Thus, Penn Annuity is a citizen of the state of Pennsylvania.

10.      Defendant Joshoa Q. Gardner is an individual. On information and belief, Josh Gardner resides in and is domiciled in Sheridan, Wyoming at all times relevant to this lawsuit. Thus, Josh Gardner is a citizen of the state of Wyoming.

11.      On information and belief, Defendant Summit Financial Group ("Summit") is a sole proprietorship and/or a d/b/a of Defendant Josh Gardner, with its principal place of business in Sheridan, Wyoming. Thus, Summit is a citizen of the state of Wyoming.

12.      Defendant GP Capital Partners LLC ("Capital") is a Wyoming limited liability company, with its principal place of business in Sheridan, Wyoming. On information and belief, at least one member of Capital—Defendant Josh Gardner— resides in Sheridan, Wyoming. Thus, Capital is a citizen of the State of Wyoming.

13.     Defendant The Burgess Group, Inc. ("Burgess") is a Utah corporation, with its principal place of business in Salt Lake City, Utah. Thus, Burgess is a citizen of the state of Utah. On information and belief, Burgess does business by, among other things, soliciting, brokering, and packaging loans for premium financed insurance products.

14.     Defendant Lake Forest Bank & Trust Company, N.A., d/b/a Wintrust Life Finance and/or Barrington Bank & Trust Company, N.A. ("Lake Forest Bank"), is a national bank with a corporate headquarters and principal place of business in Illinois. Thus, Lake Forest Bank is a citizen of the state of Illinois.

15.     On information and belief, Defendant Succession Capital Alliance ("Succession") is a Delaware corporation with a principal place of business in California. Thus, Succession is a citizen of the state of California. Succession markets itself as the "creator" of premium financing for life insurance, aimed at protecting and maximizing wealth through "financing policy premiums through a customized loan." Or, put slightly differently, like Burgess, Succession does business by, among other things, soliciting, brokering, and packaging loans for premium financed insurance products



16.    Doe Defendants are entities and/or individuals whose respective identities and roles in this case are currently unknown. The Stevenson Family therefore bring this First Amended Complaint against John Does 1–5 by fictitious names and will seek leave to amend if and when their true identities and roles are ascertained, together with additional and appropriate allegations.

### JURISDICTION AND VENUE

17.    This Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k). Defendants are subject to the jurisdiction of Montana's courts of general jurisdiction, pursuant to Montana's Long Arm Rule, Mont. R. Civ. P. 4(b), and the Due Process Clause of the U.S. Constitution, including because Defendants are: found in Montana; sell products or services in Montana; transact business in Montana; have committed acts resulting in the accrual of tort or contract actions in Montana; own, use, or possess property, or an interest therein, in Montana; and/or entered into contracts in Montana; and because the claims asserted herein arise out of Defendants' activities within the Montana.

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as complete diversity of citizenship exists between Plaintiffs and Defendants, and the amount in controversy, exclusive of costs and attorney fees, exceeds the sum of $75,000.

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Montana.

20.     Venue is proper in this division, because venue is proper in Missoula County under the laws of the State of Montana. D. Mont. L. R. 3.2(b). Specifically, at least one Defendant has a resident agent located in Missoula County. Mont. Code Ann. § 25-2-122(2)(c) ("[T]he proper place of trial for a tort action is . . . the county in which the corporation's resident agent is located[.]"); *and see* Mont. Code Ann. § 25-2-177 ("If there are two or more defendants in an action, a county that is a proper place of trial for any defendant is proper for all defendants[.]").

## ALLEGATIONS COMMON TO ALL COUNTS

### I.    CONSTRUCTING THE "TRIPARTITE RELATIONSHIP"[2] OF THE PREMIUM FINANCE SCHEME: INSURER, PREMIUM FINANCING COMPANY, AND INSUREDS.

21.     Plaintiffs incorporate every other paragraph of this First Amended Complaint as though fully set forth herein.

22.     Critical to understanding the nature and scope of the claims in this case is appreciating the nature and scope of the volatile tripartite financial structure into

---

[2] *See* COUCH ON INSURANCE § 79:17 (3d ed.) (observing that "[m]ost jurisdictions have enacted statutory regulations that govern the tripartite relationship between insurer, insured, and the premium finance company").

which Defendants pulled the Stevenson Family through misrepresentation, omission, and fraud.

23.    In short, this is not a case about the local auto insurance salesman failing to procure underinsured motorist coverage for an insured who failed to ask.

24.    This is a case about a trusted financial advisor selling the unsophisticated Stevenson Family on a highly complex and high-risk estate planning structure—involving the coordination of national insurers, brokerage firms, and banks—and promising the Stevenson Family that the structure could not collapse.

### A.    The Insurers and Their Appointed and Authorized Agents.

#### 1.    The Agents.

25.    Since at least 2002, Josh Gardner (CRD #443299) has been a Montana licensed insurance agent.

26.    As alleged further herein, Josh Gardner and his entities engaged in far more than insurance coverage and policy sales, at least with respect to the Stevenson Family.

27.    Josh Gardner held himself out as the principal owner of Summit. On information and belief, Josh Gardner at some point ceased doing business as Summit and began operating as Capital.[3]

---

[3] Hereinafter, Gardner, Summit, and Capital are collectively referred to as the "Gardner Defendants."

28.    At all times relevant to this lawsuit, Summit and/or Capital were insurance and financial services firms professing to abide by fiduciary standards and provide professional advisory services for retirement planning and estate planning.

29.    Josh Gardner and/or the Gardner Defendants held themselves out and acted as the Stevenson Family's estate and financial planner(s), forming in the Stevenson Family the reasonable expectation of Josh Gardner's high level of skill, expertise, and knowledge in premium financed life insurance products and the products' purported suitability for the Stevenson Family's estate planning goals.

30.    For example, in written correspondence and in person, Josh Gardner and/or the Gardner Defendants made repeated representations about the suitability of life insurance products for the Stevenson Family's stated estate planning goals. The Stevenson Family, in turn, repeatedly informed Josh Gardner and/or the Gardner Defendants that their risk-averse goals entailed, *inter alia*, securing educations for their grandchildren and making gifts to the church.

31.    At every turn, Josh Gardner and/or the Gardner Defendants assured the Stevenson Family that they had the skill, expertise, and knowledge to engage in the detailed suitability and financial analysis required to plan the Stevenson Family's estates through the purchase of the insurance products he hawked to them.

//

//

**2.    The Insurers.**

32.    At all times relevant to this lawsuit, Mass Mutual, Penn Mutual, and Penn Annuity appointed and authorized Josh Gardner and/or the Gardner Defendants to act as their respective insurance agent to, *inter alia*, solicit their insurance policies, produce their insurance policies, prepare and accept policy applications, and sell their insurance policies.

33.    Mass Mutual, Penn Mutual, and Penn Annuity also appointed and authorized Josh Gardner and/or the Gardner Defendants to act as their agent to prepare life insurance product illustrations for the purpose of selling their life insurance policies, present those illustrations to proposed insureds, and submitting those illustrations with the respective insurer's applications.

34.    In this case, on letters and documents sent to the Stevenson Family, Mass Mutual, Penn Annuity, and Penn Mutual listed the Josh Gardner and/or the Gardner Defendants as the servicing producer(s) or the presenter(s) of the policies. Further, Mass Mutual, Penn Annuity, and Penn Mutual prepared the relevant policy statements listing the Josh Gardner and/or the Gardner Defendants as designated contacts.

35.    In short, Mass Mutual, Penn Annuity, and Penn Mutual put Josh Gardner and/or the Gardner Defendants in a position(s) that allowed them to make representations on behalf of the insurers for purposes of soliciting policies, soliciting

and preparing applications, acting as a point of contact for the insurers' policy holders relative to their policy statements, and in preparing and presenting policy illustrations.

36.     Among the policies Mass Mutual, Penn Mutual, and Penn Annuity appointed, authorized, and empowered Josh Gardner to solicit, produce, and sell were those that contemplated insureds entering into premium financing arrangements with premium finance companies.

37.     Indeed, included in Mass Mutual, Penn Mutual, and Penn Annuity's respective policy application materials and disclosures in this case, the insurers sought specific information from the insured about, *inter alia*, (a) whether premiums would be financed by a lender, (b) the premium lender's identity, (c) the duration of the loan, and the (d) the interest rate.



38.     At all times relevant to this lawsuit, Josh Gardner and/or the Gardner Defendants earned substantial commissions and other financial incentives and benefits from Mass Mutual, Penn Mutual, and Penn Annuity for soliciting, selling, supervising, and renewing the insurers' whole life insurance policies.

FIRST AMENDED COMPLAINT FOR DAMAGES AND JURY DEMAND - 14

39.     The Stevenson Family reasonably believed that Gardner, Summit, Capital and/or Burgess were acting as authorized agents of Mass Mutual, Penn Annuity, and Penn Mutual at all relevant times.

**B.    The Premium Finance Companies.**

40.     At all times relevant to this lawsuit and for purposes of securing premium financing for whole life insurance customers, the Gardner Defendants affiliated themselves with financial advisors, brokers, and other lending professionals at Burgess and Succession.

41.     Burgess and Succession held themselves out as "strategic partners," on whom life insurance customers can trust to create "tailored legacy plans" for them, specifically with respect to financing life insurance premiums. Indeed, Succession advertised itself as the "creator" of premium financing for life insurance.



Your Strategic Partner in Premium Financing for Life Insurance

As the creators of premium financing for life insurance, Succession Capital Alliance's experienced team constructs flexible solutions, providing invaluable expertise and designing tailored legacy plans for high-net-worth clients across the nation.

42.     The Gardner Defendants received substantial financial benefits by controlling, fostering, and facilitating the relationship between his insurance customers, like the Stevenson Family, and premium finance brokers and companies,

because the loan packages secured and delivered by the companies facilitated the purchase of much higher premiums, on which the Gardner Defendants' commissions are based.

43.     Burgess and Succession, in turn, affiliated themselves with premium finance lenders and banks, like Lake Forest, to broker and secure premium loans for customers solicited and sold on policies by the Gardner Defendants.

44.     In sum, at all times relevant to this lawsuit, Defendants worked in concert to structure and sell premium financed life insurance programs to customers, including the Stevenson Family, which included (a) life insurance policies themselves, plus (b) loans to pay the premiums therefor.

**C.     The Insureds.**

45.     The Stevenson Family are third-generation Miles City morticians.

46.     The Stevenson Family are not sophisticated financial professionals.

47.     The Stevenson Family's lawyer, Janette Jones, has advised the Stevenson Family on various legal matters for years. However, Janette Jones—like the Stevenson Family—does not hold herself out as a financial advisor or sophisticated financial professional.

48.     Instead, Janette Jones prudently and reasonably directed the Stevenson Family to rely on the financial advice of those, like the Gardner Defendants, who

hold themselves out as having expertise, knowledge, and skill to decide how to appropriately and prudently map out the Stevenson Family's estate planning goals.

49.     Over the course of decades, the Stevenson Family have worked to grow their family funeral home business, Stevenson and Sons Funeral Homes, into a pillar of many Montanans' lives.

50.     The hard-earned success of Stevenson and Sons Funeral Homes brought the Stevenson Family security, until Josh Gardner and the Gardner Defendants pulled the Stevenson Family and their business into the complex tripartite structure of premium financed life insurance.

## II.     JOSH GARDNER WIELDS HIS SPECIAL RELATIONSHIP WITH THE STEVENSON FAMILY TO PULL THEM INTO THE TRIPARTITE STRUCTURE.

51.     Josh Gardner and his family have known the Stevenson Family for generations. Over the decades, the Gardners and Stevensons have buried, married, and employed each other. The families have developed the trust and knowledge of each other as only those whose great-grandparents homesteaded the dirt of the northern Great Plains together can.

52.     Josh Gardner knew the Stevenson Family's financial goals and fears.

53.     More importantly, Josh Gardner knew the Stevenson Family's lack of financial sophistication.

54.     Most importantly, Josh Gardner knew the amount of wealth the Stevenson Family accumulated over generations of hard work.

### A. Josh Gardner's Close Relationship With The Stevenson Family Allowed Him Access, Knowledge, And Trust Beyond That Of Arm's Length Insurance Agent.

55.     Wielding Josh Gardner's knowledge of the Stevenson Family's enticing combination of wealth and lack of financial sophistication, as well as the Stevenson Family's trust in Josh Gardner, the Gardner Defendants situated and represented themselves to be the Stevenson Family's "strategic advisors," with respect to wealth management, investment, retirement and estate planning.

56.     In that role, the Gardner Defendants purported to analyze the Stevenson Family's total financial and investment portfolio. The Gardner Defendants' services to the Stevenson Family included purporting to evaluate and recommend suitable life insurance options to achieve the Stevenson Family's retirement and estate planning goals.

57.     To the extent Josh Gardner did not already know by way of his special relationship with them, the Stevenson Family conveyed to the Gardner Defendants they were risk averse, at least with respect to investment and estate planning.

58.     The Stevenson Family's investment and estate planning goals were simple. They wished to protect the wealth they built over generations for the benefit of their children, grandchildren, and the church.

59.     The Stevenson Family was *not* seeking a complex, high-risk scheme that would jeopardize their generations-built business and their legacy.

**B.      The Gardner Defendants Constructed, Pitched, and Sold the Stevenson Family on the Tripartite Financial Structure, Going Far Beyond the Mere Sale of Insurance Policies.**

60.     Armed with Josh Gardner's special insight and history with the Stevenson Family, the Gardner Defendants began pitching the Stevenson Family on structuring their financial and estate planning goals on a highly complex and extremely volatile premium financed life insurance program.

61.     The complexity of the tripartite structure the Gardner Defendants constructed for the Stevenson Family plainly went well beyond an insurance salesman procuring and selling auto coverage, as evidenced by the illustrations Josh Gardner provided to the Stevenson Family in 2013, shown below.



62.     Unlike the straightforward sale of insurance from insurance agent to insured, the structure Josh Gardner built involved the coordination of sophisticated financial professionals, including lenders and brokers, insurers, and the creation of irrevocable trusts.

63.     Indeed, the tripartite program pushed on the Stevenson Family by the Gardner Defendants involved the Gardner Defendants promoting themselves to be experts in a variety of highly skilled professions, such as financial planning, life insurance, estate planning, banking, and trust law.

64.     Further, the structure the Gardner Defendants pushed on the Stevenson Family involved the Gardner Defendants coordinating and conspiring with financial and banking experts in premium finance companies, as well as pointing to and relying on the underwriting experts and professionals working in the bowels of the Mass Mutual, Penn Mutual, and Penn Annuity.

### 1.     Step 1: Josh Gardner Directs the Stevenson Family to Create the Irrevocable Life Insurance Trusts.

65.     The Gardner Defendants' pitch began as early as 2013, but no later than 2014, when Josh Gardner directed Todd to create an irrevocable life insurance trust that would be the owner of two of the whole life insurance policies the Gardner Defendants would sell Todd next.

66.    In particular, in 2013 or 2014, Josh Gardner instructed Todd to create the Todd Stevenson 2013[4] Irrevocable Family Trust.

67.    Burgess involved itself immediately in step one of building the Gardner Defendants' premium financed life insurance structure by recommending to the Stevenson Family a Utah law firm for the purpose of creating irrevocable trusts.

68.    Todd did as Josh Gardner and other Defendants instructed, and created the Todd Stevenson 2013 Irrevocable Family Trust.

69.    Todd would not have created the Todd Stevenson 2013 Irrevocable Family Trust, but for Josh Gardner's direction that it was the appropriate and suitable course with respect to the Stevenson Family's estate planning goals.

70.    Janette Jones was and remains the trustee for the Todd Stevenson 2013 Irrevocable Family Trust.

71.    Josh Gardner did the same in 2017, when he directed Terri to create the Terri L. Stevenson 2016 Irrevocable Family Trust that would be the owner of the whole life insurance policies the Gardner Defendants would sell Terri next.

72.    Terri did as Josh Gardner instructed, and created the Terri L. Stevenson 2016 Irrevocable Family Trust.

---

[4] Although named the Todd Stevenson 2013 Irrevocable Family Trust, the Trust Agreement is dated June 12, 2014.

73.    Terri would not have created the Terri L. Stevenson 2016 Irrevocable Family Trust, but for Josh Gardner's direction that it was the appropriate and suitable course with respect to the Stevenson Family's estate planning goals.

74.    Janette Jones was and remains the trustee for the Terri L. Stevenson 2016 Irrevocable Family Trust.

75.    Again in 2017, Josh Gardner directed that Todd create the Todd F. Stevenson Irrevocable Life Insurance Trust that would be the owner of additional whole life insurance policies the Gardner Defendants would go on to sell Todd next.

76.    Todd did as Josh Gardner instructed, and created the Todd F. Stevenson Irrevocable Life Insurance Trust.

77.    Todd would not have created the Todd F. Stevenson Irrevocable Life Insurance Trust, but for Josh Gardner's direction that it was the appropriate and suitable course with respect to the Stevenson Family's estate planning goals.

78.    Janette Jones was and remains the trustee for the Todd F. Stevenson Irrevocable Life Insurance Trust.

79.    Again in 2017, Josh Gardner recommended that Joe create the Joseph D. Stevenson Irrevocable Life Insurance Trust.

80.    Joe did as Josh Gardner directed, and created the Joseph D. Stevenson Irrevocable Life Insurance Trust.

81.     Joe would not have created the Joe D. Stevenson Irrevocable Life Insurance Trust, but for Josh Gardner's direction that it was the appropriate and suitable course with respect to the Stevenson Family's estate planning goals.

82.     Janette Jones was and remains the trustee for the Joseph D. Stevenson Irrevocable Life Insurance Trust.

### 2.     Step 2: Josh Gardner Sells the Stevenson Family Massive Whole Life Insurance Policies.

83.     With the first Stevenson Family irrevocable life insurance trust created in 2014, Josh Gardner and the Gardner Defendants began the lucrative (for them) process of selling enormous (and unsuitable) Mass Mutual, Penn Mutual, and Penn Annuity policies to the Stevenson Family.

84.     Josh Gardner started with Todd, by soliciting, pitching, and selling him two Mass Mutual whole life insurance policies (together, the "2014 Todd Policies").

85.     The 2014 Todd Policies are numbered 21364008 and 21359917 and owned by the Todd Stevenson 2013 Irrevocable Family Trust, with Todd Stevenson as the insured.

86.     The Todd Policies have enormous face values. The 2014 Todd Policy No. 21359917 had an initial face value of $7,500,000, and was apparently issued on August 11, 2014. The 2014 Todd Policy No. 21364008 had an initial face value of $10,000,000, and was apparently issued on August 19, 2014.

87.    Defendants failed to appropriately analyze and consider the suitability and size of the combined $17.5 million death benefit Josh Gardner solicited and sold to Todd, given the Stevenson Family's net worth and other underwriting factors and guidelines.

88.    Instead, the Gardner Defendants' sole focus was not suitability and security for the risk-averse Stevenson Family, but rather the sale of enormous policies—with commensurately enormous premiums—to generate the highest commissions for themselves.

89.    The 2014 Todd Policies' performance illustrations were produced by Mass Mutual and presented to the Stevenson Family by Gardner or those acting on Gardner's or the other Defendants' behalf.

90.    Josh Gardner's misrepresentations about the stability and suitability of the premium financed structure began right away, as evidenced by a 2014 email to Janette Jones and Todd, wherein Josh Gardner promised them that the purchasing two Mass Mutual policies, Todd could surrender and walk away right then with "$10 million of cash."

//

//

//

//



**From:** jqgardner1 . [mailto:jqgardner@gmail.com]
**Sent:** Wednesday, May 14, 2014 9:05 AM
**To:** Todd Stevenson; Jeannette Jones
**Subject:** Please respond

Hey there, wanted to run some new numbers by you.

Mass Mutual has the capacity now to take all of the 17.5 Million instead of the original 10M like we were planning on. This just happened yesterday, I talked to Todd last night and ran new numbers today that I want to share with you. We would need some more blood and updated financials but these numbers may warrant some work on our end if you agree.

This is the benefit of having it all with Mass
1.) The annual premium is $57,374 less per year, a savings of $573,740 on a 10 year policy, which in turn saves you $83,604 of interest over the 10 years.. *The annual premium savings offsets the interest cost on the loan at Stockman.....*

                                                    1                                    5/14/2014 10:42 AM
                                                                                                Janette
                                                                                         ST00016

2.) Mass allows the interest to accrue and not be paid annually.

3.) I was worried about the performance being diminished on less funding and that IS NOT the case. **At age 80 if we put it all at Mass the cash value is over $2M greater and the death benefit is$3.1M greater than if we put some with Mass and some with Ohio. The loan balance would be approx $18.8M and the gross death benefit is over $38M, for a net $20M to the trust. The gross cash value at this point is over $28M so if you wanted to surrender the policy and walk away you would leave with $10M of cash...**

Pretty strong when you consider that all this will be accomplished for the net difference between Stockman interest and the earnings at Geneva.

If we want to pursue this we should jump on it right now and get paperwork started for the additional $7.5M with Mass.......

Let me know your thoughts ASAP!
--
*Josh Gardner*
*Summit Financial Group*
*312 Whitney Lane Suite 3*
*Sheridan Wyoming 82801*

*307-655-8393 office*
*406-698-7963 cell*

91.     Energized by the commissions and incentives earned by talking Todd into purchasing the Mass Mutual policies, and reassuring and misrepresenting to the Stevenson Family at annual meetings thereafter on the strength and stability of the premium financed structure paying for the policies, as alleged further below, Josh Gardner knew he had the Stevenson Family hooked.

92.     So, Josh Gardner moved onto Terri next, soliciting, pitching, and selling Terri a Mass Mutual life insurance policy and a Penn Mutual life insurance

policy (together, the "2017 Terri Policies"). The 2017 Terri Policies were assigned the Terri L. Stevenson 2016 Irrevocable Family Trust shortly after purchase.

93.    The 2017 Terri Policies, too, have enormous face values. The 2017 Terri Mass Mutual Policy No. 22384117 had an initial face value and initial supplement rider value totaling $10,000,000, and was apparently issued on January 5, 2017. The 2017 Terri Penn Mutual Policy No. 267306690 had an initial face value plus initial supplement rider value totaling $5,000,000, and was apparently issued on January 18, 2017.

94.    Defendants failed to appropriately analyze and consider the suitability and size of the combined death benefit Josh Gardner solicited and sold to Terri, given the Stevenson Family's net worth and other underwriting factors and guidelines.

95.    Instead, the Gardner Defendants' sole focus was not suitability and security for the risk-averse Stevenson Family, but rather the sale of enormous policies—with commensurately enormous premiums—to generate the highest commissions for themselves.

96.    The 2017 Terri Policies' performance illustrations were produced by Mass Mutual and Penn Mutual and presented to the Stevenson Family by Josh Gardner or those acting on Josh Gardner's or the other Defendants' behalf.

97.     Enormous commissions from Mass Mutual and Penn Mutual drove Josh Gardner's motivation to pitch Terri on purchasing the policies, with a combined face value of $15 million.

98.     Josh Gardner moved onto T.J., next, soliciting, pitching, and selling T.J. a Mass Mutual Life Insurance Policy and a Penn Annuity Accumulation Builder Select Universal Indexed Life Insurance Policy (together, the "2017 T.J. Policies").

99.     The T.J. Policies, again, have enormous face values. The 2017 T.J. Penn Annuity Policy No. 92433340 had an initial face value of $10,000,000, and was apparently issued on October 17, 2017. The 2017 T.J. Mass Mutual Policy No. 22486207 had an initial face value plus an initial supplement rider value totaling $2,000,000, and was apparently issued on December 1, 2017.

100.     Defendants failed to appropriately analyze and consider the suitability and size of the combined death benefit Josh Gardner solicited and sold to T.J., given the Stevenson Family's net worth and other underwriting factors and guidelines.

101.     Instead, the Gardner Defendants' sole focus was not suitability and security for the risk-averse Stevenson Family, but rather the sale of enormous policies—with commensurately enormous premiums—to generate the highest commissions for themselves.

102.   The 2017 T.J. Policies' performance illustrations were produced by Mass Mutual and Penn Annuity and presented to the Stevenson Family by Josh Gardner or those acting on Josh Gardner's or the other Defendants' behalf.

103.   Enormous commissions from Mass Mutual and Penn Annuity drove Josh Gardner's motivation to pitch the policies to T.J.

104.   Fueled by the piles of commissions already earned, Josh Gardner turned back to Todd in 2017, recommending Todd's other trust, the Todd F. Stevenson Irrevocable Life Insurance Trust, purchase a Penn Annuity Guaranteed Life Insurance Policy (the "2017 Todd Policy").

105.   The 2017 Todd Policy No. 2746933, had an initial face value plus initial supplement rider value totaling $11,500,000, and was apparently issued on August 25, 2017.

106.   Defendants failed to appropriately analyze and consider the suitability and size of the death benefit Josh Gardner solicited and sold to Todd, given the Stevenson Family's net worth and other underwriting factors and guidelines.

107.   Instead, the Gardner Defendants' sole focus was not suitability and security for the risk-averse Stevenson Family, but rather the sale of enormous policies—with commensurately enormous premiums—to generate the highest commissions for themselves.

108.   The 2017 Todd Policy's performance illustrations were produced by Penn Annuity presented to the Stevenson Family by Josh Gardner or those acting on Josh Gardner's or the other Defendants' behalf.

109.   Enormous commissions from Penn Annuity drove Josh Gardner's motivation to pitch the policy to Todd.

110.   Josh Gardner finished up his run on the Stevenson Family with Joe in 2017, when on Josh Gardner's recommendation, the Joseph D. Stevenson Irrevocable Life Insurance Trust purchased a Penn Mutual Guaranteed Life Insurance Policy (the "2017 Joe Policy").

111.   The 2017 Joe Policy No. 2746927 had an initial face value plus initial supplement rider value totaling $11,500,000.00 and was apparently issued on August 25, 2017.

112.   Defendants failed to appropriately analyze and consider the suitability and size of the death benefit Josh Gardner solicited and sold to Joe, given the Stevenson Family's net worth and other underwriting factors and guidelines.

113.   Instead, the Gardner Defendants' sole focus was not suitability and security for the risk-averse Stevenson Family, but rather the sale of enormous policies—with commensurately enormous premiums—to generate the highest commissions for themselves.

114.  The 2017 Joe Policy's performance illustrations were produced by Penn Mutual presented to the Stevenson Family by Josh Gardner or those acting on Josh Gardner's or the other Defendants' behalf.

115.  Enormous opening commissions from Penn Mutual drove Josh Gardner's motivation to pitch the policy to Joe.

116.  Indeed, on every sale of every policy, the Gardner Defendants were paid commissions and received other financial benefits and incentives from Mass Mutual, Penn Mutual, and Penn Annuity.

117.  For the Gardner Defendants, the bigger the policy, the bigger the commission from the insurers. Thus, the Gardner Defendants were incentivized not to ensure the suitability of the policies they sold the Stevenson Family, but to inflate the size of the policies and the amount of the premiums to be paid and sell as many as they could convince the Stevenson Family they could afford to buy.

118.  Collectively, the Stevenson Family purchased the 2014 Todd Policies, the 2017 Terri Policies, the 2017 T.J. Policies, the 2017 Todd Policy, and the 2017 Joseph Policy (together, the "Life Insurance Policies") relying on evaluations, recommendations, illustrations, projections, and instructions Josh Gardner provided to them.

119.  As discussed further below, the Stevenson Family would not have purchased the Life Insurance Policies but for Josh Gardner and other Defendants'

representations that premium financed loan packages would provide a secure and stable method of paying for the policies.

3. **Step 3: The Gardner Defendants and the Premium Finance Companies Solicit and Package Loans to Pay for the Stevenson Family's Premiums.**

120.   At the same time the Gardner Defendants solicited, pitched, and sold the Stevenson Family on the Life Insurance Policies, the Gardner Defendants and the premium finance professionals—Burgess, Succession, and Lake Forest— worked in concert to package and secure loans that would purportedly pay the enormous premiums.

121.   As alleged previously, the insurance Defendants knew about, condoned, and encouraged Josh Gardner to invite the Stevenson Family into the volatile "tripartite relationship" with insurers and premium finance companies.

122.   Coordinating with the Gardner Defendants at every turn, Burgess and/or Succession solicited and brokered loan packages from US Bank and/or Lake Forest to pay the premiums on the enormous life insurance policies the Gardner Defendants sold to the Stevenson Family.



123.   Burgess, Succession, and Lake Forest created loan illustrations curated and customized to show the Stevenson Family how the loan packages would pay the premiums on the enormous Life Insurance Policies the Gardner Defendants were selling or had already sold to them.

124.   Throughout their relationship with the Stevenson Family, Burgess, Succession, and Lake Forest provided loan package illustrations to the Stevenson Family either directly or through the Gardner Defendants, for example:



125.   The premium loan illustrations provided to the Stevenson Family by Lake Forest, Succession Capital, and the Gardner Defendants forecast an interest rate environment wherein rates never rose above five percent.

126.   At no time did any Defendant provide the Stevenson Family with information about what would happen to the structure Josh Gardner constructed if interest rates rose beyond the illustrations provided to them.

127.   Under the favorable interest rate environment illustrated and sold by the Gardner Defendants and premium finance companies, the Stevenson Family

reasonably believed the Life Insurance Policies' performance would outpace the loan balances.

128.  Put slightly differently, the Gardner Defendants, working in concert with the premium finance companies, convinced the Stevenson Family that taking out enormous loans to pay the equally enormous premiums was not actually risky in view of the Life Insurance Policies themselves. If the scheme worked as pitched, the Stevenson Family would never have to pay the loan principal or interest because the Life Insurance Policies would accumulate sufficient cash value to cover both.

129.  In short, the Stevenson Family relied on and believed Josh Gardner when he represented to them, repeatedly and over the course of a decade, that the tripartite relationship he constructed for them would not collapse.

130.  Through the sale of enormous policies to the Stevenson Family, with commensurately massive premiums, the Gardner Defendants, Burgess, Succession, and Lake Forest collected huge commissions and other financial benefits.

### C.  The Tripartite Structure Collapses on the Stevenson Family in a Way the Defendants Promised It Wouldn't.

131.  In 2017, Josh Gardner was riding the high of the enormous commissions earned on the backs of the Stevenson Family entering into the tripartite premium financed relationship.

132.  So, he doubled down.

133.   Specifically, Josh Gardner encouraged the Stevenson Family to increase their insurance, and promised them doing so would "keep the loan balance from getting out of control."

| From: | Josh Gardner <jqgardner@gmail.com> |
|---|---|
| Sent: | Monday, January 23, 2017 5:16 PM |
| To: | Janette Jones; Todd Stevenson; Terri Stevenson - Stevenson & Sons |
| Subject: | Insurance Recap |

I got confirmation today that everything was finalized last week. We are all done!

It's pretty incredible when you think about it that between both policies you have 32 million of coverage that will be paid up in 10 years and your cost for that is $14k a year for the letter of credit! If you had term instead your premiums would be over $100k a year!

Taking the savings from what you had been paying for the LOC (12k a year) and what you paid for Terris term policies (40k a year) to service the interest on this loan is something I highly recommend that you do. Although not necessary it will make collateral come off the table sooner and keep the loan balance from getting out of control.

All the best,

JQG

134.   But in 2023, "out of control" is exactly what the Stevenson Family's loan balances got.

135.   Interest rates rose from historically low levels and the Stevenson Family's premium loans were not immune.

136.   In May of 2023, Josh Gardner finally revealed to the Stevenson Family that, in "today's environment," the cost of the premium loans was far more expensive than he and the premium finance companies had projected and illustrated.

As requested here are the renewal estimates based on today's environment. Please understand that this is a 60 day estimate and things could change either way before the rate lock date of 5/7/23. These numbers are the result of using 6.51% as the renewal rate. The actual rate won't be locked in until 30 days before the renewal date.

"For the 6/7/23 renewal, the interest would be roughly $634k and based on these projections the client will need to post roughly $400k in collateral to secure for only the 6/7 renewal."

I am in the process of double checking their numbers and the math they used to make sure it's accurate and to see if there will be adjustment made in the crediting rate on the policies. Anything that I find would change those numbers for the better, but unknown at this time what the renewal interest rate will be.....

Although premature, I wanted you to have this information as soon as I did.

All the best,

137.    In particular, interest rates on the premium loans had risen significantly above the 3.040-5.00 percent rates modeled, illustrated, and sold to the Stevenson Family by Lake Forest, Succession, Burgess, and the Gardner Defendants.

138.    In short, the favorable interest rate environment on which two arms of the tripartite relationship had promised the third arm would safely afford the enormous Life Insurance Policies, had evaporated.

139.    Now, the assets did not match the liabilities, as the Stevenson Family had been led to believe they would. In an environment of interest rates above 5.000 percent (an environment not illustrated or otherwise conveyed by Defendants to the Stevenson Family), policy dividends decreased, while the balance due on the loans skyrocketed.

140.    In her July 2023 notes, in one word, Janette Jones summed up her shock at the magnitude of the financial catastrophe facing the Stevenson Family as a consequence of an interest rate environment never disclosed, discussed, or illustrated to them. "Wow."



141.   Plaintiffs, including the family business as guarantor of at least one of the "out of control" loans, now must reckon with the consequences of the Gardner Defendants pulling them deep underwater on a structure Josh Gardner promised them would float.

142.   To date, the debt service of the premium loans has outpaced the valuation of Life Insurance Policies by roughly $8,000,000—a delta which will continue to increase over time.

143.   On information and belief, the Stevenson Family have incurred damages that are three-to-ten times the outpaced loan balance when the Life Insurance Policies are compared to safer and more suitable investments.

**D.    Defendants' Misrepresentations and Omissions about the Tripartite Structure.**

144.   At no time did Gardner Defendants discuss or communicate other insurance options or lower, non-financed insurance options to the Stevenson Family, or any other estate planning alternative. Why would they? The premium financed insurance structure allowed the Gardner Defendants to procure and sell larger policies, with larger premiums, that resulted in larger commissions.

145.   To that end, and while acting as the actual or apparent authorized agents of Mass Mutual, Penn Annuity, and Penn Mutual in soliciting and preparing the applications for the Life Insurance Policies, and in presenting the illustrations to the Stevenson Family, the Gardner Defendants, Burgess, Succession, and/or Lake Forest made catastrophic misrepresentations and omissions to the Stevenson Family about the suitability and propriety of the tripartite relationship.

146.   First, for example, the Gardner Defendants omitted pages of policy performance illustrations which were required to be disclosed to the Stevenson Family before the Life Insurance Policies were purchased.

147.   By withholding certain pages illustrations, the Stevenson Family were given a false or misleading representation of the likely performance of the Life Insurance Policies themselves.

148.   More critically, though, the Gardner Defendants—along with Succession, Burgess, and Lake Forest—failed to disclose the consequences of that would follow if interest rates rose above those the Defendants forecast and illustrated.

149.   Indeed, the Gardner Defendants and the premium finance companies—Burgess, Lake Forest, and Succession—specifically and explicitly painted a picture where the interest rate environment would never rise above five percent.

150. The structure of the tripartite relationship is complex and volatile. If one leg collapses, the others give way. The scheme depends on the costs on the premium loans over the long term being less than the returns on the insurance policies. Otherwise, the policyholder is forced to come up with the significant capital necessary to pay back the premium loans, interest, and fees.

151. The Stevenson Family should have been told that the premium finance company leg would collapse if interest rates rose too high, and the other legs would follow.

152. Defendants did not make these risks apparent to the Stevenson Family in any way, nor were the risks apparent from the face of the Life Insurance Policies themselves, nor the premium finance illustrations provided by Burgess, Succession, and Lake Forest.

153. Moreover, even if the Stevenson Family were financially sophisticated—which they aren't—Defendants' misrepresentations and omissions about the consequences of a rising interest rate environment do not necessarily conflict with vague policy language about potential risk and fluctuation. That is to say, the Stevenson Family understood the risks as they were pitched to them. They did not understand the risks that were omitted or misrepresented.

154. Moreover, the Life Insurance Policies were not suitable to achieve the Stevenson Family's stated goals of tax-free income at retirement and risk-averse

estate-planning. Due to the underlying investment components that drove the respective lenders' valuations of these products, the Life Insurance Policies would underperform the product offerings and would be insufficient to outpace the ever-growing debt service of the loans.

155.    For purposes of structuring these types of products, the Defendants should have, *inter alia*, determined whether the Life Insurance Policies were actually appropriate for Stevenson Family in the first instance, determined whether the Life Insurance Policies, if appropriate, were appropriately sized, determined whether the tripartite structure of premium financing was the appropriate way for the Stevenson Family to pay for the Life Insurance Policies, and examined a long-term record of the same or similar lending sources to assess the probability of success.

156.    However, Defendants instead only examined and provided the Stevenson Family with illustrations based on a short-term lending environment and an environment with historically low interest rates.

157.    The Stevenson Family reasonably relied on the professional advice of Defendants when they decided to buy the Life Insurance Policies and enter the tripartite relationship with the insurers and premium finance professionals.

158.    The Stevenson Family had the right to rely on Defendants to properly advise them regarding the risks, benefits, and suitability of the Life Insurance Policies and the tripartite premium financed structure.

159.   The Stevenson Family did not know and could not have known that Defendants failed to competently advise them.

160.   The Stevenson Family did not know and could not have known that Defendants provided them with false and misleading assurances about the safety and suitability of the Life Insurance Policies and the tripartite structure.

161.   Due to the nature of Defendants' omissions and misrepresentations, the Stevenson Family did not and could not have discovered Defendants' misconduct and the damages they suffered as a result until the 2023 renewal period, at the earliest.

## COUNTS

## COUNT ONE – NEGLIGENCE
### ORDINARY AND PROFESSIONAL
### (All Defendants)

162.   Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as though fully set forth herein.

163.   Mass Mutual, Penn Annuity, and Penn Mutual are vicariously liable for the breaches, negligent acts, misrepresentations, and omissions of their apparent and actual agents, the Gardner Defendants, Burgess, Succession, and Lake Forest.

164.   Every Defendant in this case owed a duty of ordinary care as well as reasonable care to the Stevenson Family in compliance with the standards of care

applicable to the professionals they held themselves out to the Stevenson Family to be, *i.e.,* financial planners, bankers, estate planners, and life insurance professionals.

165.   In underwriting and selling life insurance policies to life insurance customers, insurers owe a duty of good faith and fair dealing, which includes a duty to conducting reasonable suitability analyses and underwriting with respect to the propriety and size of life insurance products sold.

166.   In underwriting, packaging, and brokering loans to finance premiums for life insurance policies, premium finance companies owe a duty of good faith and fair dealing, which includes a duty to conducting reasonable suitability analyses and underwriting with respect to the propriety and size of life insurance products sold.

167.   In soliciting, procuring, and selling life insurance services for a life insurance customer, a life insurance agent has the duty to use the degree of learning and skill ordinarily used by life insurance professionals working in the same field of insurance and under similar circumstances.

168.   A life insurance agent's duty of care when he acts as a life insurance agent at least includes those under Montana statute and regulations. For example, a life insurance agent owes a duty to accurately represent pertinent facts related to the coverages at issue. *See* Mont. Code Ann. § 33-18-201. For another example, a life insurance agent owes a duty not to "make, issue, circulate, or cause to be made, issued, or circulated any estimate, illustration, circular, sales presentation, omission,

comparison, or statement which misrepresents the benefits, advantages, conditions, or terms of any insurance policy." *See* Mont. Code Ann. § 33-18-202(1). For yet another relevant example, a life insurance agent owes a duty not to "make, issue, circulate, or cause to be made, issued, or circulated any estimate, illustration, circular, sales presentation, omission, comparison, or statement which is a misrepresentation for the purpose of effecting . . . an assignment of or effecting a loan against any insurance policy." *See* Mont. Code Ann. § 33-18-202(7). Finally, a life insurance agent owes a duty not to "use or describe non-guaranteed elements in a manner that is misleading or has the capacity or tendency to misled." Mont. R. Amin. § 6.6.706(2)(b), (c).

169.    In performing financial and/or estate planning services for an insurance customer, life insurance agents and premium finance companies have a duty to use the degree of learning and skill ordinarily used by financial and estate planning professionals working in the same field of financial or estate planning and under similar circumstances.

170.    As previously alleged, the Gardner Defendants acted not only as life insurance agents to the Stevenson Family, but also held themselves out as financial planners, estate planners, trust lawyers, and banking experts.

171.    Defendants breached their respective duties of ordinary and professional care by, *inter alia*: weaponizing long-term relationships of trust to

convince the Stevenson Family that Defendants were skilled, knowledgeable, and qualified to safely and suitably structure the highly complex premium financed scheme; misrepresenting the loan interest rates applicable to the packages brokered by the premium finance companies; failing to disclose to the Stevenson Family the reasonably foreseeable consequences of an interest rate environment that exceeded 5.000 percent; failing to conduct reasonable suitability analyses to determine if the Life Insurance Policies were appropriately sized for the Stevenson Family's estate planning goals; failing to conduct reasonable underwriting to determine if the loan packages to finance the premiums were suitable for the Stevenson Family.

172.   At bottom, Defendants breached their respective duties of ordinary and professional care by failing to explain, in terms a layperson can understand or at all, the nature of the significant risks that may be encountered as a result of the premium financed insurance products the Gardner Defendants sold to the Stevenson Family.

173.   But for the Defendants' breach of their respective duties of ordinary and professional care, the Stevenson Family would not have entered into the volatile and high-risk tripartite relationship of premium financed life insurance and would not have suffered catastrophic financial damages that flowed therefrom.

174.   The Defendants' breaches of their respective duties of ordinary and professional care were a substantial factor in causing the Stevenson Family's catastrophic financial damages.

175.    The Defendants' breaches of their respective duties of ordinary and professional care increased the risk of harm to the Stevenson Family and/or reduced the Stevenson Family's chances of obtaining a better result.

176.    The Defendants' breaches of their respective duties of ordinary and professional care arose, centrally, from Defendants' failure to disclose all material facts relating to the proposed premium financed life insurance structure, such that the Stevenson Family's consent to the structure was not based on an intelligent exercise of judgment.

177.    The Stevenson Family did not cause or contribute to their damages in any way.

178.    The Stevenson Family is entitled to compensation for the damages caused by Defendants' misconduct.

## COUNT TWO – NEGLIGENT MISREPRESENTATION
### (All Defendants)

179.    Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as though fully set forth herein.

180.    Mass Mutual, Penn Annuity, and Penn Mutual are vicariously liable for the acts, misrepresentations, and omissions of their apparent and actual agents, Gardner Defendants, Burgess, Succession, and Lake Forest.

181.    Defendants solicited, recommended, and sold the Life Insurance Policies and the premium financing packages to the Stevenson Family on the false

notion and misrepresentation that, *inter alia*, the tripartite premium financed scheme was suitable and appropriate for the Stevenson Family's financial circumstances and stated goals, without any reasonable grounds for believing the structure was appropriate and suitable for the Stevenson Family's financial circumstances and stated goals, and further misrepresented the interest rates applicable to the loan packages solicited and sold to the Stevenson Family.

182.   In particular, on various occasions since 2014, the Gardner Defendants and premium finance companies (Burgess, Succession, and Lake Forest), misrepresented affirmatively or by omission the volatile nature of the relationship into which they were entering.

183.   For example, in 2014, Josh Gardner encouraged Todd to purchase two enormous Mass Mutual policies and finance the premiums therefor, with the explicit promise that the "annual premium savings offsets the interest costs on the loans," and told Todd further that he could surrender the policy right then and walk away with $10 million. Josh Gardner's representation was not a statement of future event or opinion, but rather an assurance of what *would be* if Todd followed his advice. Further, nowhere in Josh Gardner's promises about the benefits of the scheme, did he disclose the risks of a hostile interest rate environment. Put differently, Josh Gardner framed his unqualified representations as existing material fact.



**From:** jqgardner1 . [mailto:jqgardner@gmail.com]
**Sent:** Wednesday, May 14, 2014 9:05 AM
**To:** Todd Stevenson; Jeannette Jones
**Subject:** Please respond

Hey there, wanted to run some new numbers by you.

==Mass Mutual has the capacity now to take all of the 17.5 Million== instead of the original 10M like we were planning on. This just happened yesterday, I talked to Todd last night and ran new numbers today that I want to share with you. We would need some more blood and updated financials but these numbers may warrant some work on our end if you agree.

==This is the benefit of having it all with Mass==
1.) The annual premium is $57,374 less per year, ==a savings of $573,740 on a 10 year policy, which in turn saves you $83,604 of interest over the 10 years.. *The annual premium savings offsets the interest cost on the loan at Stockman.....*==

                                1                       5/14/2014 10:42 AM
                                                                Janette
                                                        ST00016

2.) Mass allows the interest to accrue and not be paid annually.

3.) I was worried about the performance being diminished on less funding and that IS NOT the case. **At age 80 if we put it all at Mass the cash value is over $2M greater and the death benefit is$3.1M greater than if we put some with Mass and some with Ohio. The loan balance would be approx $18.8M and the gross death benefit is over $38M, for a net $20M to the trust. The gross cash value at this point is over $28M so if you** ==wanted to surrender the policy and walk away you would leave with $10M of cash...==

Pretty strong when you consider that all this will be accomplished for the net difference between Stockman interest and the earnings at Geneva.

If we want to pursue this we should ==jump on it right now== and get paperwork started for the additional $7.5M with Mass.......

Let me know your thoughts ASAP!
--
*Josh Gardner*
*Summit Financial Group*
*312 Whitney Lane Suite 3*
*Sheridan Wyoming 82801*

*307-655-8393 office*
*406-698-7963 cell*

184.  For yet another example, in 2017 Josh Gardner encouraged the Stevenson Family to take out *more* life insurance, promising them that doing so would "keep the loan balance from getting out of control." Again, Josh Gardner's 2017 representation was not cabined by any opinion or uncertainty. Josh Gardner spoke with concrete certainty about what *would be* if the Stevenson Family took his advice. Put differently, Josh Gardner framed his unqualified representations as existing material fact.

| | |
|---|---|
| **From:** | Josh Gardner <jqgardner@gmail.com> |
| **Sent:** | Monday, January 23, 2017 5:16 PM |
| **To:** | Janette Jones; Todd Stevenson; Terri Stevenson - Stevenson & Sons |
| **Subject:** | Insurance Recap |

I got confirmation today that everything was finalized last week. We are all done!

It's pretty incredible when you think about it that between both policies you have 32 million of coverage that will be paid up in 10 years and your cost for that is $14k a year for the letter of credit! If you had term instead your premiums would be over $100k a year!

Taking the savings from what you had been paying for the LOC (12k a year) and what you paid for Terris term policies (40k a year) to service the interest on this loan is something I highly recommend that you do. Although not necessary it will make collateral come off the table sooner and keep the loan balance from getting out of control.

All the best,

JQG

185.   Defendants' unqualified misrepresentations, as exemplified above, about the suitability and performance of the premium financed life insurance structure were untrue. Of course, Josh Gardner could not promise that loan balances would not get out of control, but that's what he did. Of course, Josh Gardner could not promise that taking out massive life insurance policies would yield a certain walk-away amount given the variability of interest rates, but that's what he did.

186.   Further, the premium finance companies (Burgess, Succession, and Lake Forest) misrepresented the interest rate environment the Stevenson Family could anticipate impacting their involvement in the tripartite relationship.

187.   As alleged previously, capping the interest rate projection at 5.000 percent was not only unreasonable, given historical fluctuations, but also proved to be untrue, when interest rates skyrocketed past 5.000 in 2023.

188.   Defendants had no reasonable basis for their misrepresentations about the Life Insurance Policies' performance, the loan interest rates, or the risks to the Stevenson Family.

189.   Defendants made the representations to the Stevenson Family for the sole purpose of inducing them to purchase the enormous Life Insurance Policies and take out loans to pay the premiums.

190.   The Stevenson Family had no reason to be aware of the falsity of Defendants omissions and misrepresentations. The Stevenson Family trusted the advice of Josh Gardner, who held himself out as a skilled, knowledgeable, and trained financial, estate, and insurance professional.

191.   The Stevenson Family was justified in relying on Defendants misrepresentations, as they did not directly contradict any disclaimers or warnings in the Life Insurance Policies themselves. The Stevenson Family understood the risks associated with the tripartite relationship as Josh Gardner and the premium finance professionals erroneously framed them.

192.   Given the disparity of information and power, the Stevenson Family had no way of learning the falsity of Defendants' misrepresentation about the suitability of the Life Insurance Policies.

193.   The Stevenson Family acted in reliance upon the truth of Defendants' misrepresentation by purchasing the Life Insurance Policies, believing the Life Insurance Policies to be suitable for their stated goals.

194.   At bottom, Defendants breached their respective duties of ordinary and professional care by failing to explain, in terms a layperson can understand or at all, the nature of the significant risks that may be encountered as a result of the premium financed insurance products the Gardner Defendants sold to the Stevenson Family.

195.   But for Defendants' misrepresentations, the Stevenson Family would not have entered into the volatile financial relationship of premium financed life insurance and would not have to have suffered the catastrophic financial damages that flowed therefrom.

196.   Defendants' misrepresentations were a substantial factor in causing the Stevenson Family's catastrophic financial damages.

197.   Defendants' misrepresentations increased the risk of harm to the Stevenson Family and/or reduced the Stevenson Family's chances for obtaining a better result.

198.   Defendants' misrepresentations arose, centrally, from Defendants' failure to disclose all material facts relating to the proposed premium financed life insurance structure, such that the Stevenson Family's consent to the structure was not based on an intelligent exercise of judgment.

199.   The Stevenson Family did not cause or contribute to their damages in any way.

200.   The Stevenson Family is entitled to compensation for the damages caused by Defendants' misconduct.

## COUNT THREE – BREACH OF FIDUCIARY DUTY
### (All Defendants)

201.   Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as though fully set forth herein.

202.   Based on the special relationship between financial and insurance advisors and their clients, every Defendant owed the Stevenson Family the duty of a fiduciary, including, but not limited to: the duty of loyalty and utmost good faith; the duty of candor; the duty to refrain from self-dealing; the duty to protect the Stevenson Family from harm; the duty to refrain from wielding power to cause the Stevenson Family harm; the duty of fair and honest dealing; and the duty of full disclosure.

203.   Mass Mutual, Penn Annuity, and Penn Mutual are vicariously liable for fiduciary breaches by their apparent and actual agents, Gardner Defendants, Burgess, Succession, and Lake Forest.

204.   Gardner Defendants, Succession, Burgess, and Lake Forest, each developed, curated, and fostered a special relationship of trust between themselves and the Stevenson Family, all to convince the Stevenson Family to purchase

enormous life insurance policies and take out equally enormous loans to pay for them.

205.  Among other things, Gardner Defendants, Succession, Burgess, and Lake Forest held themselves out to the Stevenson Family as experts not only in life insurance, but also in financial and estate planning, and the creation of highly complex irrevocable trusts, and qualified to navigate and balance the tripartite premium finance scheme in a way that it would not collapse.

206.  The Gardner Defendants, in particular, wielded their close personal relationship with the Stevenson Family to entice them into believing the rosy, too-good-to-be-true picture he painted for their simple estate planning goals.

207.  Defendants breached the duty of fiduciaries by, *inter alia*: failing to act fairly and equitably in their transactions with the Stevenson Family; failing to act with utmost good faith; placing their financial interests ahead of the Stevenson Family's; and failing to fully and fairly disclose all material information to the Stevenson Family.

208.  More specifically, Defendants: recommended the Stevenson Family involve themselves in the premium financed life insurance scheme without full disclosure of the risks involved, and without ascertaining or analyzing whether the paradigm was suitable for their circumstances and stated goals; failed to fully and fairly disclose the substantial risks associated with the premium financed life

insurance structure; and failed to fully and fairly disclose other Defendants' involvement and benefits received from the Stevenson Family's involvement in the tripartite structure.

209.   Defendants' breaches caused catastrophic financial damages to the Stevenson Family.

210.   At bottom, Defendants breached their fiduciary duties by failing to explain, in terms a layperson can understand or at all, the nature of the significant risks that may be encountered as a result of the premium financed insurance products the Gardner Defendants sold to the Stevenson Family.

211.   But for Defendants' breaches, the Stevenson Family would not have entered into the volatile financial scheme that is premium financed life insurance, and would not have suffered the catastrophic financial damages that flowed therefrom.

212.   Defendants' breaches were a substantial factor in causing the Stevenson Family's catastrophic financial damages.

213.   Defendants' breaches increased the risk of harm to the Stevenson Family and/or reduced the Stevenson Family's chances of obtaining a better result.

214.   Defendants' breaches arose, centrally, from Defendants' failure to disclose all material facts relating to the proposed premium financed life insurance

structure, such that the Stevenson Family's consent to the structure was not based on an intelligent exercise of judgment.

215.   The Stevenson Family did not cause or contribute to their damages in any way.

216.   The Stevenson Family is entitled to compensation for the damages caused by Defendants' misconduct.

### COUNT FOUR – STATUTORY VIOLATIONS
#### MONT. CODE ANN. §§ 33-18-201, *et seq.*, 33-14-103, *et seq.*
#### (All Defendants)

217.   Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as though fully set forth herein.

218.   At all relevant times, Defendants engaged the sale of insurance and in trade and/or commerce within Montana. Defendants, either directly or indirectly, did sell, market, offer, or control intangible things of value that directly and indirectly affect the people of Montana.

219.   Accordingly, Defendants owe certain duties and are prohibited from certain conduct under the Montana Unfair Trade Practices Act, Mont. Code Ann. § 33-18-201, *et seq*. and the Montana Consumer Protection Act, Mont. Code Ann. § 30-14-103, *et seq.*

220.    Mass Mutual, Penn Annuity, and Penn Mutual are vicariously liable for the statutory violations of their apparent and actual agents, Gardner Defendants, Succession, Burgess, and Lake Forest.

221.    Among other things, Gardner Defendants, Succession, Burgess, and Lake Forest held themselves out to the Stevenson Family as experts not only in life insurance, but also in financial and estate planning, and the creation of highly complex irrevocable trusts, and qualified to navigate and balance the tripartite premium finance scheme in a way that it would not collapse.

222.    The Gardner Defendants, in particular, wielded their close personal relationship with the Stevenson Family to entice them into believing the rosy, too-good-to-be-true picture he painted for their simple estate planning goals.

223.    Under Montana statutory law, *supra*, Defendants are prohibited from making or causing to be made any estimate, illustration, circular, sales presentation, omission, comparison, or statement that: misrepresents pertinent facts or insurance policy provisions; misrepresents the benefits, advantages, conditions, or terms of any insurance policy; misrepresents the dividends or share of the surplus to be received on any insurance policy; is misleading or is a misrepresentation as to the financial condition of any person or as to the legal reserve system upon which any life insurer operates.

224.   Under Montana statutory law, *supra*, Defendants are also prohibited from making or causing to be made any advertisement, announcement, or statement containing any assertion, representation, or statement with respect to the business of insurance or with respect to any person in the conduct of the person's insurance business that is untrue, deceptive, or misleading.

225.   Under Montana statutory law, *supra*, Defendants are also prohibited from making or issuing, or causing to be made or issued any written or oral statement misrepresenting or making incomplete comparisons as to the terms, conditions, or benefits contained in any policy for the purpose of inducing or attempting, or tending to induce the policyholder to lapse, forfeit, surrender, retain, exchange, or convert any insurance policy.

226.   As already alleged, a life insurance agent's statutory and regulatory duties include: a duty to accurately represent pertinent facts related to the coverages at issue, *see* Mont. Code Ann. § 33-18-201; a duty not to "make, issue, circulate, or cause to be made, issued, or circulated any estimate, illustration, circular, sales presentation, omission, comparison, or statement which misrepresents the benefits, advantages, conditions, or terms of any insurance policy," *see* Mont. Code Ann. § 33-18-202(1); a duty not to "make, issue, circulate, or cause to be made, issued, or circulated any estimate, illustration, circular, sales presentation, omission, comparison, or statement which is a misrepresentation for the purpose of effecting

. . . an assignment of or effecting a loan against any insurance policy," *see* Mont. Code Ann. § 33-18-202(7); a duty not to "use or describe non-guaranteed elements in a manner that is misleading or has the capacity or tendency to misled." Mont. R. Amin. § 6.6.706(2)(b), (c).

227.   Defendants breached their statutory duties by, *inter alia,* by making misrepresentations to the Stevenson Family related to the benefits and risks associated with entering into the tripartite premium financed relationship. For example, defendants statutorily prohibited misrepresentations include, but are not limited to: falsely representing the premium financed structure as suitable for the Stevenson Family's circumstances and stated goals; and falsely representing the structure would perform at a certain level without explaining the substantial risks associated therewith, including premium-financed interest rate risk, policy performance risk, bank financing risk, carrier risk, lapse risk, and tax audit risk.

228.   Defendants also hid material facts from the Stevenson Family related to the tripartite structure, including but not limited to: whether the Life Insurance Policies were appropriate for the Stevenson Family in the first instance; whether the Life Insurance Policies were appropriately sized; whether premium financing was the appropriate means for paying for the Life Insurance Policies; the nature and details of the loan packages; and other Defendants' involvement in the Life Insurance Policies.

229.    Defendants' statutory violations also include the following misconduct:

a.  Defendants misrepresented the terms, benefits, conditions, or advantages of the insurance policy, in violation of Mont. Code Ann. §33-18-202 (1);

b.  Defendants misrepresented the dividends or shares of the surplus to be received on any insurance policy, in violation of Mont. Code Ann. § 33-18-202 (2);

c.  Defendants failed to state material facts necessary to make other statements not misleading, considering the circumstances under which the statements were made, in violation of Mont. Code Ann. § 33-18-202;

d.  Defendants directly or indirectly made, published, or disseminated, published, or disseminated assertions, representations, or statements that were untrue, deceptive, or misleading, in violation of Mont. Code Ann. § 33-18-203; and,

e.  Defendants sold, distributed, created, offered, and/or advertised products to the people of Montana that were deceptive and unfair, ultimately providing an illusory product that lacks any value whatsoever but that enables Defendants to obtain a monetary benefit while denying anything of value to consumers.

230.    Defendants were false, misleading, and deceptive. The Stevenson Family relied on these misrepresentations to their detriment.

231.    Defendants' omissions were intended to induce the Stevenson Family into purchasing the Life Insurance Policies. The Stevenson Family would not have entered into these transactions if Defendants had disclosed the truth to them.

232.    Defendants' misconduct rises to the level of statutory unconscionability. Defendants' misrepresentations and omissions took advantage of the Stevenson Family's lack of knowledge, ability, experience, or capacity to a

grossly unfair degree. Under the circumstances, Defendants' misconduct cannot be characterized as advice, judgment, or opinion.

233.   Upon information and belief, the unfair and deceptive acts and practices of Defendants constitute acts in concert, and all Defendants are jointly liable for the damages resulting from their acts or practices.

234.   The Stevenson Family suffered catastrophic financial damages as a result of Defendants' violations of the Montana Unfair Trade Practices Act and the Montana Consumer Protection Act.

235.   But for Defendants' statutory violations, the Stevenson Family would not have entered into the volatile tripartite relationship that is premium financing and would not have suffered the catastrophic financial damages that flowed therefrom.

236.   Defendants' statutory violations were a substantial factor in causing the Stevenson Family's catastrophic financial damages.

237.   Defendants' statutory violations increased the risk of harm to the Stevenson Family and/or reduced the Stevenson Family's chances of obtaining a better result.

238.   Defendants' statutory violations arose, centrally, from Defendants' failure to disclose all material facts relating to the proposed premium financed life

insurance structure, such that the Stevenson Family's consent to the structure was not based on an intelligent exercise of judgment.

239.   The Stevenson Family did not cause or contribute to their damages in any way.

240.   Defendants' misconduct was committed knowingly. Accordingly, Defendants are liable to the Stevenson Family for additional damages of up to three times the economic damages as permitted by the Montana Unfair Trade Practices and the Montana Consumer Protection Act, as well as attorney fees.

241.   The Stevenson Family is entitled to all available statutory relief for Defendants' statutory violations, including treble damages and attorneys' fees.

## COUNT FIVE – NEGLIGENCE *PER SE*
## (All Defendants)

242.   Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as though fully set forth herein.

243.   As previously alleged, Defendants owe certain duties and are prohibited from certain conduct under the Montana Unfair Trade Practices Act, Mont. Code Ann. § 33-18-201, *et seq*. and the Montana Consumer Protection Act, Mont. Code Ann. § 30-14-103, *et seq*.

244.   Mass Mutual, Penn Annuity, and Penn Mutual are vicariously liable for the statutory violations of their apparent and actual agents, Gardner Defendants, Succession, Burgess, and Lake Forest.

245.    Among other things, Gardner Defendants, Succession, Burgess, and Lake Forest held themselves out to the Stevenson Family as experts not only in life insurance, but also in financial and estate planning, and the creation of highly complex irrevocable trusts, and qualified to navigate and balance the tripartite premium finance scheme in a way that it would not collapse.

246.    The Gardner Defendants, in particular, wielded their close personal relationship with the Stevenson Family to entice them into believing the rosy, too-good-to-be-true picture he painted for their simple estate planning goals.

247.    As already alleged, a life insurance agent's statutory and regulatory duties include: a duty to accurately represent pertinent facts related to the coverages at issue, *see* Mont. Code Ann. § 33-18-201; a duty not to "make, issue, circulate, or cause to be made, issued, or circulated any estimate, illustration, circular, sales presentation, omission, comparison, or statement which misrepresents the benefits, advantages, conditions, or terms of any insurance policy," *see* Mont. Code Ann. § 33-18-202(1); a duty not to "make, issue, circulate, or cause to be made, issued, or circulated any estimate, illustration, circular, sales presentation, omission, comparison, or statement which is a misrepresentation for the purpose of effecting . . . an assignment of or effecting a loan against any insurance policy," *see* Mont. Code Ann. § 33-18-202(7); a duty not to "use or describe non-guaranteed elements in a

manner that is misleading or has the capacity or tendency to misled." Mont. R. Amin. § 6.6.706(2)(b), (c).

248.   Defendants breached their statutory duties by, *inter alia,* by making misrepresentations to the Stevenson Family related to the benefits and risks associated with entering into the tripartite premium financed relationship. For example, defendants statutorily prohibited misrepresentations include, but are not limited to: falsely representing the premium financed structure as suitable for the Stevenson Family's circumstances and stated goals; and falsely representing the structure would perform at a certain level without explaining the substantial risks associated therewith, including premium-financed interest rate risk, policy performance risk, bank financing risk, carrier risk, lapse risk, and tax audit risk.

249.   Defendants also hid material facts from the Stevenson Family related to the tripartite structure, including but not limited to: whether the Life Insurance Policies were appropriate for the Stevenson Family in the first instance; whether the Life Insurance Policies were appropriately sized; whether premium financing was the appropriate means for paying for the Life Insurance Policies; the nature and details of the loan packages; and other Defendants' involvement in the Life Insurance Policies.

250.   Defendants' statutory violations also include the following misconduct:

a. Defendants misrepresented the terms, benefits, conditions, or advantages of the insurance policy, in violation of Mont. Code Ann. §33-18-202 (1);

b. Defendants misrepresented the dividends or shares of the surplus to be received on any insurance policy, in violation of Mont. Code Ann. § 33-18-202 (2);

c. Defendants failed to state material facts necessary to make other statements not misleading, considering the circumstances under which the statements were made, in violation of Mont. Code Ann. § 33-18-202;

d. Defendants directly or indirectly made, published, or disseminated, published, or disseminated assertions, representations, or statements that were untrue, deceptive, or misleading, in violation of Mont. Code Ann. § 33-18-203; and,

e. Defendants sold, distributed, created, offered, and/or advertised products to the people of Montana that were deceptive and unfair, ultimately providing an illusory product that lacks any value whatsoever but that enables Defendants to obtain a monetary benefit while denying anything of value to consumers.

251. The foregoing statutes were enacted to protect the class of people to which the Stevenson Family belongs, *i.e.,* Montana consumers of financial and insurance products.

252. The Stevenson Family's injuries are of the kind the foregoing statutory scheme was enacted to prevent.

253. The foregoing statutory scheme was enacted and intended to regulate members of the class of financial and insurance professionals to which Defendants belong.

254.   As a direct result of Defendants' violation of Montana statutes enacted to protect Montana consumers of financial and insurance products, the Stevenson Family suffered injuries, entitling them to monetary damages and all available equitable relief.

## COUNT SIX – CONSTRUCTIVE FRAUD
### (All Defendants)

255.   Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as though fully set forth herein.

256.   Mass Mutual, Penn Annuity, and Penn Mutual are vicariously liable for the acts, misrepresentations, and omissions of their apparent and actual agents, Gardner Defendants, Burgess, Succession, and Lake Forest.

257.   As previously alleged, all Defendants—whether directly or vicariously—owed a fiduciary duty to the Stevenson Family by way of the special relationship of trust they fostered to entice the Stevenson Family into a volatile financial structure known as premium financed life insurance.

258.   Defendants solicited, recommended, and sold the Life Insurance Policies and the premium financing packages to the Stevenson Family on the false notion and misrepresentation that, *inter alia*, the tripartite premium financed scheme was suitable and appropriate for the Stevenson Family's financial circumstances and stated goals, without any reasonable grounds for believing the structure was appropriate and suitable for the Stevenson Family's financial circumstances and

stated goals, and further misrepresented the interest rates applicable to the loan packages solicited and sold to the Stevenson Family.

259.   In particular, on various occasions since 2014, the Gardner Defendants and premium finance companies (Burgess, Succession, and Lake Forest), misrepresented affirmatively or by omission the volatile nature of the relationship into which they were entering.

260.   For example, in 2014, Josh Gardner encouraged Todd to purchase two enormous Mass Mutual policies and finance the premiums therefor, with the explicit promise that the "annual premium savings offsets the interest costs on the loans," and told Todd further that he could surrender the policy right then and walk away with $10 million. Josh Gardner's representation was not a statement of future event or opinion, but rather an assurance of what *would be* if Todd followed his advice. Further, nowhere in Josh Gardner's promises about the benefits of the scheme, did he disclose the risks of a hostile interest rate environment. Put differently, Josh Gardner framed his unqualified representations as existing material fact.

From: jgardner1 . [mailto:jggardner@gmail.com]
Sent: Wednesday, May 14, 2014 9:05 AM
To: Todd Stevenson; Jeannette Jones
Subject: Please respond

Hey there, wanted to run some new numbers by you.

Mass Mutual has the capacity now to take all of the 17.5 Million instead of the original 10M like we were planning on.  This just happened yesterday, I talked to Todd last night and ran new numbers today that I want to share with you.  We would need some more blood and updated financials but these numbers may warrant some work on our end if you agree.

This is the benefit of having it all with Mass
1.) The annual premium is $57,374 less per year, a savings of $573,740 on a 10 year policy, which in turn saves you $83,604 of interest over the 10 years.. *The annual premium savings offsets the interest cost on the loan at Stockman.....*

                                        1                        5/14/2014 10:42 AM
                                                                        Janette
                                                        ST00016



2.) Mass allows the interest to accrue and not be paid annually.

3.) I was worried about the performance being diminished on less funding and that IS NOT the case. **At age 80 if we put it all at Mass the cash value is over $2M greater and the death benefit is $3.1M greater than if we put some with Mass and some with Ohio.** The loan balance would be approx $18.8M and the gross death benefit is over $38M, for a net $20M to the trust. The gross cash value at this point is over $28M so if you wanted to surrender the policy and walk away you would leave with $10M of cash...

Pretty strong when you consider that all this will be accomplished for the net difference between Stockman interest and the earnings at Geneva.

If we want to pursue this we should jump on it right now and get paperwork started for the additional $7.5M with Mass.......

Let me know your thoughts ASAP!

*Josh Gardner*
*Summit Financial Group*
*312 Whitney Lane Suite 3*
*Sheridan Wyoming 82801*

*307-655-8393 office*
*406-698-7963 cell*

261. For yet another example, in 2017 Josh Gardner encouraged the Stevenson Family to take out *more* life insurance, promising them that doing so would "keep the loan balance from getting out of control." Again, Josh Gardner's 2017 representation was not cabined by any opinion or uncertainty. Josh Gardner spoke with concrete certainty about what *would be* if the Stevenson Family took his advice. Put differently, Josh Gardner framed his unqualified representations as existing material fact.

| From: | Josh Gardner <jqgardner@gmail.com> |
|---|---|
| Sent: | Monday, January 23, 2017 5:16 PM |
| To: | Janette Jones; Todd Stevenson; Terri Stevenson - Stevenson & Sons |
| Subject: | Insurance Recap |

I got confirmation today that everything was finalized last week. We are all done!

It's pretty incredible when you think about it that between both policies you have 32 million of coverage that will be paid up in 10 years and your cost for that is $14k a year for the letter of credit! If you had term instead your premiums would be over $100k a year!

Taking the savings from what you had been paying for the LOC (12k a year) and what you paid for Terris term policies (40k a year) to service the interest on this loan is something I highly recommend that you do. Although not necessary it will make collateral come off the table sooner and keep the loan balance from getting out of control.

All the best,

JQG

262.  Defendants' unqualified misrepresentations, as exemplified above, about the suitability and performance of the premium financed life insurance structure were untrue. Of course, Josh Gardner could not promise that loan balances would not get out of control, but that's what he did. Of course, Josh Gardner could not promise that taking out massive life insurance policies would yield a certain walk-away amount given the variability of interest rates, but that's what he did.

263.  Further, the premium finance companies (Burgess, Succession, and Lake Forest) misrepresented the interest rate environment the Stevenson Family could anticipate impacting their involvement in the tripartite relationship.

264.  As alleged previously, capping the interest rate projection at 5.000 percent was not only unreasonable, given historical fluctuations, but also proved to be untrue, when interest rates skyrocketed past 5.000 in 2023.

265.   Defendants had no reasonable basis for their misrepresentations about the Life Insurance Policies' performance, the loan interest rates, or the risks to the Stevenson Family.

266.   Defendants made the representations to the Stevenson Family for the sole purpose of inducing them to purchase the enormous Life Insurance Policies and take out loans to pay the premiums.

267.   The Stevenson Family had no reason to be aware of the falsity of Defendants omissions and misrepresentations. The Stevenson Family trusted the advice of Josh Gardner, who held himself out as a skilled, knowledgeable, and trained financial, estate, and insurance professional.

268.   The Stevenson Family was justified in relying on Defendants misrepresentations, as they did not directly contradict any disclaimers or warnings in the Life Insurance Policies themselves. The Stevenson Family understood the risks associated with the tripartite relationship as Josh Gardner and the premium finance professionals erroneously framed them.

269.   Given the disparity of information and power, the Stevenson Family had no way of learning the falsity of Defendants' misrepresentation about the suitability of the Life Insurance Policies.

270.   The Stevenson Family acted in reliance upon the truth of Defendants' misrepresentation by purchasing the Life Insurance Policies, believing the Life Insurance Policies to be suitable for their stated goals.

271.   At bottom, Defendants breached their respective duties of ordinary and professional care by failing to explain, in terms a layperson can understand or at all, the nature of the significant risks that may be encountered as a result of the premium financed insurance products the Gardner Defendants sold to the Stevenson Family.

272.   But for Defendants' misrepresentations, the Stevenson Family would not have entered into the volatile financial relationship of premium financed life insurance and would not have to have suffered the catastrophic financial damages that flowed therefrom.

273.   Defendants' misrepresentations were a substantial factor in causing the Stevenson Family's catastrophic financial damages.

274.   Defendants' misrepresentations increased the risk of harm to the Stevenson Family and/or reduced the Stevenson Family's chances of obtaining a better result.

275.   Defendants' misrepresentations arose, centrally, from Defendants' failure to disclose all material facts relating to the proposed premium financed life insurance structure, such that the Stevenson Family's consent to the structure was not based on an intelligent exercise of judgment.

276.    The Stevenson Family did not cause or contribute to their damages in any way.

277.    The Stevenson Family is entitled to compensation for the damages caused by Defendants' misconduct.

## COUNT SEVEN – ACTUAL FRAUD
### (All Defendants)

278.    Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as though fully set forth herein.

279.    Mass Mutual, Penn Annuity, and Penn Mutual are vicariously liable for the acts, misrepresentations, and omissions of their apparent and actual agents, Gardner, Summit, Capital, and/or Burgess.

280.    Defendants made representations to the Stevenson Family about the Life Insurance Policies, including but not limited to: representing that the Life Insurance Policies and the premium finance structure were suitable for the Stevenson Family's circumstances and stated goals; and representing that the Life Insurance Policies and the premium finance structure would perform at a certain level without explaining the substantial risks associated with the policies.

281.    In particular, on various occasions since 2014, the Gardner Defendants and premium finance companies (Burgess, Succession, and Lake Forest), misrepresented affirmatively or by omission the volatile nature of the relationship into which they were entering.

282.   For example, in 2014, Josh Gardner encouraged Todd to purchase two enormous Mass Mutual policies and finance the premiums therefor, with the explicit promise that the "annual premium savings offsets the interest costs on the loans," and told Todd further that he could surrender the policy right then and walk away with $10 million. Josh Gardner's representation was not a statement of future event or opinion, but rather an assurance of what *would be* if Todd followed his advice. Further, nowhere in Josh Gardner's promises about the benefits of the scheme, did he disclose the risks of a hostile interest rate environment. Put differently, Josh Gardner framed his unqualified representations as existing material fact.



283.  For yet another example, in 2017 Josh Gardner encouraged the Stevenson Family to take out *more* life insurance, promising them that doing so would "keep the loan balance from getting out of control." Again, Josh Gardner's 2017 representation was not cabined by any opinion or uncertainty. Josh Gardner spoke with concrete certainty about what *would be* if the Stevenson Family took his advice. Put differently, Josh Gardner framed his unqualified representations as existing material fact.

| | |
|---|---|
| From: | Josh Gardner <jqgardner@gmail.com> |
| Sent: | Monday, January 23, 2017 5:16 PM |
| To: | Janette Jones; Todd Stevenson; Terri Stevenson - Stevenson & Sons |
| Subject: | Insurance Recap |

I got confirmation today that everything was finalized last week. We are all done!

It's pretty incredible when you think about it that between both policies you have 32 million of coverage that will be paid up in 10 years and your cost for that is $14k a year for the letter of credit! If you had term instead your premiums would be over $100k a year!

Taking the savings from what you had been paying for the LOC (12k a year) and what you paid for Terris term policies (40k a year) to service the interest on this loan is something I highly recommend that you do. Although not necessary it will make collateral come off the table sooner and keep the loan balance from getting out of control.

All the best,

JQG

284.  Defendants' unqualified misrepresentations, as exemplified above, about the suitability and performance of the premium financed life insurance structure were untrue. Of course, Josh Gardner could not promise that loan balances would not get out of control, but that's what he did. Of course, Josh Gardner could not promise that taking out massive life insurance policies would yield a certain walk-away amount given the variability of interest rates, but that's what he did.

285.   Further, the premium finance companies (Burgess, Succession, and Lake Forest) misrepresented the interest rate environment the Stevenson Family could anticipate impacting their involvement in the tripartite relationship.

286.   As alleged previously, capping the interest rate projection at 5.000 percent was not only unreasonable, given historical fluctuations, but also proved to be untrue, when interest rates skyrocketed past 5.000 in 2023.

287.   Defendants' representations were false, based on the Stevenson Family's circumstances and risk tolerance, as well as relevant industry data and financial forecasts.

288.   Defendants' representations were significant and material; Defendants' representations went to the heart of the Stevenson Family's decisions to purchase enter into the tripartite relationship of premium financed life insurance, and the Stevenson Family would not have entered the relationship, purchased the Life Insurance Policies, and taken out the premium loans absent Defendants' representations. Further, Defendants' representations were not subjective opinions, but factual assurances of the suitability and propriety of the Life Insurance Policies for the Stevenson Family.

289.   Defendants knew the representations about the Life Insurance Policies' suitability were false, because Defendants had access both to the Stevenson Family's materials, statements, and goals, as well as industry data and financial forecasts.

290. Defendants intended the Stevenson Family to rely on the representations about the Life Insurance Policies, as evidenced by Defendants' solicitation, recommendation, and encouragement that the Stevenson Family purchase the Life Insurance Policies based on their purported suitability.

291. The Stevenson Family was unaware of the falsity of Defendants' representations about the Life Insurance Policies, nor could the Stevenson Family have made themselves aware of the falsity based on their relative lack of informational access, knowledge, and financial power. Further, Defendants' misrepresentations did not run directly contrary to the sweeping "risk" disclosures in the policies; instead, misrepresentations purported to explain and bound the universe of "risk" ambiguously referenced in written materials.

292. The Stevenson Family relied on Defendants' representations; the Stevenson Family would not have purchased the Life Insurance Policies absent the representations.

293. The Stevenson Family had a right to rely on Defendants' representations. Defendants held themselves out as insurance and financial professionals, estate planners and trust experts, banking experts and loan brokers, promising the Stevenson Family to care for their insurance and financial and estate planning needs.

294.   But for Defendants' misrepresentations, the Stevenson Family would not have entered into the volatile financial relationship of premium financed life insurance and would not have to have suffered the catastrophic financial damages that flowed therefrom.

295.   Defendants' misrepresentations were a substantial factor in causing the Stevenson Family's catastrophic financial damages.

296.   Defendants' misrepresentations increased the risk of harm to the Stevenson Family and/or reduced the Stevenson Family's chances for obtaining a better result.

297.   Defendants' misrepresentations arose, centrally, from Defendants' failure to disclose all material facts relating to the proposed premium financed life insurance structure, such that the Stevenson Family's consent to the structure was not based on an intelligent exercise of judgment.

298.   The Stevenson Family did not cause or contribute to their damages in any way.

299.   The Stevenson Family is entitled to compensation for the damages caused by Defendants' misconduct.

## COUNT EIGHT – FRAUDULENT INDUCEMENT
### (All Defendants)

300.   Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as though fully set forth herein.

301.   Mass Mutual, Penn Annuity, and Penn Mutual are vicariously liable for the acts, misrepresentations, and omissions of their apparent and actual agents, Gardner, Summit, Capital, and/or Burgess.

302.   Defendants made representations to the Stevenson Family about the Life Insurance Policies, including but not limited to: representing that the Life Insurance Policies and the premium finance structure were suitable for the Stevenson Family's circumstances and stated goals; and representing that the Life Insurance Policies and the premium finance structure would perform at a certain level without explaining the substantial risks associated with the policies.

303.   In particular, on various occasions since 2014, the Gardner Defendants and premium finance companies (Burgess, Succession, and Lake Forest), misrepresented affirmatively or by omission the volatile nature of the relationship into which they were entering.

304.   For example, in 2014, Josh Gardner encouraged Todd to purchase two enormous Mass Mutual policies and finance the premiums therefor, with the explicit promise that the "annual premium savings offsets the interest costs on the loans," and told Todd further that he could surrender the policy right then and walk away with $10 million. Josh Gardner's representation was not a statement of future event or opinion, but rather an assurance of what *would be* if Todd followed his advice. Further, nowhere in Josh Gardner's promises about the benefits of the scheme, did

he disclose the risks of a hostile interest rate environment. Put differently, Josh

Gardner framed his unqualified representations as existing material fact.

**From:** jggardner1 . [mailto:jggardner@gmail.com]
**Sent:** Wednesday, May 14, 2014 9:05 AM
**To:** Todd Stevenson; Jeannette Jones
**Subject:** Please respond

Hey there, wanted to run some new numbers by you.

==Mass Mutual has the capacity now to take all of the 17.5 Million== instead of the original 10M like we were planning on. This just happened yesterday, I talked to Todd last night and ran new numbers today that I want to share with you. We would need some more blood and updated financials but these numbers may warrant some work on our end if you agree.

==This is the benefit of having it all with Mass==
1.) The annual premium is $57,374 less per year, a savings of $573,740 on a 10 year policy, which in ==turn saves you $83,604 of interest over the 10 years.. *The annual premium savings offsets the interest cost on the loan at== Stockman.....*

1    5/14/2014 10:42 AM
Janette

ST00016

2.) Mass allows the interest to accrue and not be paid annually.

3.) I was worried about the performance being diminished on less funding and that IS NOT the case. **At age 80 if we put it all at Mass the cash value is over $2M greater and the death benefit is $3.1M greater than if we put some with Mass and some with Ohio.** ==The loan balance would be approx $18.8M and the gross death benefit is over $38M, for a net $20M to the trust. The gross cash value at this point is over $28M so if you wanted to surrender the policy and walk away you would leave with $10M of cash...==

Pretty strong when you consider that all this will be accomplished for the net difference between Stockman interest and the earnings at Geneva.

If we want to pursue this we should ==jump on it right now== and get paperwork started for the additional $7.5M with Mass.......

Let me know your thoughts ASAP!
--
*Josh Gardner*
*Summit Financial Group*
*312 Whitney Lane Suite 3*
*Sheridan Wyoming 82801*

307-655-8393 office
406-698-7963 cell

305.    For yet another example, in 2017 Josh Gardner encouraged the

Stevenson Family to take out *more* life insurance, promising them that doing so

would "keep the loan balance from getting out of control." Again, Josh Gardner's

2017 representation was not cabined by any opinion or uncertainty. Josh Gardner

spoke with concrete certainty about what *would be* if the Stevenson Family took his

advice. Put differently, Josh Gardner framed his unqualified representations as existing material fact.

**From:** Josh Gardner <jqgardner@gmail.com>
**Sent:** Monday, January 23, 2017 5:16 PM
**To:** Janette Jones; Todd Stevenson; Terri Stevenson - Stevenson & Sons
**Subject:** Insurance Recap

I got confirmation today that everything was finalized last week. We are all done!

It's pretty incredible when you think about it that between both policies you have 32 million of coverage that will be paid up in 10 years and your cost for that is $14k a year for the letter of credit! If you had term instead your premiums would be over $100k a year!

Taking the savings from what you had been paying for the LOC (12k a year) and what you paid for Terris term policies (40k a year) to service the interest on this loan is something I highly recommend that you do. Although not necessary it will make collateral come off the table sooner and keep the loan balance from getting out of control.

All the best,

JQG

306. Defendants' unqualified misrepresentations, as exemplified above, about the suitability and performance of the premium financed life insurance structure were untrue. Of course, Josh Gardner could not promise that loan balances would not get out of control, but that's what he did. Of course, Josh Gardner could not promise that taking out massive life insurance policies would yield a certain walk-away amount given the variability of interest rates, but that's what he did.

307. Further, the premium finance companies (Burgess, Succession, and Lake Forest) misrepresented the interest rate environment the Stevenson Family could anticipate impacting their involvement in the tripartite relationship.

308.   As alleged previously, capping the interest rate projection at 5.000 percent was not only unreasonable, given historical fluctuations, but also proved to be untrue, when interest rates skyrocketed past 5.000 in 2023.

309.   Defendants' representations were false, based on the Stevenson Family's circumstances and risk tolerance, as well as relevant industry data and financial forecasts.

310.   Defendants' representations were significant and material; Defendants' representations went to the heart of the Stevenson Family's decisions to purchase enter into the tripartite relationship of premium financed life insurance, and the Stevenson Family would not have entered the relationship, purchased the Life Insurance Policies, and taken out the premium loans absent Defendants' representations. Further, Defendants' representations were not subjective opinions, but factual assurances of the suitability and propriety of the Life Insurance Policies for the Stevenson Family.

311.   Defendants knew the representations about the Life Insurance Policies' suitability were false, because Defendants had access both to the Stevenson Family's materials, statements, and goals, as well as industry data and financial forecasts.

312.   Defendants intended the Stevenson Family to rely on the representations about the Life Insurance Policies, as evidenced by Defendants'

solicitation, recommendation, and encouragement that the Stevenson Family purchase the Life Insurance Policies based on their purported suitability.

313.    Defendants intended that their misrepresentations, false representations, concealment, and/or nondisclosure would induce the Stevenson Family to purchase the Life Insurance Policies.

314.    The Stevenson Family was unaware of the falsity of Defendants' representations about the Life Insurance Policies, nor could the Stevenson Family have made themselves aware of the falsity based on their relative lack of informational access, knowledge, and financial power. Further, Defendants' misrepresentations did not run directly contrary to the sweeping "risk" disclosures in the policies; instead, misrepresentations purported to explain and bound the universe of "risk" ambiguously referenced in written materials.

315.    The Stevenson Family relied on Defendants' representations; the Stevenson Family would not have purchased the Life Insurance Policies absent the representations.

316.    The Stevenson Family had a right to rely on Defendants' representations. Defendants held themselves out as insurance and financial professionals, estate planners and trust experts, banking experts and loan brokers, promising the Stevenson Family to care for their insurance and financial and estate planning needs.

317.   But for Defendants' misrepresentations, the Stevenson Family would not have entered into the volatile financial relationship of premium financed life insurance and would not have to have suffered the catastrophic financial damages that flowed therefrom.

318.   Defendants' misrepresentations were a substantial factor in causing the Stevenson Family's catastrophic financial damages.

319.   Defendants' misrepresentations increased the risk of harm to the Stevenson Family and/or reduced the Stevenson Family's chances of obtaining a better result.

320.   Defendants' misrepresentations arose, centrally, from Defendants' failure to disclose all material facts relating to the proposed premium financed life insurance structure, such that the Stevenson Family's consent to the structure was not based on an intelligent exercise of judgment.

321.   The Stevenson Family did not cause or contribute to their damages in any way.

322.   The Stevenson Family is entitled to compensation for the damages caused by Defendants' misconduct.

## COUNT NINE – UNJUST ENRICHMENT
### (All Defendants)

323.   Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as though fully set forth herein.

324.    Mass Mutual, Penn Annuity, and Penn Mutual are vicariously liable for the acts, misrepresentations, and omissions of their apparent and actual agents, the Gardner Defendants, Succession, Burgess, and Lake Forest.

325.    As alleged already, through Defendants' misrepresentations, omissions, and/or negligence, the Stevenson Family conferred upon Defendants a substantial monetary benefit, including but not limited to monies to purchase the unsuitable Life Insurance Policies and commissions, fees, interest, and other costs.

326.    Defendants certainly knew or appreciated the benefit conferred on them by way of the Stevenson Family's purchase of the enormous Life Insurance Policies and attendant payment of fees, interest, and other costs.

327.    Defendants retained the benefit the Stevenson Family conferred and continues to confer on them in a circumstance that would make it inequitable for Defendants to retain the benefit without payment of its value.

328.    The Stevenson Family is entitled to a remedy for Defendants' unjust enrichment, including but not limited to imposition of a constructive trust.

## COUNT TEN – PUNITIVE DAMAGES
### (All Defendants)

329.    Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as though fully set forth herein.

330.   Mass Mutual, Penn Annuity, and Penn Mutual are vicariously liable for the acts, misrepresentations, and omissions of their apparent and actual agents, the Gardner Defendants, Succession, Burgess, and Lake Forest.

331.   Defendants deliberately acted in conscious or intentional disregard of, or indifference to, the high probability of injury to the Stevenson Family, by ignoring the Stevenson Family's stated goals and risk aversion and soliciting and encouraging the Stevenson Family to place themselves in catastrophic financial risk with respect to the Life Insurance Policies and the volatile tripartite relationship of premium financed life insurance.

332.   Defendants acted with actual malice and oppression, because Defendants knew or should have known their conduct, acts, and omissions would cause the Stevenson Family harm.

333.   Defendants their weaponized close personal and professional relationships of trust to entice the Stevenson Family into putting their legacy and security in a high-risk, highly complex financial scheme. Defendants knew their close relationships with the Stevenson Family afforded them a position of trust and opened the Stevenson Family up to vulnerability that would not have been available to arms-length professionals.

334.   Defendants made misrepresentations that did not run facially contrary to the Life Insurance Policies' ambiguous disclaimers about risk, so that the

Stevenson Family could not and would not discover the nature of the misrepresentations and actual risks.

335.   In engaging in the conduct described herein, Defendants acted with utter and complete disregard for the rights and interests of the Stevenson Family.

336.   Defendants repeatedly placed their own interests ahead of the interests of the Stevenson Family.

337.   Defendants' conduct was so malicious, willful, and egregious as to justify an award of punitive or exemplary damages to punish Defendants and to serve as an example to other similarly situated entities that conduct of the kind engaged in by Defendants is unacceptable in society and will not be tolerated.

338.   Defendants should pay punitive damages in an amount sufficient to deter such conduct by these Defendants and others similarly situated.

## COUNT ELEVEN – RESCISSION AND RESTITUTION
### (All Defendants)

339.   Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as though fully set forth herein.

340.   Consent to the terms of the Life Insurance Policies and premium loans and all other contracts entered into effect the purchase of the Life Insurance Policies was not real or free and was given under mistake or fraud.

341.   Defendants improperly induced the Stevenson Family to contract.

342.   The Stevenson Family seek recission of the Life Insurance Policies and all other contracts, including promissory notes, entered into effect the purchase thereof and restitution of all funds, fees, and interest charged by Defendants.

## COUNT TWELVE – FOR AN ACCOUNTING
### (All Defendants)

343.   Plaintiffs hereby incorporate all other paragraphs of this First Amended Complaint as though fully set forth herein.

344.   An action for an accounting is appropriate to pursue disgorgement of unjust gains and/or discovery of information necessary to evaluate one's rights.

345.   Defendants had a special relationship with the Stevenson Family, including fiduciary relationships, as alleged herein.

346.   Through annual meetings since 2013 that involved the Gardner Defendants, Succession, Burgess, and Lake Forest, the Stevenson Family has repeatedly sought information about the suitability and status of the Life Insurance Policies, payment of premiums and other costs, premium loan balances and fees, and the commission structure between the entities, but full information has never been produced by any Defendant.

347.   Defendants have engaged in lucrative business transactions while ignoring and contravening their contractual, fiduciary, and ordinary obligations of care to the Stevenson Family, and refusing the Stevenson Family information about

the financial benefits received by Defendants by way of pulling the Stevenson Family into the tripartite relationship.

348.   Defendants exercise exclusive control over much of the information and documents necessary for the Stevenson Family to ascertain and exercise the full extent of their rights and claims against Defendants.

349.   The Stevenson Family seek information regarding the payments, fees, and interest taken by Defendants.

350.   An accounting will demonstrate the amounts of payments, fees, and interest Defendants wrongfully took from the Stevenson Family, which the Stevenson Family is entitled to recoup.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.     For all damages, including treble, equitable, monetary, and punitive damages, proximately caused by Defendants' conduct;

2.     For Defendants to be held jointly and severally liable;

3.     For attorney's fees, costs, and interest as allowed by law without limitation;

4.     For pre-judgment and post-judgment interest at the highest rate allowed by law; and

5.      For any such other relief as may be permitted by law or equity or deemed appropriate by this Court.

### JURY DEMAND

Plaintiffs request a jury trial of all matters appropriately tried to a jury.

DATED this 28th day of October 2024.


/s/ John L. Amsden
BECK AMSDEN & STALPES, PLLC

*Attorneys for Plaintiffs*