John L. Amsden, Esq.
Justin P. Stalpes, Esq
Sydney E. Best, Esq.
Samuel J. Johnston, Esq.
BECK AMSDEN & STALPES, PLLC
610 Professional Drive
Bozeman, MT 59718
T: 406-586-8700 / F: 406-586-8960
amsden@becklawyers.com
sydney@becklawyers.com
justin@becklawyers.com
sam@becklawyers.com

*Attorneys for Plaintiffs*

\* \* \* \* \* \* \*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA, MISSOULA DIVISION

\* \* \* \* \* \* \*

| | |
|---|---|
| TODD F. STEVENSON, an individual on behalf of himself, and as grantor of the Todd Stevenson 2013 Irrevocable Family Trust and the Todd F. Stevenson Irrevocable Life Insurance Trust; TERRI L. STEVENSON, an individual on behalf of herself, and as grantor of the Terri L. Stevenson 2016 Irrevocable Family Trust; TODD J. STEVENSON, an individual; and JOSEPH D. STEVENSON, an individual on behalf of himself, and as grantor of the Joseph D. Stevenson Irrevocable Life Insurance Trust; JANETTE KRUTZFELDT JONES, on behalf of and as trustee for the Todd Stevenson 2013 Irrevocable Family Trust, the Todd F. Stevenson Irrevocable Life Insurance Trust, the Terri L. Stevenson 2016 Irrevocable | Case No. 9:24-cv-00109-DLC<br><br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES AND JURY DEMAND** |

| | |
|---|---|
| Family Trust, and Joseph D. Stevenson Irrevocable Life Insurance Trust; and STEVENSON AND SONS FUNERAL HOMES,<br><br>         Plaintiffs,<br><br>     v.<br><br>MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY; THE PENN MUTUAL LIFE INSURANCE COMPANY; THE PENN INSURANCE AND ANNUITY COMPANY; SUMMIT FINANCIAL GROUP; GP CAPITAL PARTNERS LLC; JOSHOA Q. GARDNER, an individual; WINTRUST LIFE FINANCIAL, a Division of Lake Forest Bank & Trust CO., N.A.; BARRINGTON BANK & TRUST CO., N.A.; CMS NATIONAL SERVICES, LLC; and JOHN DOES 1–5;<br><br>        Defendants. | |

Plaintiffs, by and through their counsel of record, file their Second Amended Complaint. The Second Amended Complaint leaves materially unchanged all claims as they were made in the First Amended Complaint as against Defendants Massachusetts Mutual Life Insurance Company, The Penn Mutual Life Insurance Company, the Penn Insurance and Annuity Company, Summit Financial Group, GP Capital Partners LLC, and Joshoa Q. Gardner.

The Second Amended Complaint clarifies, amplifies, and amends allegations and claims as against Defendants Wintrust Life Financial, a Division of Lake Forest Bank & Trust Company Lake Forest Bank & Trust, Co., N.A. ("Wintrust") and CMS National Services, LLC ("Succession"), and adds Wintrust affiliate Defendant Barrington Bank & Trust Company, N.A ("Barrington").

## INTRODUCTION

Plaintiffs are third-generation Miles City funeral home professionals. With the help of Plaintiffs and their family business, thousands of Montanans have laid their loved ones to rest with dignity and peace. This lawsuit is about Plaintiffs' effort to protect their legacy and pass the family business to the next generation, and how Defendants thwarted that effort by directing Plaintiffs down a path of financial ruin.

Through misrepresentation, omission, or plain professional incompetence, Defendants convinced Plaintiffs to place their family's savings into financial structures known as premium financed life insurance. The premium financed life insurance structure is a risky, volatile, and highly complex financial scheme that combines highly priced life insurance policies and borrowing to fund their premiums. Under the premium financed life insurance tripartite paradigm (comprised of insurer, premium financing companies, and insured), there is no policy without a loan, and no loan without the policy.

In this case, Defendants disguised the dangerous premium financed life insurance structure as a stable, safe, and tax-friendly estate and retirement planning tool. With initial cash outlays from Plaintiffs, Defendants promised each Plaintiff's respective life insurance policy or policies would pay for themselves in two steps: (1) funding for premiums would be arranged by and borrowed from premium finance companies; (2) some of the initial outlays of Plaintiffs' cash would be invested and earn returns that would not only pay back the premium finance professionals and lenders, plus interest, plus fees, but also steadily increase the value of the policies themselves.

What Defendants didn't tell Plaintiffs—an eastern Montana family of fiscally conservative, investment-risk-averse, financially unsophisticated morticians—is the premium financed "pay for itself" structure is anything but stable and secure. Instead, when interest rates rose from historically low levels, depressed returns on the invested initial cash outlays could not keep up paying back the premium loans, interest, and service fees. Plaintiffs quickly found themselves pulled deep underwater by about eight million dollars.

The financial catastrophe into which Defendants led Plaintiffs could have been avoided had Defendants told them what the tripartite structure actually is: a high-risk, interest-rate-sensitive, and volatile structure unsuitable for low-risk estate and retirement goals. But Defendants didn't, and instead masked the tripartite

structure as safe, stable, and secure enough to withstand the winds of changing interest rate environments.

The premium financed structure was pushed on Plaintiffs, not because the structure was suitable and safe for Plaintiffs and their goals, but because the paradigm afforded Defendants the otherwise unavailable opportunity to procure and sell the largest policies and earn the largest commissions. But for Defendants' misrepresented, omission-laden, and repeated pitches on the tripartite premium financed structure, Plaintiffs would have avoided the scheme altogether and advanced their estate and retirement planning goals through appropriate financial tools.

## PARTIES

### I. Plaintiffs[1]

1.    Todd F. Stevenson ("Todd"), individually and as the grantor of the Todd Stevenson 2013 Irrevocable Family Trust and the Todd F. Stevenson Irrevocable Life Insurance Trust, resides and is domiciled in Miles City, Montana. Thus, Todd is a citizen of the state of Montana.

---

[1] Throughout this Second Amended Complaint, Plaintiffs are collectively referred to as "the Stevenson Family."

2.      Terri L. Stevenson ("Terri"), individually and as the grantor of the Terri L. Stevenson 2016 Irrevocable Family Trust, resides and is domiciled in Miles City, Montana. Thus, Terri is a citizen of the state of Montana.

3.      Todd J. Stevenson ("T.J."), individually and as the owner of one or some of the policies described herein, resides and is domiciled in Miles City, Montana. Thus, T.J. is a citizen of the state of Montana.

4.      Joseph D. Stevenson ("Joe"), individually and as the grantor of the Joseph D. Stevenson Irrevocable Life Insurance Trust, resides and is domiciled in Miles City, Montana. Thus, Joe is a citizen of the state of Montana.

5.      Janette Krutzfeldt Jones ("Jones") is an individual who resides and is domiciled in Miles City, Montana, and who brings claims on behalf of and as trustee for the Todd Stevenson 2013 Irrevocable Family Trust, the Todd F. Stevenson Irrevocable Life Insurance Trust, the Terri L. Stevenson 2016 Irrevocable Family Trust, and Joseph D. Stevenson Irrevocable Life Insurance Trust. Thus, because Jones is a citizen of the state of Montana, so too are the trusts for which she is a trustee.

6.      Stevenson and Sons Funeral Homes is a Montana corporation with its principal place of business in Miles City, Montana. Thus, Stevenson and Sons Funeral Homes is a citizen of the state of Montana.

II.    **Defendants**

7.    Defendant Massachusetts Mutual Life Insurance Company ("Mass Mutual") is a Massachusetts corporation, with its principal place of business in Springfield, Massachusetts. Thus, Mass Mutual is a citizen of the state of Massachusetts.

8.    Defendant The Penn Mutual Life Insurance Company ("Penn Mutual") is a Pennsylvania corporation, with its principal place of business in Horsham, Pennsylvania. Thus, Penn Mutual is a citizen of the state of Pennsylvania.

9.    Defendant The Penn Insurance and Annuity Company ("Penn Annuity") is a Delaware corporation, with its principal place of business in Horsham, Pennsylvania. Thus, Penn Annuity is a citizen of the state of Pennsylvania.

10.    Defendant Joshoa Q. Gardner ("Josh Gardner") is an individual. On information and belief, Josh Gardner resides in and is domiciled in Sheridan, Wyoming at all times relevant to this lawsuit. Thus, Josh Gardner is a citizen of the state of Wyoming.

11.    On information and belief, Defendant Summit Financial Group ("Summit Financial") is a sole proprietorship and/or a d/b/a of Josh Gardner, with its principal place of business in Sheridan, Wyoming. Thus, Summit is a citizen of the state of Wyoming.

12.    Defendant GP Capital Partners LLC ("GP Capital") is a Wyoming limited liability company, with its principal place of business in Sheridan, Wyoming. On information and belief, at least one member of Capital—Josh Gardner—resides in Sheridan, Wyoming. Thus, Capital is a citizen of the State of Wyoming.

13.    Defendant Wintrust Life Financial, A Division of Lake Forest Bank & Trust Company, N.A., d/b/a Wintrust Life Finance and/or Barrington Bank & Trust Company, N.A. ("Wintrust"), is a national bank with a corporate headquarters and principal place of business in Illinois. Thus, Wintrust is a citizen of the state of Illinois.

14.    Defendant Barrington Bank & Trust Company, N.A., a Wintrust Community Bank, ("Barrington") is a national bank with a corporate headquarters and principal place of business in Illinois. Thus, Barrington is a citizen of the State of Illinois.

15.    On information and belief, CMS National Services, LLC, d/b/a Succession Capital Alliance Insurance, LLC ("Succession") is a limited liability with two members, one of whom is a corporation incorporated in California and with a principal place of business in California. Thus, Succession is a citizen of the state of California.

16.    Doe Defendants are entities and/or individuals whose respective identities and roles in this case are currently unknown. The Stevenson Family

therefore bring this Second Amended Complaint against John Does 1–5 by fictitious names and will seek leave to amend if and when their true identities and roles are ascertained, together with additional and appropriate allegations.

JURISDICTION AND VENUE

17.    This Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k). Defendants are subject to the jurisdiction of Montana's courts of general jurisdiction, pursuant to Montana's Long Arm Rule, Mont. R. Civ. P. 4(b), and the Due Process Clause of the U.S. Constitution, including because Defendants are: found in Montana; sell products or services in Montana; transact business in Montana; have committed acts resulting in the accrual of tort or contract actions in Montana; own, use, or possess property, or an interest therein, in Montana; and/or entered into contracts in Montana; and because the claims asserted herein arise out of Defendants' activities within the Montana.

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as complete diversity of citizenship exists between Plaintiffs and Defendants, and the amount in controversy, exclusive of costs and attorney fees, exceeds the sum of $75,000.

19.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Montana.

20.    Venue is proper in this division, because venue is proper in Missoula County under the laws of the State of Montana. D. Mont. L. R. 3.2(b). Specifically, at least one Defendant has a resident agent located in Missoula County. Mont. Code Ann. § 25-2-122(2)(c) ("[T]he proper place of trial for a tort action is . . . the county in which the corporation's resident agent is located[.]"); *and see* Mont. Code Ann. § 25-2-177 ("If there are two or more defendants in an action, a county that is a proper place of trial for any defendant is proper for all defendants[.]").

### ALLEGATIONS COMMON TO ALL COUNTS

### I.    CONSTRUCTING THE "TRIPARTITE RELATIONSHIP"[2] OF THE PREMIUM FINANCED SCHEME: INSURERS, LENDING COMPANIES, AND INSUREDS.

21.    The tripartite premium financed life insurance structure is highly complex, highly volatile, and interest-rate sensitive.

22.    The premium financed structure is not suitable or stable for the risk-averse.

23.    Through misrepresentation and omission, Defendants convinced the Stevenson Family to enter into the premium financed structure by assuring the Stevenson Family that the structure was suitable and stable for their risk-averse retirement and estate planning goals.

---

[2] *See* COUCH ON INSURANCE § 79:17 (3d ed.) (observing that "[m]ost jurisdictions have enacted statutory regulations that govern the tripartite relationship between insurer, insured, and the premium finance company").

24.    So, this is not a case about the local auto insurance salesman failing to procure underinsured motorist coverage for an insured who failed to ask.

25.    This is a case about a trusted financial advisor selling the unsophisticated Stevenson Family on a highly complex and highly risky financial structure, by disguising the structure as a safe, stable, and low-risk estate and retirement planning product.

26.    The promise sold to the Stevenson Family—that the tripartite premium financed structure was a stable, safe retirement and estate planning tool, notwithstanding interest rate variability—was an illusion, and one the Stevenson Family would not have bought but for their trusted advisor's encouragement, assurances, and advice.

**A.    The Insurance Agents and the Insurance Companies.**

**1.    Gardner Defendants.**

27.    Since at least 2002, Josh Gardner (CRD #443299) has been a Montana licensed insurance agent.

28.    Josh Gardner was the principal owner of Summit Financial. On information and belief, Josh Gardner at some point ceased doing business as Summit Financial and began operating as GP Capital.[3]

---

[3] Hereinafter, Josh Gardner, Summit Financial, and GP Capital are collectively referred to as "Gardner Defendants."

29.     Summit Financial and/or GP Capital were insurance and financial services firms professing to abide by fiduciary standards and provide professional advisory services for retirement and estate planning.

30.     Josh Gardner and his entities engaged in far more than insurance coverage and policy sales, at least with respect to the Stevenson Family.

31.     Over the course of a decade or more, Gardner Defendants fostered and developed an exclusive relationship with the Stevenson Family of trust and reliance on Gardner Defendants to guide them in their financial, estate, and retirement planning affairs.

32.     Garder Defendants held themselves out to the Stevenson Family as competent, professional experts in a wide variety of complex financial fields, including insurance, estate planning, and retirement planning.

33.     The Stevenson Family trusted and relied upon Gardner Defendants when the Gardner Defendants led the Stevenson Family to and advised them to enter the technically complex tripartite structure of premium financed life insurance.

34.     Gardner Defendants assured the Stevenson Family that Gardner Defendants had the skill, expertise, and knowledge to engage in the detailed suitability and financial analysis required to plan the Stevenson Family's low-risk estate and retirement goals by way of premium financed life insurance.

35.     The Stevenson Family would not have invested their assets in the premium financed life insurance structure absent Gardner Defendants' recommendation as their trusted, longstanding advisors.

### 2.     Insurance Defendants.

36.     At all times relevant to this lawsuit, Gardner Defendants acted within the course and scope of their agency relationship with Mass Mutual, Penn Mutual, and Penn Annuity (collectively, "Insurance Defendants").

37.     Insurance Defendants appointed and authorized Josh Gardner and/or Gardner Defendants to act as their respective agents to, *inter alia*, solicit their insurance policies, produce their insurance policies, prepare and accept policy applications, and sell their insurance policies to the Stevenson Family.

38.     Insurance Defendants also appointed and authorized Josh Gardner and/or Gardner Defendants to act as their agent(s) to prepare life insurance product illustrations for the purpose of selling their life insurance policies to the Stevenson Family, present life insurance product illustrations to the Stevenson Family, and submit illustrations with the Stevenson Family's applications.

39.     On letters and documents sent to the Stevenson Family, Insurance Defendants listed the Josh Gardner and/or Gardner Defendants as the servicing producer(s) or the presenter(s) of the Insurance Defendants' policies sold to the Stevenson Family. Further, Insurance Defendants prepared the relevant policy

statements listing the Josh Gardner and/or Gardner Defendants as designated contacts.

40.     With respect to the Stevenson Family, Insurance Defendants clothed Josh Gardner and/or Gardner Defendants with the authority to make representations on behalf of Insurance Defendants for purposes of soliciting policies, solicit and prepare applications, act as a point of contact between Insurance Defendants' and the Stevenson Family, and in prepare and present policy illustrations.

41.     Among the policies Insurance Defendants appointed, authorized, and empowered Josh Gardner and/or Gardner Defendants to solicit, produce, and sell to the Stevenson Family were those that contemplated the Stevenson Family entering into premium financing arrangements with premium finance companies.

42.     Included in Insurance Defendants' respective policy application materials and disclosures in this case, Insurance Defendants sought specific information from the Stevenson Family about, *inter alia*, (a) whether premiums would be financed by a lender, (b) the premium lender's identity, (c) the duration of the loan, and the (d) the interest rate.



SECOND AMENDED COMPLAINT FOR DAMAGES AND JURY DEMAND - 14

43.    At all times relevant to this lawsuit, Josh Gardner and/or Gardner Defendants earned substantial commissions and other financial incentives and benefits from Insurance Defendants for soliciting, selling, supervising, and renewing the Insurance Defendants' life insurance policies.

misguided and inapplicable against Gardner.  Plaintiffs do not and cannot allege that

29

Case 9:24-cv-00109-DLC    Document 76    Filed 12/04/24    Page 35 of 40

they gave any funds or "benefit" to Gardner.  ==To the extent that Gardner collected commissions, commissions are paid by insurers, not Plaintiffs.==

Gardner Defs.' Br. ISO Mot. to Dismiss (Dec. 4, 2024).

5.    Identify all commissions, fees, and other compensation received by **GARDNER** and/or its agents from the sale, servicing or monitoring of premium-financed life insurance products to Plaintiffs.

**RESPONSE:** The Gardner Defendants object to this Request because the Request is vague, ambiguous as to the phrase "and/or its agents" as it relates to Defendant Gardner, overly broad in scope and time, and burdensome.  The Gardner Defendants further object to this Request as it seeks private and confidential financial information not relevant to this litigation, and the disclosure of which would not support any of Plaintiffs' legal theories of recovery.  ==To the extent that the Gardner Defendants collected "commissions," they are paid by insurers, not the Plaintiffs.==  Subject to and without waiving the above-objections, the Gardner Defendants respond as follows:

**Penn Mutual**

   Terri Stevenson (002730669):  $156,507.31;

   Joseph Stevenson (002746927):  $302,522.12;

   Todd F. Stevenson (002746933):  $234,737.09;

   Todd J. Stevenson (009243334):  $43,994.28.

**Mass Mutual**

Policy #21359917: $103,740.76;

Policy #21364008: $138,321;

Policy #22384117: $146,614.99;

Policy #22486207: $12,977.64.

Gardner Defs.' Resp. to Pls.' Int. No. 5 (Dec. 30, 2024).

44.    At all times relevant to this lawsuit, the Stevenson Family reasonably believed that Josh Gardner and/or Garder Defendants were acting within the authorized scope of their agency relationship with Insurance Defendants.

**B.    The Premium Finance Companies and Their Agents.**

45.    At all times relevant to this lawsuit, Gardner Defendants acted within the course and scope of their agency relationship with Succession, Wintrust, and Barrington (collectively, "Lender Defendants").

46.    Succession is a premium financing brokerage firm that markets itself as the "creator" of premium financing for life insurance, and advertises that it "protects" and "maximizes" wealth through "financing policy premiums through a customized loan."



47.    Succession held itself as a "strategic partner," on whom life insurance customers can trust to create "tailored legacy plans," specifically with respect to financing life insurance premiums.



Your Strategic Partner in Premium Financing for Life Insurance

As the creators of premium financing for life insurance, Succession Capital Alliance's experienced team constructs flexible solutions, providing invaluable expertise and designing tailored legacy plans for high-net-worth clients across the nation.

48.    Succession does business by soliciting, brokering, and packaging loans for premium financed insurance products.

49.    Wintrust is a lending entity, loaning insureds like the Stevenson Family sums to fund the premiums on life insurance policies.

50.    Likewise, Barrington—a "Wintrust Community Bank"—is a lending entity, loaning insureds like the Stevenson Family sums to fund the premiums on life insurance policies.

51.    At all times relevant to this lawsuit and for purposes of securing premium financing for the whole life insurance policies Gardner Defendants sold the Stevenson Family, Gardner Defendants affiliated themselves with financial advisors, brokers, and lending professionals working on behalf of Lender Defendants.

52.    Succession acted as the middleman between Wintrust and Barrington (collectively, "Wintrust Defendants") and Gardner Defendants, brokering, securing, and explaining to Gardner Defendants the performance of the premium loans to fund the life insurance policies Gardner Defendants solicited and sold the Stevenson Family.

53.    Gardner Defendants, in turn, acted as the middlemen between Lender Defendants and the Stevenson Family, and served to bottleneck communication and information from the Lender Defendants to the Stevenson Family.

54.    Until the premium financed life insurance structure Gardner Defendants constructed and sold to the Stevenson Family collapsed in 2023, the only direct communication between Lender Defendants and the Stevenson Family came in the form of illustrations, promissory notes, and renewal letters Wintrust Defendants sent to some—but not all—members of the Stevenson Family, all of which Wintrust Defendants simultaneously provided to Gardner Defendants, either directly or through Succession.

55.    With respect to Wintrust Defendants' materials provided directly to the Stevenson Family, Gardner Defendants alerted the Stevenson Family to Wintrust Defendants' correspondence in advance of the Stevenson Family's receipt of the same, so Gardner Defendants could arrange a prompt meeting with the Stevenson Family to "explain" Wintrust Defendants' materials.

56.    Gardner Defendants collected signatures from the Stevenson Family for Wintrust Defendants' loan materials, including promissory notes, and then Gardner Defendants sent those materials back to Wintrust Defendants. Wintrust Defendants never required or requested that the Stevenson Family send any materials directly to Wintrust Defendants, nor did they object to Gardner Defendants sending the materials to Wintrust Defendants on the Steveson Family's behalf.

57.    Wintrust Defendants also clothed their broker, Succession, with the authority to present loan performance and stability and suitability information to the Stevenson Family through Gardner Defendants. Wintrust Defendants attached Succession's illustrations to Wintrust Defendants' communications to the Stevenson Family, giving Succession's illustrations the imprimatur of Wintrust Defendants' approval and authorization to explain the stability of the loan structure.

58.    Wintrust Defendants knew and intended that, by authorizing Gardner Defendants and Succession to explain, communicate about, and sell Wintrust Defendants' loans and renewals to the Stevenson Family, the Stevenson Family would reasonably believe and rely upon the belief that Gardner Defendants and Succession were acting on behalf of Wintrust Defendants with respect to those explanations, communications, assurances, and sales pitches.

59.    Indeed, so aware were Wintrust Defendants of the agency relationship created by its decision to use middlemen to communicate and explain its loan terms

and other information to the Stevenson Family and profiting from the legwork of middlemen to do that job, Wintrust Defendants included in its form master promissory notes boilerplate "acknowledgments," purportedly to disclaim an agency relationship.

60.     But given the sweeping role Gardner Defendants played with respect to the Stevenson Family—acting not just as the Stevenson Family's insurance agents, but also as their financial advisors and retirement and estate planners—and that Succession acted as the Stevenson Family's *loan* broker—not their insurance broker—Wintrust Defendants' vague "acknowledgment" language was insufficient to extinguish the Stevenson Family's reasonable belief and reliance upon the belief that with respect to Wintrust Defendants' loans, the Stevenson Family's financial advisors (Gardner Defendants) and loan broker (Succession) were Wintrust Defendants' agents.

61.     Further, and though Wintrust Defendants could have, Wintrust Defendants never clarified the boilerplate "acknowledgments" to disclaim any agency relationship with *anyone* pitching and selling its financial products to the Stevenson Family.

62.     Additionally, and though Wintrust Defendants could have, Wintrust Defendants never instructed either Succession or Gardner Defendants to disclaim or

explain to the Stevenson Family their respective roles as Wintrust Defendants' actual or ostensible agents.

63.    Succession also clothed Gardner Defendants with authority to act on and speak for Succession on its behalf with respect to communications about the loans and renewals to the Stevenson Family.

64.    Succession provided Gardner Defendants with copies of loan performance illustrations—covered with Succession's logos and letterhead—for the purpose of presenting, explaining, and selling the loans Succession brokered to the Stevenson Family on Succession's behalf, entrusting Gardner Defendants to explain the function, suitability, stability, and performance of the loan packages in view of the insurance policies the loans funded and to entice the Stevenson Family to buy into the loan program.

65.    By way of the email communications, too, between Gardner Defendants and Succession to which the Stevenson Family only became aware if Gardner Defendants provided a copy to the Stevenson Family, the Stevenson Family reasonably understood Succession had authorized the Gardner Defendants to communicate with the Stevenson Family with respect to Succession's brokered loans.

66.    For example, in 2021, Gardner Defendants shared with the Stevenson Family communications between Gardner Defendants and an individual named Joe

Robles at Succession about the status of and plan for the Stevenson Family's premium loans. (Handwriting, below, is Ms. Jones'.) (Confidentiality stamp added by Plaintiffs in discovery in this lawsuit.)





8/9/2021                                        gpcapital.com Mail - RE: Stevenson
Renewal Date: 10/17/2021

**44-105383 Joseph D. Stevenson**
Current Loan Balance: $4,339,570.86
Current Posted Collateral: 1 First Interstate Bank LOC in the amount of $1,292,770.00    ↑ 220 K
Planned Funding for 2021: $1,028,514.55 for Policy 2746927
Balance after Funding 2021: $5,368,085.41
Renewal Date: 8/25/2021

**Joe Robles | Renewal Coordinator**
949-527-3223 (direct) | 949-794-1882 (office)
4695 MacArthur Court, Suite 400 Newport Beach, CA 92660
www.successioncapital.com

SUCCESSION CAPITAL
ALLIANCE ™

**From:** Josh Gardner <josh@gpcapital.com>
**Sent:** Monday, August 9, 2021 7:10 AM
**To:** Joe Robles <jrobles@successioncapital.com>
**Subject:**

I need the loan balances, and current posted collateral on the following please.

Todd F. and Terri Stevenson

Todd J. Stevenson

Todd F. and Joe Stevenson

Thanks!
*Joshoa Q. Gardner*

*Founding Partner*

*406-698-7963 mobile*

*307-672-1828 office*

*307-461-5494 zoom phone*

For more information go to gpcapital.com and see how we help clients fund their risk management
strategies by utilizing leverage.                                        ST000194
https://mail.google.com/mail/u/0?ik=55684b81c7&view=pt&search=all&permthid=thread-f%3A1707633100261944691&simpl=msg-f%3A17076331002...    2/3
CONFIDENTIAL

67.    Accordingly, Succession knew and intended its communications to

Gardner Defendants about the status and performance of the premium loans

Succession brokered and packaged for the Stevenson Family would be relied upon

by the Stevenson Family to understand the stability and status of the loans.

68.    Succession's communications to Gardner Defendants about the status and performance of the premium loans Succession brokered and sold to the Stevenson Family were never marked as "Confidential," for example, nor did they contain warnings or directions to Gardner Defendants not to share with the Stevenson Family the information Succession provided about the Stevenson Family's loans.

69.    Succession, like Wintrust Defendants, could have but did not instruct Gardner Defendants to disclaim or otherwise explain the actual or ostensible agency role Gardner Defendants played with respect to Succession.

70.    That Succession chose to communicate information about the loans it brokered and sold to the Stevenson Family through a middleman—Gardner Defendants—does not operate to sever the connection between Succession and the Stevenson Family.

71.    So, and notwithstanding boilerplate "acknowledgments" that Wintrust Defendants argue purportedly disclaim any agency relationship between Wintrust Defendants, Succession, and Gardner Defendants, Lender Defendants' knowing and intentional omissions and commissions about their relationship with Gardner Defendants—*i.e.,* authorizing Gardner Defendants to serve as their mouthpiece to explain and sell materials covered in Lender Defendants' names to the Stevenson

Family—led the Stevenson Family to reasonably believe otherwise and rely upon their reasonable belief.

72.     Gardner Defendants, too, buttressed the Stevenson Family's perception that Gardner Defendants acted as agents for Lender Defendants, by assuring the Stevenson Family that Gardner Defendants and Lender Defendants were working together on packaging and preparing loans suitable and stable for the Stevenson Family's low-risk goals.

73.     Given the lack of meaningful, direct communication between Lender Defendants and the Stevenson Family, together with the loan materials Lender Defendants provided directly to Gardner Defendants to then provide and explain to the Stevenson Family—all covered in Lender Defendants' letterhead and logos—together with Gardner Defendants' representations about working with the Lender Defendants, the Stevenson Family reasonably understood Lender Defendants had authorized and appointed Gardner Defendants to act as their agents.

74.     As such, Lender Defendants are responsible for the acts and omissions of their actual or ostensible agents, Gardner Defendants, in addition to their own direct liability for the Stevenson Family's damages.

75.     Additionally, Wintrust Defendants are responsible for the acts and omissions of its agent and broker, Succession, in addition to Wintrust Defendants' own direct liability.

76.     Gardner Defendants received substantial benefits by controlling, fostering, and facilitating the relationship between the Stevenson Family and Lender Defendants, because the loan packages secured and delivered by Lender Defendants to the Stevenson Family facilitated the Stevenson Family's purchase of much larger insurance policies, with much larger premiums, on which the Gardner Defendants' commissions are based.

77.     Lender Defendants, too, received substantial benefits by brokering and selling loan packages to the Stevenson Family. For Succession, on information and belief, those benefits came in the form of commission sharing agreements with Gardner Defendants. For Wintrust Defendants, those benefits came from interest accrued and accruing on the loans.

78.     Lender Defendants also benefited from the relationship of trust between their actual or ostensible agents, the Gardner Defendants, and the Stevenson Family. Without the relationship of trust between Gardner Defendants and the Stevenson Family, the Stevenson Family would not have engaged with Lender Defendants in the first instance.

79.     Under the doctrines of estoppel and waiver, Lender Defendants cannot disclaim the agency relationship they created and from which they profited. As discussed already, Wintrust Defendants placed an "acknowledgment" in its master promissory notes purportedly disclaiming such a relationship.

80.     As alleged above, Wintrust Defendants knowingly and intentionally conducted themselves inconsistently with the purported "acknowledgment" of an agency relationship by delegating communications to the Stevenson Family to Gardner Defendants and Succession about the financial products Wintrust Defendants marketed and sold to the Stevenson Family, delegating to Gardner Defendants and Succession the task of explaining and selling Wintrust Defendants' loan proposals to the Stevenson Family, and clothing Gardner Defendants and Succession with the apparent authority through emails and other communications to speak and act on Wintrust Defendants' behalf.

81.     The agency relationship between Wintrust Defendants and Gardner Defendants and Succession was material to the Stevenson Family's reliance on Gardner Defendants' misrepresentations and omissions about the suitability, stability, and performance of Wintrust Defendants' financing products and the premium financed structure as whole.

82.     When the Stevenson Family acted on their reasonable belief with respect to the relationship between Wintrust Defendants and Gardner Defendants and Succession—a belief created by Wintrust Defendants' conduct—the Stevenson Family did not know that Wintrust Defendants' purported disclaimer meant that the Stevenson Family could not rely on their financial advisor and loan broker's representations with respect to Wintrust Defendants' financing products.

83.    In short, Wintrust Defendants intended the Stevenson Family to rely and act on the agency relationship between Wintrust Defendants and Gardner Defendants and Succession—purportedly "acknowledged"—by intentionally and over a long period authorizing Gardner Defendants and Succession to speak to the Stevenson Family for Wintrust Defendants with respect to marketing, explaining, and selling Wintrust Defendants' financing products.

84.    As alleged further below, the Stevenson Family were prejudiced by Wintrust Defendants' conduct by relying on Gardner Defendants' and Succession's misrepresentations and omissions about the function, performance, and stability of Wintrust Defendants' loans, reasonably believing Gardner Defendants' and Succession's explanations and assurances were Wintrust Defendants' explanations and assurances.

## C.    The Insureds.

85.    The Stevenson Family are third-generation Miles City morticians.

86.    The Stevenson Family are not sophisticated financial professionals.

87.    Over the course of decades, the Stevenson Family have worked to grow their family funeral home business, Stevenson and Sons Funeral Homes, into a pillar of many Montanans' lives.

88.    The Stevenson Family's lawyer, Janette Jones, has advised the Stevenson Family on various legal matters for years. Ms. Jones—like the Stevenson

Family—does not hold herself out as a financial advisor or sophisticated financial professional. With respect to the premium financed life insurance structure Gardner Defendants sold the Stevenson Family, Ms. Jones was as much a customer—serving solely as the trustee for the trusts that purchased the insurance policies and took out the premium loans—as the rest of the Stevenson Family.

89.     As such, Ms. Jones and the rest of the Steveson Family and reasonably relied on the financial advice of Gardner Defendants, who held themselves out as having expertise, knowledge, and skill to decide how to appropriately and prudently map out the Stevenson Family's estate and retirement planning goals.

90.     The hard-earned success of Stevenson and Sons Funeral Homes brought the Stevenson Family security, until Gardner Defendants pulled the Stevenson Family into the complex, high-risk, and volatile structure of premium financed life insurance, selling the structure as low-risk, suitable, and stable for the Stevenson Family's stated estate and retirement planning goals.

## II.     JOSH GARDNER WIELDED HIS SPECIAL RELATIONSHIP WITH THE STEVENSON FAMILY TO PULL THEM INTO THE TRIPARTITE STRUCTURE.

91.     Josh Gardner and his family have known the Stevenson Family for generations. Over the decades, the Gardners and the Stevensons have buried, married, and employed each other. The families have developed the trust and knowledge of each other as only those whose great-grandparents homesteaded the dirt of the northern Great Plains together can.

92.     Josh Gardner knew the Stevenson Family's financial goals and fears.

93.     More importantly, Josh Gardner knew the Stevenson Family's lack of financial sophistication.

94.     Most importantly, Josh Gardner knew the amount of wealth the Stevenson Family accumulated over generations of hard work.

A.     **Josh Gardner's Close Relationship with The Stevenson Family Allowed Him Access, Knowledge, and Trust Beyond that Of Arm's Length Insurance Agent.**

95.     Wielding Josh Gardner's knowledge of the Stevenson Family's enticing combination of wealth and lack of financial sophistication, as well as the Stevenson Family's trust in Josh Gardner, Gardner Defendants situated and represented themselves to be the Stevenson Family's "strategic advisors" with respect to wealth management, investment, retirement and estate planning.

96.     In that role, in or around 2013, Gardner Defendants purported to analyze the Stevenson Family's total financial and investment portfolio.

97.     Gardner Defendants' services to the Stevenson Family included purporting to evaluate and recommend suitable life insurance options to purportedly achieve the Stevenson Family's retirement and estate planning goals.

98.     The Stevenson Family did not approach Gardner Defendants to guide them into or procure for them the premium financed life insurance structure.

99.    To the extent Josh Gardner did not already know by way of his special relationship with them, the Stevenson Family conveyed to the Gardner Defendants they were risk-averse, at least with respect to retirement and estate planning.

100.   The Stevenson Family's retirement and estate planning goals were simple. They wished to protect the wealth they built over generations for the benefit of their children, grandchildren, and their church.

101.   The Stevenson Family was *not* seeking a complex, high-risk investment scheme that would jeopardize their generations-built business and their family legacy.

102.   But Gardner Defendants, backed by Lender Defendants' institutional marketing and the purported soundness of their products, recommended the premium financed life insurance structure as the sole, suitable, and stable option for the Stevenson Family's risk-averse goals.

**B.     The Gardner Defendants Constructed, Pitched, and Sold the Stevenson Family on the Tripartite Financial Structure, Going Far Beyond the Mere Sale of Insurance Policies.**

103.   Armed with Josh Gardner's special and familial insight and history with the Stevenson Family, Gardner Defendants began pitching the Stevenson Family on structuring their retirement and estate planning goals on a highly complex and extremely volatile premium financed life insurance program.

104.   The complexity of the tripartite structure Gardner Defendants constructed for the Stevenson Family plainly went well beyond an insurance salesman procuring and selling auto coverage, as evidenced by the illustrations Josh Gardner provided to the Stevenson Family in 2013.



105.   Unlike the straightforward sale of insurance from insurance agent to insured, the structure Gardner Defendants built for the Stevenson Family involved coordination with sophisticated Lender Defendants and Insurance Defendants, and the creation of irrevocable trusts.

106.   To sell the premium financed program pushed on the Stevenson Family, Gardner Defendants promoted themselves to the Stevenson Family as experts in a variety of highly skilled professions, such as financial planning, life insurance, estate planning, banking, and trust law.

1.    **Step 1: Gardner Defendants Directed the Stevenson Family to Create the Irrevocable Life Insurance Trusts.**

107.    Gardner Defendants' pitch began as early as 2013, but no later than 2014, when Gardner Defendants advised and directed Todd Stevenson to create an irrevocable life insurance trust that would own two of the whole life insurance policies Gardner Defendants sold Todd next. In particular, in 2013 or 2014, Josh Gardner instructed Todd to create the Todd Stevenson 2013 Irrevocable Family Trust.

108.    Todd did as Gardner Defendants instructed, and created the Todd Stevenson 2013 Irrevocable Family Trust. Todd would not have created the Todd Stevenson 2013 Irrevocable Family Trust, but for Gardner Defendants' direction that it was the appropriate and suitable course with respect to the Stevenson Family's retirement and estate planning goals.

109.    Gardner Defendants did the same in 2017, when Gardner Defendants advised and directed Terri Stevenson to create the Terri L. Stevenson 2016 Irrevocable Family Trust that would own the whole life insurance policies Gardner Defendants sold Terri.

110.    Terri also did as Gardner Defendants instructed, and created the Terri L. Stevenson 2016 Irrevocable Family Trust. Terri would not have created the Terri L. Stevenson 2016 Irrevocable Family Trust, but for Gardner Defendants' direction

that it was the appropriate and suitable course with respect to the Stevenson Family's estate planning goals.

111.   Again in 2017, Gardner Defendants directed and advised Todd to create the Todd F. Stevenson Irrevocable Life Insurance Trust that would own additional whole life insurance policies Gardner Defendants sold Todd next.

112.   Todd again did as Gardner Defendants instructed, and created the Todd F. Stevenson Irrevocable Life Insurance Trust. Todd would not have created the Todd F. Stevenson Irrevocable Life Insurance Trust, but for Gardner Defendants' advice that it was the appropriate and suitable course with respect to the Stevenson Family's estate planning goals.

113.   Again in 2017, Gardner Defendants advised and instructed that Joe Stevenson create the Joseph D. Stevenson Irrevocable Life Insurance Trust.

114.   Joe also did as Gardner Defendants directed, and created the Joseph D. Stevenson Irrevocable Life Insurance Trust. Joe would not have created the Joseph D. Stevenson Irrevocable Life Insurance Trust, but for Gardner Defendants' direction that it was the appropriate and suitable course with respect to the Stevenson Family's estate planning goals.

### 2.    Step 2: Gardner Defendants Sold the Stevenson Family Life Insurance Policies, to Be Funded by Premium Financing.

115.   With the first Stevenson Family irrevocable life insurance trust created no later than 2014, Gardner Defendants began the lucrative (for them) process of

selling large and unsuitable Mass Mutual, Penn Mutual, and Penn Annuity policies to the Stevenson Family.

116.   Josh Gardner started with Todd, by soliciting, pitching, and selling him two Mass Mutual whole life insurance policies (together, the "2014 Todd Policies").

117.   The 2014 Todd Policies are numbered 21364008 and 21359917 and owned by the Todd Stevenson 2013 Irrevocable Family Trust, with Todd Stevenson as the insured. The 2014 Todd Policy No. 21359917 had an initial face value of $7,500,000. The 2014 Todd Policy No. 21364008 had an initial face value of $10,000,000.

118.   Defendants failed to appropriately analyze and consider the suitability and size of the combined $17.5 million death benefit Gardner Defendants solicited and sold to Todd, given the Stevenson Family's net worth and other insurance underwriting factors and guidelines.

119.   Defendants' sole focus was not suitability, stability, and security for the risk-averse Stevenson Family, but rather the sale of large policies—with commensurately large premiums—to generate the highest commissions and profits for themselves.

120.   The 2014 Todd Policies' performance illustrations were produced by Mass Mutual and presented to the Stevenson Family by Gardner Defendants.

121.  Gardner Defendants' misrepresentations about the stability and suitability of the premium financed structure began right away, as evidenced by a 2014 email to Ms. Jones and Todd, wherein Gardner Defendants stated that the Stevenson Family could surrender the Mass Mutual policies and walk away right then with "$10 million of cash."

From: jggardner1 . [mailto:jggardner@gmail.com]
Sent: Wednesday, May 14, 2014 9:05 AM
To: Todd Stevenson; Jeannette Jones
Subject: Please respond

Hey there, wanted to run some new numbers by you.

Mass Mutual has the capacity now to take all of the 17.5 Million instead of the original 10M like we were planning on.  This just happened yesterday, I talked to Todd last night and ran new numbers today that I want to share with you.  We would need some more blood and updated financials but these numbers may warrant some work on our end if you agree.

This is the benefit of having it all with Mass
1.) The annual premium is $57,374 less per year, a savings of $573,740 on a 10 year policy, which in turn saves you $83,604 of interest over the 10 years..  *The annual premium savings offsets the interest cost on the loan at Stockman.....*

2.) Mass allows the interest to accrue and not be paid annually.

3.) I was worried about the performance being diminished on less funding and that IS NOT the case.  **At age 80 if we put it all at Mass the cash value is over $2M greater and the death benefit is $3.1M greater than if we put some with Mass and some with Ohio.**  The loan balance would be approx $18.8M and the gross death benefit is over $38M, for a net $20M to the trust. The gross cash value at this point is over $28M so if you wanted to surrender the policy and walk away you would leave with $10M of cash...

Pretty strong when you consider that all this will be accomplished for the net difference between Stockman interest and the earnings at Geneva.

If we want to pursue this we should jump on it right now and get paperwork started for the additional $7.5M with Mass.......

Let me know your thoughts ASAP!
--
*Josh Gardner*
*Summit Financial Group*
*312 Whitney Lane Suite 3*
*Sheridan Wyoming 82801*

*307-655-8393 office*
*406-698-7963 cell*

122.  Gardner Defendants' representation about "walking away" with $10 million of cash was false or misleading, because Gardner Defendants' were representing non-guaranteed values as guaranteed, without any caveat or disclaimer

that the policies may not perform as Gardner Defendants' unequivocally represented they would.

123.  The purpose of Gardner Defendants' false or misleading statement about "walk away" value was to advance the big illusion—that the premium financed life insurance structure was a stable, certain, and safe estate and retirement planning program, rather than a volatile, high-risk investment scheme.

124.  Gardner Defendants' other written statements in 2014, too, similarly and misleadingly misrepresented the policies' performance with respect to the loans that paid for them as guaranteed, without any discussion about the non-guaranteed nature of the policies' cash accretion and the loan interest rates' variability, *i.e.,* "the annual premium savings offsets the interest cost on the loan," without any disclosure or disclaimer that the promised "offset" was contingent on non-guaranteed elements.

125.  Again, the purpose Gardner Defendants' false or misleading statement about guaranteed "offsets" was to advance the big illusion—that the premium financed structure was a stable, certain, and safe estate and retirement planning program, rather than a volatile, high-risk, and unstable financial structure.

126.  Energized by the commissions and financial incentives earned by talking Todd into purchasing the Mass Mutual policies, and reassuring and misrepresenting to the Stevenson Family at annual meetings thereafter on the strength and stability of the loan structure paying for the policies with respect to the

policies' performance, Gardner Defendants knew they had the Stevenson Family hooked.

127.   So, Gardner Defendants moved onto Terri next, soliciting, pitching, and selling Terri a Mass Mutual life insurance policy and a Penn Mutual life insurance policy (together, the "2017 Terri Policies"). The 2017 Terri Policies were assigned the Terri L. Stevenson 2016 Irrevocable Family Trust shortly after purchase.

128.   The 2017 Terri Mass Mutual Policy No. 22384117 had an initial face value and initial supplement rider value totaling $10,000,000. The 2017 Terri Penn Mutual Policy No. 267306690 had an initial face value plus initial supplement rider value totaling $5,000,000, and was apparently issued on January 18, 2017.

129.   The 2017 Terri Policies' performance illustrations were produced by Mass Mutual and Penn Mutual and presented to the Stevenson Family by Gardner Defendants.

130.   Gardner Defendants moved onto T.J. next, soliciting, pitching, and selling T.J. a Mass Mutual Life Insurance Policy and a Penn Annuity Accumulation Builder Select Universal Indexed Life Insurance Policy (together, the "2017 T.J. Policies"). The 2017 T.J. Penn Annuity Policy No. 92433340 had an initial face value of $10,000,000. The 2017 T.J. Mass Mutual Policy No. 22486207 had an initial face value plus an initial supplement rider value totaling $2,000,000.

131.  The 2017 T.J. Policies' performance illustrations were produced by Mass Mutual and Penn Annuity and presented to the Stevenson Family by Gardner Defendants.

132.  Fueled by the piles of commissions already earned from Insurance Defendants, Gardner Defendants turned back to Todd in 2017, recommending Todd's other trust, the Todd F. Stevenson Irrevocable Life Insurance Trust, purchase a Penn Annuity Guaranteed Life Insurance Policy (the "2017 Todd Policy"). The 2017 Todd Policy No. 2746933, had an initial face value plus initial supplement rider value totaling $11,500,000.

133.  The 2017 Todd Policy's performance illustrations were produced by Penn Annuity and presented to the Stevenson Family by Gardner Defendants.

134.  Gardner Defendants finished up their run on the Stevenson Family with Joe in 2017, when on Gardner Defendants' recommendation, the Joseph D. Stevenson Irrevocable Life Insurance Trust purchased a Penn Mutual Guaranteed Life Insurance Policy (the "2017 Joe Policy"). The 2017 Joe Policy No. 2746927 had an initial face value plus initial supplement rider value totaling $11,500,000.

135.  The 2017 Joe Policy's performance illustrations were produced by Penn Mutual and presented to the Stevenson Family by Gardner Defendants.

136.  Collectively, the Stevenson Family purchased the 2014 Todd Policies, the 2017 Terri Policies, the 2017 T.J. Policies, the 2017 Todd Policy, and the 2017

Joe Policy (together, the "Life Insurance Policies") relying on evaluations, recommendations, assurances, illustrations, projections, and instructions Gardner Defendants provided and presented to them.

137.   Defendants failed to appropriately analyze and consider the suitability and size of the death benefits under the Life Insurance Policies, given the Stevenson Family's net worth and other insurance underwriting guidelines and factors.

138.   Instead, Defendants' sole focus was not suitability and security for the risk-averse Stevenson Family, but rather the sale of the large Life Insurance Policies—with commensurately large premiums—to generate the highest commissions and profits for themselves.

139.   On every sale of every policy, Gardner Defendants were paid commissions and received other financial benefits and incentives from Insurance Defendants.

140.   At every turn, including at annual meetings with the Stevenson Family, Gardner Defendants assured the Stevenson Family that the Life Insurance Policies were a part of a suitable, stable, and safe estate and retirement planning paradigm, stably balanced against the loans that funded them, into which the Stevenson Family could safely pour their savings, rather than one leg of a volatile and high-risk and unstable financial structure.

141.   And at every turn, including at annual meetings with the Stevenson Family and in written correspondence like the exemplar email from 2014, above, Gardner Defendants omitted or misrepresented information about the high-risk, highly complex nature of funding the Life Insurance Policies through premium financing, which Gardner Defendants convinced the Stevenson Family was the appropriate and stable means of paying for the Life Insurance Policies.

142.   The Stevenson Family would not have purchased the Life Insurance Policies and funded them through premium financing, but for Gardner Defendants' and Lender Defendants' representations that premium financed loan packages would provide a secure, stable, and low-risk method of paying for Life Insurance Policies.

### 3.    Step 3: Gardner Defendants and Lender Defendants Solicited and Packaged Loans to Fund the Life Insurance Policies' Premiums.

143.   At the same time Gardner Defendants solicited, pitched, and sold the Stevenson Family on the Life Insurance Policies, Gardner Defendants and Lender Defendants worked in concert to package and secure loans that would purportedly pay the premiums on the Life Insurance Policies.

144.   As alleged previously, Insurance Defendants knew about, condoned, and encouraged Gardner Defendants to invite the Stevenson Family into the volatile tripartite relationship with themselves and Lender Defendants.

145.   Lender Defendants also understood that the loans brokered, packaged, and sold to the Stevenson Family were one leg of the tripartite premium financed structure. Lender Defendants knew their loans funded the Life Insurance Policies, and Lender Defendants knew that without their loans funding the Life Insurance Policies, the Life Insurance Policies—and thus the premium financed structure—would not exist.

146.   Coordinating with Gardner Defendants, Succession solicited and brokered loan packages from Wintrust Defendants to fund the premiums on the Life Insurance Policies.

147.   Lender Defendants created loan illustrations curated and customized for the Stevenson Family—down to estimated death dates—to purportedly demonstrate to the Stevenson Family how their loans would safely and stably pay the premiums on the Life Insurance Policies Gardner Defendants were selling or had already sold to them.

148.   To that end, Lender Defendants provided and presented loan package illustrations and other loan information and communications to the Stevenson Family through their agents, Gardner Defendants, all stamped with Lender Defendants' logos and names.



**WINTRUST**

**LIFE FINANCE**

Projected Loan Performance Schedule

Deal Number: 44-106284

Additional Days of Interest Collateralized: 60

Interest Stress Factor: 0.50

| Date | Annual Loan Increment | Principal Payment | Outstanding Principal | Interest Rate¹ | Interest On Loan | Additional Interest | LPS Interest | Cash Surrender Value | Additional Collateral Value | Collateral Deficit | Death Benefit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/7/2020 | 384,225.00 | 0.00 | 6,194,779.07 | 3.82% | 239,927.24 | 39,440.09 | 279,367.33 | 5,176,701.00 | | (1,297,445.40) | 18,313,068.00 |
| 6/9/2020 | 512,300.00 | 0.00 | 6,707,079.07 | 3.82% | 259,660.18 | 42,701.74 | 302,361.91 | 5,791,726.00 | 0.00 | (1,217,714.99) | 18,577,330.00 |
| 6/7/2021 | | | | | | MATURED | | | | | |

//

![SUCCESSION CAPITAL]    **CAPITAL MAXIMIZATION STRATEGY** *SM*

Loan interest is not deductible. This illustration does not take into consideration any assumption regarding income, gift, or estate tax. Please consult your tax advisor.

**Additional $2,792,991 was Borrowed in the First Year to Pay Off the Existing Loan**

FOR:   Mr. & Mrs. Stevenson                                                    POLICY: Composite

AGE:   54 & 57                                                                         ISSUER: CMS Carrier

CLASSIFICATION (M) Standard-NS & (F) Standard-NS

| | Finance | | | | | | | Taxable Investment | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Annual Insurance Outlay | Cumulative Loan | Annual Loan Rate | Policy Income | Net Outlay | Surrender Value | Policy Surrender Value Death Benefit Net of Loan | Death Benefit Net of Loan | Net Outlay | Gross Withdrawal | 6.45% Growth Net of Tax @ 30% | Net After Tax and Net of Withdrawals |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 1 | (1,727,414) | (4,520,405) | 3.040% | 0 | (139,329) | 3,300,419 | (1,219,986) | 28,865,464 | (139,329) | 0 | 6,291 | 145,620 |
| 2 | (1,727,414) | (6,247,820) | 3.040% | 0 | (192,572) | 4,958,216 | (1,289,604) | 27,773,662 | (192,572) | 0 | 15,269 | 353,461 |
| 3 | (1,727,414) | (7,975,234) | 3.040% | 0 | (245,814) | 6,813,768 | (1,161,466) | 26,738,322 | (245,814) | 0 | 27,057 | 626,332 |
| 4 | (1,727,414) | (9,702,648) | 3.040% | 0 | (299,057) | 8,777,898 | (924,750) | 25,763,780 | (299,057) | 0 | 41,781 | 967,171 |
| 5 | (1,727,414) | (11,430,063) | 3.040% | 0 | (352,300) | 10,853,260 | (576,802) | 24,839,108 | (352,300) | 0 | 59,574 | 1,379,045 |
| 6 | (1,727,414) | (13,157,477) | 3.040% | 0 | (405,543) | 13,051,535 | (106,842) | 23,967,070 | (405,543) | 0 | 80,574 | 1,865,162 |
| 7 | (1,727,414) | (14,884,891) | 3.040% | 0 | (458,785) | 15,384,946 | 500,065 | 23,153,866 | (458,785) | 0 | 104,926 | 2,428,973 |
| 8 | (830,889) | (15,715,780) | 3.040% | 0 | (484,395) | 17,023,036 | 1,307,256 | 23,369,838 | (484,395) | 0 | 131,534 | 3,044,803 |
| 9 | (830,889) | (16,546,670) | 3.040% | 0 | (510,005) | 18,750,495 | 2,203,825 | 23,611,433 | (510,005) | 0 | 160,500 | 3,715,307 |
| 10 | (830,889) | (17,377,559) | 3.040% | 0 | (535,615) | 20,573,482 | 3,195,923 | 23,882,979 | (535,615) | 0 | 191,929 | 4,442,852 |
| | (14,584,968) | | | 0 | (3,623,416) | | | | (3,623,416) | | | |

149.  Lender Defendants could have, but did not, communicate or explain their branded illustrations directly to the Stevenson Family, but instead relied on their downstream agents to do that for them, knowing and intending that the downstream agents would use Lender Defendants' branded materials to entice the Stevenson Family into believing the premium financing structure was suitable and stable with respect to the cash accretion performance of the Life Insurance Policies.

150.  For Wintrust Defendants, those downstream agents were Succession and Gardner Defendants. For Succession, the downstream agents were Gardner

Defendants. Together, Lender Defendants down-streamed communication and explanations to the Stevenson Family about the loan packages and loan performance and stability against the Life Insurance Policies to bottleneck, ultimately, at Gardner Defendants.

151.   Wintrust Defendants' and Succession's communications to the Stevenson Family—ultimately funneled through Gardner Defendants—about how Wintrust Defendants' loans would perform against the cash accretion of the Life Insurance Policies were, at best, misleading.

152.   For example, on September 27, 2017, Wintrust Defendants offered the Stevenson Family to arrange financing for some of the Life Insurance Policies—an offer letter copied to Gardner Defendants, which Wintrust Defendants authorized Gardner Defendants to explain and pitch to the Stevenson Family, weaponizing Gardner Defendants' special relationship of trust with the Stevenson Family to do so.

153.   An individual named Douglas Salvi signed Wintrust Defendants' 2017 offer letter.

154.   The body of Wintrust Defendants' 2017 offer letter explained that the interest rate charged on the premium loan would be calculated on each anniversary of the policy issue date by "adding 135 base points (1.35%) to the one-year LIBOR

rate as published thirty (30) days prior to each anniversary of the policy issue date. At no time shall the overall rate charged fall below 2.45%."

155.  Given the catastrophic risk involved with funding the whole Life Insurance Policies through financing, Wintrust Defendants' 2017 offer letter should have, but did not disclose, explain, or otherwise discuss that interest rate variability risked the Stevenson Family ending up irretrievably underwater on the loans.

156.  Given the catastrophic risk involved with funding the whole Life Insurance Policies through financing, Wintrust Defendants' 2017 offer letter should have, but did not disclose, explain, or otherwise discuss that balancing the loan debt against the cash accretion of the policy it funded was a complex, delicate, high-risk, proposition unsuitable for risk-averse customers.

157.  Had Wintrust Defendants' 2017 offer letter disclosed anything close to the fact that balancing the performance of the Life Insurance Policies against the performance of the loans funding them was volatile and so interest-rate sensitive that the Stevenson Family would lose their entire net worth if the balance inverted (*i.e.,* if interest rates increased such that the Life Insurance Policies' cash accretion no longer outpaced the loan balances), the Stevenson Family would not have borrowed any money from Wintrust Defendants, nor would they (or could they) have purchased the Life Insurance Policies the loans funded.

158.   Instead, Wintrust Defendants attached to the 2017 offer letter a Succession illustration that misleadingly indicated the fictitious stability of positive balance between loan performance and policy performance.

159.   Specifically, Wintrust Defendants attached to the 2017 offer a customized illustration produced by Succession, containing information about the purported annual interest rates of the loans, the surrender value of the life insurance policy, the death benefit of the policy, and more.

160.   The Succession illustration was customized for the Stevenson Family and designed and intended by Succession for Gardner Defendants' to use it to pitch and sell the Stevenson Family on the loan package Succession brokered from Wintrust.

161.   Succession knew and intended that its customized illustration would be communicated to, shown to, and explained to the Stevenson Family by Gardner Defendants for purposes of inducing the Stevenson Family to buy into the premium financed program.

162.   The interest rate in Succession's customized illustration varied from 3.04%-5%, but never exceeded 5% for the entire life of the policy.

163.   In tiny, boilerplate language at the bottom of the Succession illustration attached to Wintrust Defendants' 2017 offer letter, and overwritten on the first page by direction to a signature page, a purported disclaimer reads "Life Insurance values

based on current expenses and crediting rate. Results are not guaranteed. Financing assumptions are for illustrative purposes only. The Lender will determine the actual loan terms." (Arrows added below for emphasis.)

**CAPITAL MAXIMIZATION STRATEGY** SM

*Loan interest is not deductible. This illustration does not take into consideration any assumption regarding income, gift, or estate tax. Please consult your tax advisor.*

**Additional $2,792,991 was Borrowed in the First Year to Pay Off the Existing Loan**

FOR: Mr. & Mrs. Stevenson
AGE: 54 & 57
CLASSIFICATION (M) Standard-NS & (F) Standard-NS

POLICY: Composite
ISSUER: CMS Carrier

| Year | Annual Insurance Outlay | Cumulative Loan | Annual Loan Rate | Policy Income | Net Outlay | Surrender Value | Policy Surrender Value Net of Loan | Death Benefit Net of Loan | Net Outlay | Gross Withdrawal | 6.45% Growth Net of Tax @ 30% | Net After Tax and Net of Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 1 | (1,727,414) | (4,520,405) | 3.040% | 0 | (139,329) | 3,300,419 | (1,219,986) | 28,865,464 | (139,329) | 0 | 6,291 | 145,620 |
| 2 | (1,727,414) | (6,247,820) | 3.040% | 0 | (192,572) | 4,958,216 | (1,289,604) | 27,773,662 | (192,572) | 0 | 15,269 | 353,461 |
| 3 | (1,727,414) | (7,975,234) | 3.040% | 0 | (245,814) | 6,813,768 | (1,161,466) | 26,738,322 | (245,814) | 0 | 27,057 | 626,332 |
| 4 | (1,727,414) | (9,702,648) | 3.040% | 0 | (299,057) | 8,777,898 | (924,750) | 25,763,780 | (299,057) | 0 | 41,781 | 967,171 |
| 5 | (1,727,414) | (11,430,063) | 3.040% | 0 | (352,300) | 10,853,260 | (576,802) | 24,839,108 | (352,300) | 0 | 59,574 | 1,379,045 |
| 6 | (1,727,414) | (13,157,477) | 3.040% | 0 | (405,543) | 13,061,636 | (106,842) | 23,967,070 | (405,543) | 0 | 80,574 | 1,865,162 |
| 7 | (1,727,414) | (14,884,891) | 3.040% | 0 | (458,785) | 15,384,946 | 500,065 | 23,153,866 | (458,785) | 0 | 104,926 | 2,428,873 |
| 8 | (830,889) | (15,715,780) | 3.040% | 0 | (484,395) | 17,023,036 | 1,307,256 | 23,369,838 | (484,395) | 0 | 131,534 | 3,044,003 |
| 9 | (830,889) | (16,546,670) | 3.040% | 0 | (510,005) | 18,750,495 | 2,203,825 | 23,611,433 | (510,005) | 0 | 160,500 | 3,716,307 |
| 10 | (830,889) | (17,377,559) | 3.040% | 0 | (535,615) | 20,573,482 | 3,195,923 | 23,882,979 | (535,615) | 0 | 191,929 | 4,442,852 |
| | (14,584,568) | | | 0 | (3,623,416) | | | | (3,623,416) | 0 | | |
| 11 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 21,689,860 | 4,312,291 | 24,676,992 | (535,615) | 0 | 224,778 | 5,203,244 |
| 12 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 22,861,971 | 5,484,412 | 25,586,792 | (535,615) | 0 | 259,109 | 5,997,969 |
| 13 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 24,091,780 | 6,714,220 | 26,532,392 | (535,615) | 0 | 294,991 | 6,828,575 |
| 14 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 25,377,770 | 8,000,211 | 27,507,222 | (535,615) | 0 | 332,493 | 7,696,683 |
| 15 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 26,721,592 | 9,344,033 | 28,513,351 | (535,615) | 0 | 371,688 | 8,603,987 |
| 16 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 28,124,378 | 10,746,819 | 29,549,347 | (535,615) | 0 | 412,653 | 9,552,254 |
| 17 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 29,584,449 | 12,206,890 | 30,616,280 | (535,615) | 0 | 455,467 | 10,543,337 |
| 18 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 31,104,421 | 13,726,862 | 31,715,041 | (535,615) | 0 | 500,215 | 11,579,166 |
| 19 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 32,686,137 | 15,308,578 | 32,852,763 | (535,615) | 0 | 546,982 | 12,661,764 |
| 20 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 34,329,762 | 16,952,203 | 34,026,043 | (535,615) | 0 | 595,862 | 13,793,240 |
| | (14,584,568) | | | 0 | (8,979,566) | | | | (8,979,566) | 0 | | |
| 21 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 36,035,849 | 18,658,290 | 35,231,364 | (535,615) | 0 | 646,948 | 14,975,803 |
| 22 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 37,804,955 | 20,427,396 | 36,467,458 | (535,615) | 0 | 700,341 | 16,211,759 |
| 23 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 39,637,272 | 22,259,713 | 37,734,463 | (535,615) | 0 | 756,144 | 17,503,518 |
| 24 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 41,539,621 | 24,162,062 | 39,039,819 | (535,615) | 0 | 814,467 | 18,853,600 |
| 25 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 43,510,943 | 26,133,384 | 40,447,391 | (535,615) | 0 | 875,423 | 20,264,638 |
| 26 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 45,547,361 | 28,169,802 | 42,086,522 | (535,615) | 0 | 939,131 | 21,739,384 |
| 27 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 47,648,971 | 30,271,412 | 43,779,798 | (535,615) | 0 | 1,005,716 | 23,280,715 |
| 28 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 49,820,623 | 32,443,064 | 45,543,220 | (535,615) | 0 | 1,075,307 | 24,889,637 |
| 29 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 52,060,248 | 34,682,689 | 47,374,797 | (535,615) | 0 | 1,148,040 | 26,575,293 |
| 30 | 0 | (17,377,559) | 3.040% | 0 | (535,615) | 54,367,834 | 36,990,275 | 49,272,043 | (535,615) | 0 | 1,224,057 | 28,334,965 |
| | (14,584,568) | | | 0 | (14,335,715) | | | | (14,335,715) | 0 | | |

*Life Insurance values based on current expenses and crediting rate. Results are not guaranteed. ... purposes only. The Lender will determine the actual loan terms.*

**SEE PAGE 4 for SIGNATURE**

Page 1 of 20                                                    1/6/2017

CONFIDENTIAL

STO001452

164. The Succession illustration misled the Stevenson Family into reasonably believing that premium financed structure was suitably balanced by illustrating the structure only in an interest rate environment between 2.45% and 5%.

165. The Succession illustration should have, but did not, illustrate the consequences to the Stevenson Family if interest rates rose above the illustrated 5%

—scenario reasonably foreseeable to financial professionals given historical data and analysis to which Gardner Defendants and Lender Defendants all were aware and had access.

166.   Had the Succession illustration shown that the tripartite structure would destabilize and collapse, and take the Stevenson Family's net worth with it, if interest rates rose above 5%, the Stevenson Family would not have borrowed any money from Wintrust Defendants pursuant to the loan packages Succession brokered, nor would they (or could they) have purchased the Life Insurance Policies the loans funded.

167.   In short, Wintrust Defendants' offer letter and the Succession illustration attached thereto, should have, but did not disclose to the Stevenson Family that if interest rates rose beyond the level illustrated, the premium financed structure would capsize and pitch the Stevenson Family and their net worth under water.

168.   And certainly, the "disclaimer" at the bottom of the Succession illustration says nothing about *interest rate* fluctuation beyond the amounts illustrated. Instead, the only "non-guaranteed" element identified in the "disclaimer" are some nebulous "results." Given that the Succession illustration is entitled "Capital Maximization Strategy," the Stevenson Family reasonably understood that

"results" meant the profitability of the loan program, not the risk of infinite loss if the premium financed program failed.

169.   Lender Defendants could have, but did not, include in their communication to the Stevenson Family that the program pitched was volatile, high-risk, and inappropriate for low-risk estate and retirement planning goals.

170.   The dearth of warning by Lender Defendants was filled by their agents' assurances.

171.   With Gardner Defendants acting as Lender Defendants' agents and conduits of information about the financing offer and terms thereof, Gardner Defendants affirmed the Stevenson Family's reasonable belief with respect to the stability and suitability of the premium financed structure, pointing to Lender Defendants' illustrations showing only the most favorable interest rate environment, and never discussed or warned what would happen if interest rates rose above the 5% illustrated.

172.   The same misleading and omission-laden information was conveyed to the Stevenson Family—through Gardner Defendants—by "Projected Loan Performance Schedules" created by Wintrust Defendants and intended to reach the Stevenson Family for explanation by Gardner Defendants and for the purpose of inducing the Stevenson Family to buy in to the program.

173. For example, beginning in 2014, Wintrust Defendants created "schedules" of loans packaged for and sold to the Stevenson Family, wherein Wintrust Defendants represented the purported stability of the premium financed program by illustrating interest rates—illustrations presented and Wintrust Defendants intended to be presented to the Stevenson Family by Gardner Defendants—of no greater than 3.82%.

174. In this lawsuit, initiated after the supposedly stable and suitable premium financed structure collapsed in 2023 when interest rates surged past 7%, Wintrust Defendants rely on tiny, boilerplate "disclaimers" at the bottom of their loan schedules created before the collapse to contend that the Stevenson Family unreasonably understood the structure was well-balanced, stable, and would extinguish their net worth in an interest rate environment not illustrated. (Arrows added below for emphasis.)



175.   Though the Wintrust Defendants' disclaimers did a bit more work than Succession's by actually using the phrase "interest rate" and stating that the interest rate was not guaranteed, they were still wholly inadequate in context to adequately or actually warn the catastrophic consequences to the Stevenson Family if interest rates shot beyond those purposefully illustrated in the most favorable scenario.

176.   Wintrust Defendants could have, but did not, include in their illustrations for the Stevenson Family any warning that the program pitched was volatile, high-risk, and inappropriate for low-risk estate and retirement planning goals.

177.   Wintrust Defendants, instead and purposefully, only illustrated the loan program under the most favorable circumstances, all to entice the Stevenson Family into believing the structure was stable.

178.   The dearth of warning by Wintrust Defendants was filled by their agents' assurances.

179.   Specifically, again, Wintrust Defendants authorized Gardner Defendants to present and explain their loan schedules and other loan information to the Stevenson Family for the purpose of inducing the Stevenson Family to buy into the program.

180.   Gardner Defendants, acting simultaneously as the Stevenson Family's financial advisor and the actual or ostensible agent of Wintrust Defendants,

explained Wintrust Defendants' vague nod to "non-guaranteed" interest rates in tiny font by assuring the Stevenson Family that in any interest rate scenario, the premium financed structure was suitable and stable for the Stevenson Family's goals, and certainly never conveyed that the Stevenson Family could lose their net worth if the interest rate environment rose above that illustrated by Wintrust Defendants.

181.    Notably, Ms. Jones' signature appears on loan materials not as the Stevenson Family's legal advisor guiding them on the same, but simply as the trustee for some of the trusts borrowing the money from Wintrust Defendants.

182.    The sole advisors with respect to Lender Defendants' loan packages were Gardner Defendants, who Lender Defendants authorized to pitch, explain, and sell their financial products, and who the Stevenson Family trusted as their financial, estate, retirement, and insurance expert.

183.    Wintrust Defendants' master promissory notes—again, copied by Wintrust Defendants to Gardner Defendants so Gardner Defendants could explain and sell Wintrust Defendants' loans to the Stevenson Family—also failed to disclose the volatility of the premium financed program, and that the Stevenson Family could lose everything if interest rates climbed above what Gardner Defendants and Lender Defendants illustrated.

184.    Lender Defendants' decision to use Gardner Defendants as the conduit of communication to the Stevenson Family, coupled with Lender Defendants' failure

to illustrate anything to the Stevenson Family other than a favorable, stable interest rate environment, defeats any reliance on complex, boilerplate language in the master promissory notes about how the unsophisticated Stevenson Family could have annually done the math (in the future, apparently) to predict for themselves each year that the loans' interest rates might exceed what the Lender Defendants enticingly and misleadingly illustrated and scheduled, and to understand from that prediction the catastrophic consequences attendant with an higher-than-illustrated rate.

185.    Providing the interest rate calculation method to the Stevenson Family, as explained by Gardner Defendants, failed to disclose to the Stevenson Family the catastrophic risk to the Stevenson Family if interest rates—however calculated—rose too high.

186.    Again, Wintrust Defendants could have, but did not, include in their master promissory notes warnings that the program into which the Stevenson Family was signing was volatile, high-risk, and inappropriate for low-risk estate and retirement planning goals.

187.    The dearth of warning by Wintrust Defendants was filled by their agents' assurances.

188.    Gardner Defendants arrived at meetings with the Stevenson Family with a pile of papers, including Gardner Defendants' copies of Wintrust Defendants'

master promissory notes, urged the Stevenson Family to sign them with assurances about the stability of the premium financed structure, notwithstanding any interest rate variability.

189.   Wintrust Defendants' loan renewal letters, beginning in 2018 and continuing through 2023, buttressed the Stevenson Family's understanding about the stability and safety of the premium loan program. Until interest rates rose above the "scheduled" 5%, Wintrust Defendants' loan renewal letters contained *no* breakdown of how the next year's interest rate would be calculated.

190.   In the face of Wintrust Defendants' renewal letters' omitted interest rate calculation, Gardner Defendants—Lender Defendants' authorized mouthpiece— filled the informational void with false assurances that the structure was stable and well-balanced and that the interest rate for the upcoming year was between 2% and 5%, but never showed the Stevenson Family his math.

191.   Only when interest rates surged in late 2022 and early 2023— irretrievably inverting the balance between loan debt and cash accretion and dropping the mask on the purportedly stable and suitable premium financed structure—did Wintrust Defendants add to their renewal letters material information about how the upcoming years' terrifying interest rate would be calculated.

Accordingly, your interest rate for this year's loan term will be calculated by adding: .61% (fixed index adjustment) + 1.35% (spread from origination) + 5.38% (one-year U.S. Treasury yield rate). The rate of interest to be charged under your Master Promissory Note for the current year is 7.34%.

192. As sophisticated lending professionals, and particularly lending professionals in the business of soliciting and packaging loans for financing life insurance policies, Lender Defendants knew or should have known that omitting the impact of less-than-favorable interest rate environments from their sales materials and illustrations, as well as the calculations to reach those less-than-favorable environments, would have the capacity or tendency to mislead unsophisticated consumers like the Stevenson Family into believing that the relationship between the loans offered and the policy or policies they funded was stable and well-balanced.

193. Further, as sophisticated lending professionals communicating to unsophisticated customers through a middleman agent—here, Gardner Defendants—Lender Defendants knew or should have known that if the middleman did not clarify and explain that tripartite program Gardner Defendants constructed would catastrophically collapse on the Stevenson Family if interest rates rose above those illustrated, unsophisticated consumers like the Stevenson Family would be reasonably misled to believe that the loan balances would never get "out of control" with respect to the policy or policies they funded.

194. At no time did any Defendant provide the Stevenson Family with information about what would happen to the purportedly stable and suitable structure

if interest rates rose beyond the illustrations, renewal letters, and other materials provided.

195.   Under the favorable interest rate environment illustrated and sold and reassured by Lender Defendants and Gardner Defendants, and without any disclosures about the catastrophe that would follow an interest rate outside the illustrations, the Stevenson Family reasonably believed the Life Insurance Policies' performance would stably and reliably outpace the loan balances.

196. Gardner Defendants and Lender Defendants—with the former authorized to speak on the latter's behalf—worked in concert to convince the Stevenson Family that taking out loans to pay the Life Insurance Policies' premiums was not actually risky in view of the Life Insurance Policies themselves. If the scheme worked as pitched, the Stevenson Family would never have to pay the loan principal or interest because the Life Insurance Policies would accumulate sufficient cash value to cover both.

197.   The Stevenson Family reasonably relied on and believed Gardner Defendants—who Lender Defendants authorized to speak for them and armed with misleading illustrations, schedules, and letters created and customized for the Stevenson Family—when Gardner Defendants represented to them, repeatedly and over the course of a decade, that the tripartite relationship Gardner Defendants constructed was stable and could not collapse.

SECOND AMENDED COMPLAINT FOR DAMAGES AND JURY DEMAND - 56

198.   Had Lender Defendants conveyed the *actual* the risks to the Stevenson Family if interest rates rose well over the rates illustrated, scheduled, and communicated to them, the Stevenson Family would not have entered into and remained in the premium financed structure, as the structure is anything but the stable, secure estate and retirement planning vehicle Gardner Defendants and Lender Defendants represented it to be.

## III.   THE TRIPARTITE STRUCTURE COLLAPSED.

199.   In 2017, Gardner Defendants were riding the high of the commissions earned by pulling Todd into the tripartite premium financed relationship.

200.   So, Gardner Defendants doubled down with Terri.

201.   Gardner Defendants encouraged the Stevenson Family to increase their premium financed whole life insurance investment by dropping Terri's safer term life insurance policies, purchasing the 2017 Terri Policies, and advised the Stevenson Family to roll the purported "savings" borne of entering tripartite structure into the premium loans. Doing so, Gardner Defendants assured, would "keep the loan balance from getting out of control."

//

//

//

//

| From: | Josh Gardner <jqgardner@gmail.com> |
| Sent: | Monday, January 23, 2017 5:16 PM |
| To: | Janette Jones; Todd Stevenson; Terri Stevenson - Stevenson & Sons |
| Subject: | Insurance Recap |

I got confirmation today that everything was finalized last week. We are all done!

It's pretty incredible when you think about it that between both policies you have 32 million of coverage that will be paid up in 10 years and your cost for that is $14k a year for the letter of credit! If you had term instead your premiums would be over $100k a year!

Taking the savings from what you had been paying for the LOC (12k a year) and what you paid for Terris term policies (40k a year) to service the interest on this loan is something I highly recommend that you do. Although not necessary it will make collateral come off the table sooner and keep the loan balance from getting out of control.

All the best,

JQG

202.   Gardner Defendants' representation that sinking more money into the premium financed structure would keep the loan balance from "getting out of control" was false or misleading, because Gardner Defendants were representing a non-guaranteed outcome (loan balances remaining in control) as guaranteed, without any caveat or disclaimer that the policies and loans may not perform as he unequivocally represented they would.

203.   The purpose of Gardner Defendants' false or misleading statement about preventing "loan balance from getting out of control" was to advance the big illusion—that the premium financed structure was a stable, certain, and safe estate and retirement planning program, rather than a volatile, high-risk, and unstable investment structure.

204.   Indeed, in 2023, "out of control" is exactly what the Stevenson Family's loan balances got.

205.   Interest rates rose from historically low levels and the Stevenson Family's premium loans were not immune.

206.   In May of 2023, Gardner Defendants revealed to the Stevenson Family that, in "today's environment"—an interest rate environment above 5%, the consequences of which were never disclosed to the Stevenson Family—the tripartite structure Gardner Defendants had constructed and sold to the Stevenson Family as safe and stable for their goals had sunk, taking the Stevenson Family's net worth with it.

As requested here are the renewal estimates based on today's environment. Please understand that this is a 60 day estimate and things could change either way before the rate lock in date of 5/7/23. These numbers are the result of using 6.51% as the renewal rate. The actual rate won't be locked in until 30 days before the renewal date.

"For the 6/7/23 renewal, the interest would be roughly $634k and based on these projections the client will need to post roughly $400k in collateral to secure for only the 6/7 renewal."

I am in the process of double checking their numbers and the math they used to make sure it's accurate and to see if there will be adjustment made in the crediting rate on the policies.  Anything that I find would change those numbers for the better, but unknown at this time what the renewal interest rate will be.....

Although premature, I wanted you to have this information as soon as I did.

All the best,

207.   The mask had fallen on Gardner Defendants and Lender Defendants' pitch. The tripartite premium financed structure—solicited, marketed, and sold to the Stevenson Family as a stable, safe, and low-risk estate and retirement planning program—was shown for the first time to be a volatile, unstable, and high-risk scheme.

208.   Now, assets did not match liabilities, as the Stevenson Family had been led to believe they would. In an environment of interest rates above 5% (an

environment not illustrated or otherwise conveyed as an environment wherein the premium financed structure would irretrievably collapse), policy dividends decreased, while the balance due on the loans skyrocketed.

209.   In her July 2023 notes, in one word, Ms. Jones summed up her shock at the magnitude of the financial catastrophe facing the Stevenson Family as a consequence of a scenario never disclosed, discussed, or illustrated to them. "Wow."



210.   The Stevenson Family, including the family business as guarantor of at least one of the "out of control" loans, now must reckon with the consequences of Defendants pulling them deep underwater on a structure sold to stably float.

211.   To date, the debt service of the premium loans has outpaced the valuation of Life Insurance Policies by roughly $8,000,000—a delta which will continue to increase over time.

212.   On information and belief, the Stevenson Family have incurred damages that are three-to-ten times the outpaced loan balance when the Life Insurance Policies are compared to safer and more suitable estate and retirement planning products.

213.   Had the Defendants, in keeping with the Stevenson Family's well-documented risk-averse goals, recommended a suitable, stable lower-priced term life insurance policy—instead of the whole life premium financed program they ultimately recommended—and arranged for the family's initial resources to be invested by a reasonably prudent investment professional, the Stevenson Family's financial situation would have benefited substantially.

214.   Although Defendants would not have earned the higher premiums, insurance commissions, loan fees, and interest associated with a whole life policy, the Stevenson Family would have secured more appropriate and cost-effective coverage.

215.   By failing to identify and recommend this less risky alternative, Defendants deprived the Stevenson Family of the opportunity to obtain significant savings and a more stable financial outcome.

## IV.   DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS ABOUT THE SUITABILITY AND STABILITY OF THE TRIPARTITE STRUCTURE.

216.   At no time did Gardner Defendants discuss or communicate other insurance options or lower, non-financed insurance options to the Stevenson Family, or any other estate or retirement planning alternative. Why would they? The premium financed insurance structure allowed Gardner Defendants to procure and sell larger policies, with larger premiums, that resulted in larger commissions.

217.   To that end, and while acting as the actual or ostensible authorized agents of Insurance Defendants and Lender Defendants, Gardner Defendants made misrepresentations and omissions to the Stevenson Family about the suitability, propriety, and stability of the premium financed structure.

218.   Gardner Defendants omitted pages of the Life Insurance Policies' performance illustrations which were required to be disclosed to the Stevenson Family before they purchased the Life Insurance Policies.

219.   By withholding certain pages of the Life Insurance Policies' illustrations, Gardner Defendants buttressed their false and misleading pitch to the Stevenson Family that the Life Insurance Policies would perform optimally, thereby creating in the Stevenson Family the reasonable belief that the insurance leg of the tripartite structure was stable and suitable for their low-risk goals, rather than the volatile and complex investment it actually is.

220.   Gardner Defendants and Lender Defendants omitted or misrepresented material risks and information about the consequences that would befall the Stevenson Family if interest rates rose above those illustrated, and scheduled.

221.   Gardner Defendants and Lender Defendants—the latter using the former as its mouthpiece—implicitly and explicitly represented that the premium finance leg of the tripartite structure was stable and safe for the Stevenson Family's stated low-risk goals, by representing and omitting material information to lead the

Stevenson Family to believe that the loan's interest rates would never outpace the cash accretion of the Life Insurance Policies.

222.  Contrary to Defendants' statements otherwise, the structure of the tripartite relationship is complex and volatile. If one leg collapses, the others give way. The scheme depends on the costs on the premium loans over the long term being less than the returns on the cash value of the Life Insurance Policies. Otherwise, the policyholder is forced to come up with the significant capital necessary to pay back the premium loans, interest, and fees.

223.  That is what Defendants should have told the Stevenson Family. In explicit and unequivocal terms, Defendants should have communicated that the premium financed structure is complex, volatile, and high-risk, and that the premium financed leg of the structure could collapse if interest rates rose beyond those illustrated and scheduled, and the other legs would follow.

224.  But no Defendant told the Stevenson Family that. To the contrary, Defendants omitted and misrepresented material information to lead the Stevenson Family to reasonably believe that financing the premiums on the Life Insurance Policies was a low-risk, stable, and suitable method for the Stevenson Family's non-complex retirement and estate goals—funding grandkids' educations and giving to their church.

225.   Defendants did not make these risks apparent to the Stevenson Family in any way, nor were the risks apparent from the face of the Life Insurance Policies themselves, nor were the risks apparent from the materials Lender Defendants provided to Gardner Defendants to present to the Stevenson Family. Indeed, the material risks were specifically omitted from the illustrations and schedules provided to the Stevenson Family.

226.   Defendants' misrepresentations and omissions about the consequences of a rising interest rate environment do not necessarily conflict with vague policy language and loan illustration and schedule disclaimers about potential fluctuation in interest rates, such that the risks were apparent from any written document.

227.   The premium financed structure was not and was never suitable or stable to achieve the Stevenson Family's stated goals of tax-free income at retirement and risk-averse estate-and-retirement planning. Due to the underlying investment components that drove Lender Defendants' valuations, the Life Insurance Policies would underperform the product offerings and would be insufficient to outpace the ever-growing debt service of the loans.

228.   In addition to disclosing the catastrophic risks associated with entering the premium financed structure, Defendants also should have but did not, *inter alia*, determine whether the Life Insurance Policies were actually appropriate for Stevenson Family in the first instance, determine whether the Life Insurance

Policies, if appropriate, were appropriately sized, determine whether the tripartite structure of premium financing was the appropriate way for the Stevenson Family to pay for the Life Insurance Policies, and examined a long-term record of the same or similar lending sources to assess the probability of the suitability and stability of the program actually bearing out.

229.   Defendants instead only examined and provided the Stevenson Family with illustrations based on a short-term lending environment and an environment with historically low interest rates.

230.   The Stevenson Family reasonably relied on the professional advice of Defendants when they decided to buy the Life Insurance Policies and to fund their premiums through financing.

231.   The Stevenson Family had the right to rely on Defendants to properly advise them regarding the risks, stability, benefits, and suitability of the premium financed structure.

232.   The Stevenson Family did not know and could not have known that Defendants failed to competently and appropriately advise them.

233.   The Stevenson Family did not know and could not have known that Defendants provided them with false and misleading assurances about the safety, stability, and suitability of the Life Insurance Policies and the tripartite structure.

234.    Due to the nature of Defendants' omissions and misrepresentations, and the complexity of the structure, the Stevenson Family did not discover and could not have discovered Defendants' misconduct and the damages they suffered as a result until the 2023 renewal period, at the earliest, when Lender Defendants and Gardner Defendants finally revealed that the structure could not hold in an interest rate environment they never illustrated.

### COUNTS

### COUNT ONE – NEGLIGENCE: ORDINARY AND PROFESSIONAL
**Direct (All Defendants)**
**Vicarious (Lender Defendants and Insurance Defendants)**

235.    Plaintiffs hereby incorporate all other paragraphs of this Second Amended Complaint as though fully set forth herein.

236.    Insurance Defendants and Lender Defendants are vicariously liable for the breaches, negligent acts, misrepresentations, and omissions of their ostensible or actual agents, Gardner Defendants.

237.    Wintrust Defendants are also vicariously liable for the breaches, negligent acts, misrepresentations, and omissions of their ostensible or actual agents, Succession.

238.    All Defendants owed a general common law duty to the Stevenson Family to use reasonable care under the circumstances to avoid causing the Stevenson Family foreseeable harm.

239.   Duty is measured by the scope of the risk which negligent conduct reasonably entails.

240.   A higher degree of care is required of individuals in the face of a known danger.

241.   It was reasonably foreseeable and knowable to all Defendants, given their knowledge, expertise, and access to historical data, that the premium financed structure sold to the Stevenson Family would collapse if interest rates rose above the 5% illustrated to the Stevenson Family.

242.   It was reasonably foreseeable and knowable to all Defendants, given their knowledge, expertise, and access to the Stevenson Family's financial information and stated goals, that the Stevenson Family risked losing their net worth if the premium financed structure collapsed.

243.   It was reasonably foreseeable and knowable to all Defendants, given their knowledge of and access to the Stevenson Family's information and stated goals, that the Stevenson Family would not choose to invest their family's legacy into the premium financed structure, if the Stevenson Family knew the volatility and interest-rate-sensitivity of the premium financed structure risked the loss of the Stevenson Family's entire net worth.

244.   Thus, every Defendant owed a duty of care to adequately and actually disclose to and warn the Stevenson Family that the premium financed structure was

inappropriate and unstable for their low-risk retirement and estate planning goals, as the structure could catastrophically and irreparably extinguish the Stevenson Family's entire net worth if it failed.

245.   Insurance Defendants also owed a duty of professional care and good faith and fair dealing in underwriting and selling life insurance policies to life insurance customers, which includes a duty to conduct reasonable suitability analyses and underwriting with respect to the propriety and size of life insurance products solicited and sold.

246.   Lender Defendants also owed a duty of good faith and fair dealing in underwriting, packaging, and brokering loans to finance premiums for life insurance policies, which includes a duty to clearly communicate the material risks of, terms of, performance of, and information about loans marketed and sold to customers to finance life insurance premiums, as well as a duty not omit material risks of, terms of, and information about loans marketed and sold to finance life insurance premiums.

247.   Lender Defendants also owed professional duties of care, in compliance with industry standards for professionals who underwrite, package, illustrate, schedule, sell, and renew loan packages to fund life insurance policies.

248.   Gardner Defendants owed a duty of professional care to the Stevenson Family in compliance with the standards of care applicable to the professionals they

held themselves out to the Stevenson Family to be, *i.e.,* financial and retirement advisors, lenders, estate planners, and life insurance professionals.

249.   Gardner Defendants' duty of care also included, but was not limited to, a duty to procure coverage as requested and a duty not to misrepresent the coverage procured.

250.   A life insurance agent's duty of care also includes those duties described under Montana statutes and regulations. For example, a life insurance agent owes a duty to accurately represent pertinent facts related to the coverages at issue. *See* Mont. Code Ann. § 33-18-201. For another example, a life insurance agent owes a duty not to "make, issue, circulate, or cause to be made, issued, or circulated any estimate, illustration, circular, sales presentation, omission, comparison, or statement which misrepresents the benefits, advantages, conditions, or terms of any insurance policy." *See* Mont. Code Ann. § 33-18-202(1). For yet another example, a life insurance agent owes a duty not to "make, issue, circulate, or cause to be made, issued, or circulated any estimate, illustration, circular, sales presentation, omission, comparison, or statement which is a misrepresentation for the purpose of effecting. . . an assignment of or effecting a loan against any insurance policy." *See* Mont. Code Ann. § 33-18-202(7). For another example, a life insurance agent owes a duty not to "use or describe non-guaranteed elements in a manner that is misleading or has the capacity or tendency to mislead." Mont. R. Amin. § 6.6.706(2)(b). For

another example, a life insurance agent owes a duty not to "state or imply that the payment or amount of non-guaranteed element is guaranteed. Mont. R. Amin. § 6.6.706(2)(c). For another example, a life insurance agent owes a duty not to "provide an applicant with an incomplete illustration;" Mont. R. Amin. § 6.6.706(2)(f).

251. Gardner Defendants and Insurance Defendants breached their respective duties of ordinary and professional care by, *inter alia*: failing to supervise and train their agents with respect to soliciting, pitching, and selling the Life Insurance Policies to the Stevenson Family; weaponizing their long-term relationship of trust with the Stevenson Family to convince the Stevenson Family that Gardner Defendants were skilled, knowledgeable, and qualified to safely and suitably structure the highly complex premium financed scheme to meet the Stevenson Family's low-risk estate and retirement planning goals; misrepresenting the stability and suitability of loan interest rates applicable to the packages brokered and sold by the Lender Defendants through Gardner Defendants; failing to disclose to the Stevenson Family the reasonably foreseeable consequences of an interest rate environment that exceeded 5%, and that the consequence rendered the tripartite structure unsuitable and unstable for the Stevenson Family's stated low-risk goals; failing to conduct reasonable suitability analyses to determine if the Life Insurance Policies were appropriately sized for the Stevenson Family's estate and retirement

planning goals; and failing to conduct reasonable analyses to determine if paying for the Life Insurance Policies through premium financing was suitable and stable for the Stevenson Family's stated goals.

252.   Lender Defendants breached their respective duties of ordinary and professional care by, *inter alia*: failing to appropriately and reasonably underwrite the premium loans issued to the Stevenson Family to determine if they were suitable and stable for the Stevenson Family stated low-risk goals; providing misleading loan performance illustrations and schedules that led the Stevenson Family to reasonably believe that the liabilities on the loans would not outpace the cash accretion of the Life Insurance Policies, irrespective of interest rate variability; failing to provide actual and adequate warnings about the risk of premium financing if interest rates did not behave as illustrated and scheduled; omitting from illustrations and schedules any analysis of an interest rate environment less favorable than 5%, because Lender Defendants understood that doing so would reveal the instability, volatility, and risk of the program and discourage the Stevenson Family from entering into it; omitting from renewal letters the interest rate calculation until interest rates rose and the Lender Defendants understood that the volatility of the program could no longer be hidden behind a historically low-interest rate environment; relying on Gardner Defendants to communicate and explain all loan materials, illustrations, and schedules.

253. At bottom, Defendants breached their respective duties of ordinary and professional care by failing to explain and disclose the significant risks associated with the high-risk, volatile premium financed life insurance structure Gardner Defendants pitched and sold to the Stevenson Family as a safe, stable, and suitable low-risk retirement and estate planning tool.

254. But for Defendants' breaches of their respective duties of ordinary and professional care, the Stevenson Family would not have entered into the volatile and high-risk premium financed life insurance structure and would not have suffered catastrophic financial damages that flowed therefrom.

255. Defendants' breaches of their respective duties of ordinary and professional care were a substantial factor in causing the Stevenson Family's damages.

256. Defendants' breaches of their respective duties of ordinary and professional care increased the risk of harm to the Stevenson Family and/or reduced the Stevenson Family's chances of obtaining a better result through appropriate, suitable, and stable retirement and estate planning products.

257. Defendants' breaches of their respective duties of ordinary and professional care arose from Defendants' misrepresentations and failures to disclose all material facts relating to the risks associated with the premium financed life

insurance structure, such that the Stevenson Family's consent to the structure was not based on an intelligent exercise of judgment.

258.    The Stevenson Family reasonably relied on the advice and assurances of Gardner Defendants—who all other Defendants authorized to speak for them with respect to selling the Stevenson Family on false notion that the premium finance scheme was suitable and stable for the Stevenson Family's stated goals—and would not have entered into the structure but for that advice and those assurances.

259.    The Stevenson Family did not cause or contribute to their damages in any way.

260.    The Stevenson Family is entitled to compensation for the damages caused by Defendants' negligence.

## COUNT TWO – NEGLIGENT MISREPRESENTATION
### Direct (Gardner Defendants and Lender Defendants)
### Vicarious (Lender Defendants and Insurance Defendants)

261.    Plaintiffs hereby incorporate all other paragraphs of this Second Amended Complaint as though fully set forth herein.

262.    Insurance Defendants and Lender Defendants are vicariously liable for the acts, misrepresentations, and omissions of their ostensible and actual agents, Gardner Defendants.

263.   Wintrust Defendants are also vicariously liable for the breaches, negligent acts, misrepresentations, and omissions of their ostensible or actual agents, Succession.

264.   In the course of their respective professional businesses, Gardner Defendants and Lender Defendants solicited, recommended, and sold the Life Insurance Policies and the premium loans to the Stevenson Family based on the misrepresentation that the volatile premium financed life insurance structure was suitable, stable, and appropriate for the Stevenson Family's financial circumstances and stated low-risk retirement and estate planning goals.

265.   Gardner Defendants and Lender Defendants, through a failure to exercise care and competence, misrepresented that the volatile, high-risk premium financed insurance program was stable, suitable, and appropriate for the Stevenson Family's goals, without any reasonable basis for their misrepresentations and omissions.

266.   First for example, in 2014, Gardner Defendants encouraged Todd to purchase two Mass Mutual policies and finance the premiums therefor, misrepresenting without caveat that "annual premium savings offsets the interest costs on the loans," and misrepresented further, falsely and without caveat, that Todd could surrender the policy right then and walk away with $10 million.

267.    Gardner    Defendants'    misrepresentations—misleadingly    omitting material information that the purported "offset" was not guaranteed, and that the "walk-away" amount was not guaranteed, either—were not statements about a future event or opinion, but rather an assurance of the purported truth regarding the stability of the structure Gardner Defendants' solicited and sold the Stevenson Family.

268.    Gardner Defendants misrepresented that the premium financed structure was stable, with guaranteed elements, and combined that misrepresentation with false promises about future events to sell the Stevenson Family on the big illusion—that the structure was sound, stable, and suitable for the Stevenson Family's low-risk estate and retirement planning goals.

269.    Further, nowhere in Gardner Defendants' promises about the stability of the scheme did Gardner Defendants disclose the risks of a hostile interest rate environment. Instead, Gardner Defendants omitted material information about the substantial risks of the complex structure, falsely characterizing non-guaranteed elements as guaranteed results.

From: jggardner1 . [mailto:jggardner@gmail.com]
Sent: Wednesday, May 14, 2014 9:05 AM
To: Todd Stevenson; Jeannette Jones
Subject: Please respond

Hey there, wanted to run some new numbers by you.

Mass Mutual has the capacity now to take all of the 17.5 Million instead of the original 10M like we were planning on. This just happened yesterday, I talked to Todd last night and ran new numbers today that I want to share with you. We would need some more blood and updated financials but these numbers may warrant some work on our end if you agree.

This is the benefit of having it all with Mass
1.) The annual premium is $57,374 less per year, a savings of $573,740 on a 10 year policy, which in turn saves you $83,604 of interest over the 10 years.. *The annual premium savings offsets the interest cost on the loan at Stockman.....*

1                                    5/14/2014 10:42 AM
                                            Janette
                              ST00016



2.) Mass allows the interest to accrue and not be paid annually.

3.) I was worried about the performance being diminished on less funding and that IS NOT the case. **At age 80 if we put it all at Mass the cash value is over $2M greater and the death benefit is $3.1M greater than if we put some with Mass and some with Ohio.** The loan balance would be approx $18.8M and the gross death benefit is over $38M, for a net $20M to the trust. The gross cash value at this point is over $28M so if you wanted to surrender the policy and walk away you would leave with $10M of cash...

Pretty strong when you consider that all this will be accomplished for the net difference between Stockman interest and the earnings at Geneva.

If we want to pursue this we should jump on it right now and get paperwork started for the additional $7.5M with Mass......

Let me know your thoughts ASAP!

*Josh Gardner*
*Summit Financial Group*
*312 Whitney Lane Suite 3*
*Sheridan Wyoming 82801*

*307-655-8393 office*
*406-698-7963 cell*

270. Second, for yet another example, in 2017 Gardner Defendants encouraged the Stevenson Family to pour more assets into the premium financed structure, advised them to abandon safer term life insurance policies, and assured them that rolling the savings from the switch into the premium financed structure would maintain the stability of the structure by "keep[ing] the loan balance from getting out of control."

271. Again, Gardner Defendants' 2017 misrepresentation was not cabined by any opinion or non-guaranteed caveat. Gardner Defendants assured the Stevenson Family of the purported truth of the stability and suitability of the structure—suitability and stability that would be maintained if the Stevenson Family took Gardner Defendants' advice and poured more money into the structure.

272. Again, Gardner Defendants misrepresented that the premium financed structure was stable, with guaranteed elements, and combined that misrepresentation

with illusions about future events to assure the Stevenson Family of the big illusion—that the structure was sound, stable, and suitable for the Stevenson Family's low-risk estate and retirement planning goals.

| From: | Josh Gardner <jqgardner@gmail.com> |
|---|---|
| Sent: | Monday, January 23, 2017 5:16 PM |
| To: | Janette Jones; Todd Stevenson; Terri Stevenson - Stevenson & Sons |
| Subject: | Insurance Recap |

I got confirmation today that everything was finalized last week. We are all done!

It's pretty incredible when you think about it that between both policies you have 32 million of coverage that will be paid up in 10 years and your cost for that is $14k a year for the letter of credit! If you had term instead your premiums would be over $100k a year!

Taking the savings from what you had been paying for the LOC (12k a year) and what you paid for Terris term policies (40k a year) to service the interest on this loan is something I highly recommend that you do. Although not necessary it will make collateral come off the table sooner and keep the loan balance from getting out of control.

All the best,

JQG

273.    At no time, when Gardner Defendants made the misrepresentations and omissions and thereafter, were Gardner Defendants' misrepresentations and omissions about the stability and suitability of the premium financed structure true. At no time was it true that the loan balances were immune from "getting out of control." At no time could Gardner Defendants truthfully represent that buying into the tripartite structure would yield a certain walk-away amount given the variability of interest rates. But Gardner Defendants made those representations anyway.

274.    Further, acting as the mouthpiece for Lender Defendants, Gardner Defendants misrepresented and omitted material information about the

consequences of interest rates less favorable than illustrated by Lender Defendants and existent when the Stevenson Family entered into the premium financed program.

275.    Lender Defendants' illustrations, schedules, and renewal letters— showing only favorable scenarios in which interest rates fell below 5%—also amounted to direct and untrue misrepresentations about the performance and stability of tripartite structure to the Stevenson Family, even setting aside Gardner Defendants' conduct as Lender Defendants' agent in muddying and muddling the Lender Defendants' materials further.

276.    First for example, on September 17, 2017, Wintrust Defendants' employee Douglas Salvi offered the Stevenson Family to arrange financing for the Life Insurance Policies. The offer letter contained a complex interest rate calculation, and attached a Succession-created illustration showing an interest rate varying from 3.04%-5%, but never exceeding 5% for the entire life of the policy.

277.    Tiny, boilerplate language at the bottom of the Succession illustration contained a purported disclaimer reading, "Life Insurance values based on current expenses and crediting rate. Results are not guaranteed. Financing assumptions are for illustrative purposes only. The Lender will determine the actual loan terms."

278.    Lender Defendants' combined offer letter was misleading and untrue, as it contained an apparent interest rate floor in the body of Wintrust Defendants' letter itself, and then directed the Stevenson Family to a Succession illustration to

understand the function of the loan program, but only illustrated a favorable interest rate environment (where the structure was stable), without warning that the loan program would fail outside the environment illustrated. The only "non-guaranteed" element identified in the "disclaimer" are some nebulous "results."

279.   Given that the illustration is entitled "Capital Maximization Strategy," the Stevenson Family reasonably understood that "results" meant the profitability of the loan program, not the risk of infinite loss if the program failed.

280.   Wintrust Defendants and Succession intended that the omissions and misrepresentations and dearth of warning would reach the Stevenson Family and induce the Stevenson Family to buy into the tripartite structure on the misbelief that the structure was stable and suitable.

281.   Further, with Gardner Defendants acting as Lender Defendants' agents and conduits of information about the financing offer and terms thereof, Gardner Defendants affirmed the Stevenson Family's reasonable belief with respect to the stability of the premium financed structure as represented in the Lender Defendants' materials, assuring the Stevenson Family that the cash accretion of the Life Insurance Policies would always positively outpace the loan debt, even in interest rate environments outside the purposefully favorable one illustrated by Succession.

282.   Second, for example, the same misleading and omission-laden information was conveyed to the Stevenson Family—through Gardner

Defendants—by "Projected Loan Performance Schedules" created by Wintrust Defendants.

283.  Beginning in 2014, Wintrust Defendants created "schedules" for loans packaged and sold to the Stevenson Family, scheduling applicable interest rates—illustrations presented to the Stevenson Family by Gardner Defendants—of no greater than 3.82%.

284.  In this lawsuit, initiated after the supposedly stable and suitable tripartite structure collapsed in 2023 when interest rates surged past 7%, Wintrust Defendants rely on tiny, boilerplate "disclaimers" at the bottom of their loan schedules created before the collapse to contend that the Stevenson Family unreasonably understood that the Wintrust Defendants' loan program was stable and appropriate for their low-risk goals, regardless of interest rate variability outside the only—and favorable—environment Wintrust Defendants' illustrated. (Arrows added below for emphasis.)

//

//

//

//

//

//



285.   Wintrust Defendants' "disclaimer" was wholly inadequate in context to disabuse the Stevenson Family of the impression created by the offer letter and schedules themselves that that the premium financed structure Gardner Defendants constructed for them was suitable and stable, nor did the illustration disclose the catastrophic risks involved if the interest rates rose beyond those illustrated.

286.   Wintrust Defendants' intended their illustration would reach the Stevenson Family to induce the Stevenson Family to buy into the premium financed structure on the misbelief that the structure was suitable and stable.

287.   Gardner Defendants, acting simultaneously as the Stevenson Family's financial advisor and the actual or ostensible agent of Wintrust Defendants, explained Wintrust Defendant's wave to "non-guaranteed" interest rates in tiny font by assuring that while the interest rates might rise above the illustrated 3.82%, for

example, the loan program would remain stable and appropriate for the Stevenson Family's stated goals.

288.   The sole advisors with respect to Lender Defendants' loan packages were Gardner Defendants, who Lender Defendants authorized to pitch, explain, and sell their financial products, and who the Stevenson Family trusted as their financial, estate, retirement, and insurance expert.

289.   Third, for example, Wintrust Defendants issued master promissory notes to the Stevenson Family—again, through Gardner Defendants—that also purported to explain that interest rates might rise beyond the schedules and illustrations wherein Lender Defendants enticingly and conveniently set out *no* such unfavorable scenario and catastrophic consequences associated therewith.

290.   Lender Defendants' decision to use Gardner Defendants as the conduits of communication to the Stevenson Family defeats any reliance on complex, boilerplate language in the master promissory notes about how the unsophisticated Stevenson Family could have done the math and consulted the LIBOR rate to predict for themselves each year that the loans' interest rates might exceed what the Lender Defendants enticingly and misleadingly illustrated and scheduled, and that the Stevenson Family should have extrapolated from there that they would lose their entire net worth if the interest rate environment became too hostile.

291.    Fourth, for example, Wintrust Defendants' loan renewal letters, beginning in 2018 and continuing through 2023, buttressed the Stevenson Family's understanding about the stability and safety of the loan program.

292.    In renewal letters until the 2023 collapse, Wintrust Defendants' letters contained inadequate and misleading information about interest rates. Indeed, it was only when interest rates rose above the "scheduled" 5%—and Wintrust Defendants knew the structure had irretrievably sunk—that Wintrust Defendants' loan renewal letters contained *any* breakdown of how the next year's interest rate would be calculated.

293.    In the face of Wintrust Defendants' renewal letters' omitted interest rate calculation, Gardner Defendants—Lender Defendants' authorized mouthpiece—filled the informational void with false assurances that the interest rate for the upcoming year was between 2% and 5%, but never showed the Stevenson Family his math.

294.    Gardner Defendants' and Lender Defendants' misrepresentations and omissions were significant and material, and went to the heart of the Stevenson Family's decision to enter into the volatile premium financed relationship, as the Stevenson Family were led by Gardner Defendants and Lender Defendants to believe that the structure was anything but volatile.

295.   The Stevenson Family would not have entered into the structure, purchased the Life Insurance Policies, and taken out the premium loans absent Gardner Defendants and Lender Defendants' misrepresentations and omissions. Further, Gardner Lender Defendants' representations were never made as subjective opinions, but instead as factual, expert assurances of the suitability, stability and propriety of the structure for the Stevenson Family.

296.  Gardner   Defendants   and   Lender   Defendants   knew   their misrepresentations and omissions about the structure's stability and suitability were false and misleading, because Gardner Defendants and Lender Defendants had access to the Stevenson Family's materials, statements, and goals (showing the Stevenson's low risk tolerance), as well as industry data and financial forecasts (showing the volatility and high-risk nature of the structure).

297.  As demonstrated through solicitation, pitching, and selling the Stevenson Family on the premium financed structure through misrepresentation and omission, Gardner Defendants and Lender Defendants evidenced their intent that their misrepresentations and omissions would be provided to and induce the Stevenson Family to purchase the Life Insurance Policies and take out loans to pay for them, just as the Stevenson Family did.

298.  The Stevenson Family were unaware of the falsity of Gardner Defendants and Lender Defendants' misrepresentations and omissions about the

instability of the complex premium financed structure, nor could the Stevenson Family have made themselves aware of the falsity based on their relative lack of informational access, knowledge, and power.

299.   Further, Defendants' misrepresentations and omissions did not run so contrary to the sweeping, boilerplate "risk" disclosures in the Life Insurance Policies, and vague disclaimers in Lender Defendants' materials to put the Stevenson Family on notice of a problem. Instead, Gardner Defendants' misrepresentations purported to explain and bound the universe of "risk" ambiguously referenced in Insurance and Lender Defendants' written materials, by assuring the Stevenson Family that the structure was stable and sound regardless of interest rate fluctuation.

300.   The Stevenson Family had a right to rely on Gardner Defendants and Lender Defendants' misrepresentations and omissions. Gardner Defendants and Lender Defendants held themselves out to the Stevenson Family as insurance and financial professionals, estate planners and trust experts, banking experts and loan brokers, promising the Stevenson Family to care for their insurance and financial and estate planning needs.

301. But   for   Gardner   Defendants   and   Lender   Defendants' misrepresentations and omissions, the Stevenson Family would not have suffered the financial damages that flowed from pouring their money into a structure they believed to be stable and low-risk, but which was actually volatile and high-risk.

302. Gardner Defendants' and Lender Defendants' misrepresentations and omissions were a substantial factor in causing the Stevenson Family's financial damages.

303. Gardner Defendants and Lender Defendants' misrepresentations and omissions increased the risk of harm to the Stevenson Family and/or reduced the Stevenson Family's chances of obtaining a better result with stable and suitable financial products appropriate for their low-risk goals.

304. Defendants' misrepresentations and omissions arose from Gardner Defendants and Lender Defendants' failure to disclose all material facts relating to the stability of the premium financed life insurance structure, such that the Stevenson Family's consent to the structure was not based on an intelligent exercise of judgment.

305. The Stevenson Family did not cause or contribute to their damages in any way.

306. The Stevenson Family are entitled to compensation for the damages caused by Defendants' negligent misrepresentations.

## COUNT THREE – BREACH OF FIDUCIARY DUTY
### Direct (Gardner Defendants)
### Vicarious (Lender Defendants and Insurance Defendants)

307. Plaintiffs hereby incorporate all other paragraphs of this Second Amended Complaint as though fully set forth herein.

308.   Insurance Defendants and Lender Defendants are vicariously liable for fiduciary breaches by their ostensible or actual agents, Gardner Defendants.

309.   Gardner Defendants' special relationship with the Stevenson Family rose to the level of a fiduciary relationship.

310.   As such, Gardner Defendants owed the Stevenson Family the duty of a fiduciary, including but not limited to: the duty of loyalty and utmost good faith; the duty of candor; the duty to refrain from self-dealing; the duty to protect the Stevenson Family from harm; the duty to refrain from wielding power to cause the Stevenson Family harm; the duty of fair and honest dealing; and the duty of full disclosure.

311.   Gardner Defendants developed, curated, and fostered a special relationship of trust between themselves and the Stevenson Family over the course of decades, all to convince the Stevenson Family to purchase the Life Insurance Policies and to take out loans to pay for them.

312.   Among other things, Gardner Defendants held themselves out to the Stevenson Family as experts not only in life insurance, but also in financial and estate planning, and the creation of highly complex irrevocable trusts, and as qualified to navigate and balance the tripartite premium financed scheme in a way that it would not collapse.

313.   Gardner Defendants wielded their close personal and familial relationship with the Stevenson Family to entice them into sinking their savings into a volatile high-risk premium financed life insurance structure .

314.   Gardner Defendants breached the fiduciary duty owed to the Stevenson Family by, *inter alia*: failing to act fairly and equitably in their transactions with the Stevenson Family; failing to act with utmost good faith; placing their financial interests ahead of the Stevenson Family's; and failing to fully and fairly disclose all material information to the Stevenson Family.

315.   More specifically, Gardner Defendants: convinced the Stevenson Family pour their money into the volatile, high-risk premium financed life insurance structure by misrepresenting that the structure was low-risk, suitable, and stable for their estate and retirement planning goals; failed to disclose the risks involved with the premium financed structure; failed to ascertain or analyze whether the structure was suitable for the Stevenson Family's circumstances and stated goals; and failed to fully and fairly disclose other Defendants' involvement and benefits received from the Stevenson Family's involvement in the structure.

316.   But for Gardner Defendants' breach of fiduciary duty, the Stevenson Family would not have entered into the volatile premium financed life insurance scheme, and would not have suffered the financial damages that flowed therefrom.

317.   Gardner Defendants' breaches were a substantial factor in causing the Stevenson Family's financial damages.

318.   Gardner Defendants' breaches increased the risk of harm to the Stevenson Family and/or reduced the Stevenson Family's chances of obtaining a better result.

319.   Gardner Defendants' breaches arose from Gardner Defendants' failure to disclose all material facts and risks related to the premium financed life insurance structure, such that the Stevenson Family's consent to the structure was not based on an intelligent exercise of judgment.

320.   The Stevenson Family did not cause or contribute to their damages in any way.

321.   The Stevenson Family is entitled to compensation for damages caused by Gardner Defendants' misconduct.

## COUNT FOUR – STATUTORY VIOLATIONS
### MONT. CODE ANN. §§ 33-18-201, *et seq.*, 33-14-103, *et seq.*
### Direct (Gardner Defendants and Insurance Defendants)
### Vicarious (Lender Defendants and Insurance Defendants)

322.   Plaintiffs hereby incorporate all other paragraphs of this Second Amended Complaint as though fully set forth herein.

323.   Insurance Defendants and Lender Defendants are vicariously liable for the statutory violations of their ostensible or actual agents, Gardner Defendants.

324.   At all relevant times, Insurance and Gardner Defendants engaged in the sale of insurance and in trade and/or commerce within Montana. Defendants, either directly or indirectly, sold, marketed, offered, or controlled intangible things of value that directly and indirectly affect the people of Montana.

325.   Accordingly, Insurance and Gardner Defendants owe certain duties and are prohibited from certain conduct under the Montana Unfair Trade Practices Act, Mont. Code Ann. § 33-18-201, *et seq*. and the Montana Consumer Protection Act, Mont. Code Ann. § 30-14-103, *et seq.*

326. Under Montana statutory law*, supra*, Insurance and Gardner Defendants are prohibited from making or causing to be made any estimate, illustration, circular, sales presentation, omission, comparison, or statement that: misrepresents pertinent facts or insurance policy provisions; misrepresents the benefits, advantages, conditions, or terms of any insurance policy; misrepresents the dividends or share of the surplus to be received on any insurance policy; is misleading or is a misrepresentation as to the financial condition of any person or as to the legal reserve system upon which any life insurer operates.

327. Under Montana statutory law*, supra*, Insurance and Gardner Defendants are also prohibited from making or causing to be made any advertisement, announcement, or statement containing any assertion, representation, or statement with respect to the business of insurance or with respect to any person

in the conduct of the person's insurance business that is untrue, deceptive, or misleading.

328. Under Montana statutory law, *supra*, Insurance and Gardner Defendants are also prohibited from making or issuing, or causing to be made or issued any written or oral statement misrepresenting or making incomplete comparisons as to the terms, conditions, or benefits contained in any policy for the purpose of inducing or attempting, or tending to induce the policyholder to lapse, forfeit, surrender, retain, exchange, or convert any insurance policy.

329. A life insurance agent's statutory and regulatory duties include: a duty to accurately represent pertinent facts related to the coverages at issue, *see* Mont. Code Ann. § 33-18-201; a duty not to "make, issue, circulate, or cause to be made, issued, or circulated any estimate, illustration, circular, sales presentation, omission, comparison, or statement which misrepresents the benefits, advantages, conditions, or terms of any insurance policy," *see* Mont. Code Ann. § 33-18-202(1); a duty not to "make, issue, circulate, or cause to be made, issued, or circulated any estimate, illustration, circular, sales presentation, omission, comparison, or statement which is a misrepresentation for the purpose of effecting . . . an assignment of or effecting a loan against any insurance policy," *see* Mont. Code Ann. § 33-18-202(7); a duty not to "use or describe non-guaranteed elements in a manner that is misleading or has the capacity or tendency to mislead;" Mont. R. Amin. § 6.6.706(2)(b); a duty not

to "state or imply that the payment or amount of non-guaranteed element is guaranteed; Mont. R. Amin. § 6.6.706(2)(c); a duty not to "provide an applicant with an incomplete illustration;" Mont. R. Amin. § 6.6.706(2)(f).

330.   Gardner Defendants breached their statutory duties by, *inter alia,* by making misrepresentations and omissions to the Stevenson Family related to the benefits and risks associated with entering into the premium financed insurance structure. For example, Gardner Defendants' statutorily prohibited misrepresentations and omissions include, but are not limited to: falsely representing the premium financed structure as suitable and stable for the Stevenson Family's circumstances and stated goals; and falsely representing the structure would perform at a certain level without explaining the substantial risks associated therewith, including premium-financed interest rate risk, policy performance risk, bank financing risk, carrier risk, lapse risk, and tax audit risk.

331.   Gardner Defendants also withheld material facts from the Stevenson Family related to the stability and suitability of the tripartite structure, including but not limited to: whether the Life Insurance Policies were appropriate for the Stevenson Family in the first instance; whether the Life Insurance Policies were appropriately sized; whether premium financing was the appropriate means for paying for the Life Insurance Policies under the Stevenson Family's circumstances;

the nature and details of the loan packages; and other Defendants' involvement in the Life Insurance Policies.

332.   Gardner Defendants' statutory violations also include the following misconduct:

        a.   Gardner Defendants misrepresented the terms, benefits, conditions, or advantages of the insurance policy, in violation of Mont. Code Ann. §33-18-202 (1);

        b.   Gardner Defendants misrepresented the dividends or shares of the surplus to be received on any insurance policy, in violation of Mont. Code Ann. § 33-18-202 (2);

        c.   Gardner Defendants failed to state material facts necessary to make other statements not misleading, considering the circumstances under which the statements were made, in violation of Mont. Code Ann. § 33-18-202;

        d.   Gardner Defendants directly or indirectly made, published, or disseminated, published, or disseminated assertions, representations, or statements that were untrue, deceptive, or misleading, in violation of Mont. Code Ann. § 33-18-203; and,

        e.   Gardner Defendants sold, distributed, created, offered, and/or advertised products to the people of Montana that were deceptive and unfair, ultimately providing an illusory product that lacks any value whatsoever but that enables Defendants to obtain a monetary benefit while denying anything of value to consumers.

333.   Gardner Defendants' misrepresentations and omissions were false, misleading, and deceptive. The Stevenson Family relied on these misrepresentations to their detriment.

334.    Gardner Defendants' misrepresentations and omissions were intended to induce the Stevenson Family into purchasing the Life Insurance Policies and paying for them through premium financing. The Stevenson Family would not have entered into these transactions if Gardner Defendants had disclosed the truth to them.

335.    Gardner Defendants' misconduct rises to the level of statutory unconscionability. Gardner Defendants' misrepresentations and omissions took advantage of the Stevenson Family's lack of knowledge, ability, experience, or capacity to a grossly unfair degree. Under the circumstances, Gardner Defendants' misconduct cannot be characterized as advice, judgment, or opinion.

336.    Upon information and belief, the unfair and deceptive acts and practices of Gardner Defendants constitute acts in concert, and all Defendants are jointly liable for the damages resulting from their acts or practices.

337.    The Stevenson Family suffered financial damages as a result of Defendants' violations of the Montana Unfair Trade Practices Act and the Montana Consumer Protection Act.

338.    Gardner Defendants' statutory violations were a substantial factor in causing the Stevenson Family's catastrophic financial damages.

339.    Gardner Defendants' statutory violations increased the risk of harm to the Stevenson Family and/or reduced the Stevenson Family's chances of obtaining a better result.

340.   Gardner Defendants' statutory violations arose, centrally, from Defendants' failure to disclose all material facts relating to the proposed premium financed life insurance structure, such that the Stevenson Family's consent to the structure was not based on an intelligent exercise of judgment.

341.   The Stevenson Family did not cause or contribute to their damages in any way.

342.   Gardner Defendants' misconduct was committed knowingly. Accordingly, Gardner Defendants are liable to the Stevenson Family for additional damages of up to three times the economic damages as permitted by the Montana Unfair Trade Practices and the Montana Consumer Protection Act, as well as attorney fees.

343.   The Stevenson Family is entitled to all available statutory relief for Gardner Defendants' statutory violations, including treble damages and attorneys' fees.

## COUNT FIVE – NEGLIGENCE *PER SE*
### Direct (Gardner Defendants and Lender Defendants)
### Vicarious (Lender Defendants and Insurance Defendants)

344.   Plaintiffs hereby incorporate all other paragraphs of this Second Amended Complaint as though fully set forth herein.

345.   Insurance Defendants and Lender Defendants are vicariously liable for the statutory violations of their ostensible or actual agents, Gardner Defendants.

346.    As previously alleged, Insurance and Gardner Defendants owe certain duties and are prohibited from certain conduct under the Montana Unfair Trade Practices Act, Mont. Code Ann. § 33-18-201, *et seq*. and the Montana Consumer Protection Act, Mont. Code Ann. § 30-14-103, *et seq.*

347.    Insurance Defendants and Lender Defendants are vicariously liable for the statutory violations of their ostensible or actual agents, Gardner Defendants.

348.    As already alleged, a life insurance agent's statutory and regulatory duties include: a duty to accurately represent pertinent facts related to the coverages at issue, *see* Mont. Code Ann. § 33-18-201; a duty not to "make, issue, circulate, or cause to be made, issued, or circulated any estimate, illustration, circular, sales presentation, omission, comparison, or statement which misrepresents the benefits, advantages, conditions, or terms of any insurance policy," *see* Mont. Code Ann. § 33-18-202(1); a duty not to "make, issue, circulate, or cause to be made, issued, or circulated any estimate, illustration, circular, sales presentation, omission, comparison, or statement which is a misrepresentation for the purpose of effecting . . . an assignment of or effecting a loan against any insurance policy," *see* Mont. Code Ann. § 33-18-202(7); a duty not to "use or describe non-guaranteed elements in a manner that is misleading or has the capacity or tendency to misled." Mont. R. Amin. § 6.6.706(2)(b), (c).

349.   As previously alleged, Gardner Defendants breached their statutory duties by, *inter alia,* by making misrepresentations to the Stevenson Family related to the benefits and risks associated with entering into the tripartite premium financed relationship.

350.   As previously alleged, Gardner Defendants also omitted material facts from disclosures to the Stevenson Family related to the stability of the tripartite premium financed life insurance structure.

351.   As previously alleged, Gardner Defendants' misrepresentations and omissions violated a variety of Montana statutes.

352.   The foregoing enumerated statutes were enacted to protect the class of people to which the Stevenson Family belongs, *i.e.,* Montana consumers of financial and insurance products.

353.   The Stevenson Family's injuries are of the kind the foregoing statutory scheme was enacted to prevent.

354.   The foregoing statutory scheme was enacted and intended to regulate members of the class of financial and insurance professionals to which Gardner Defendants and their principals belong.

355.   As a direct result of Gardner Defendants' violation of Montana statutes enacted to protect Montana consumers of financial and insurance products, the

Stevenson Family suffered injuries, entitling them to monetary damages and all available equitable relief.

### COUNTS SIX, SEVEN AND EIGHT – CONSTRUCTIVE FRAUD, ACTUAL FRAUD AND FRAUDULENT INDUCEMENT
### Direct (Gardner Defendants)
### Vicarious (Lender Defendants and Insurance Defendants)

356.   Plaintiffs hereby incorporate all other paragraphs of this Second Amended Complaint as though fully set forth herein.

357.   Insurance Defendants and Lender Defendants are vicariously liable for the fraudulent acts, misrepresentations, and omissions of their ostensible and actual agents, Gardner Defendants.

358.   Gardner Defendants made material misrepresentations and omissions to the Stevenson Family about the Life Insurance Policies, including but not limited to: misrepresenting that the premium finance structure was stable and suitable for the Stevenson Family's circumstances and stated goals; and misrepresenting that the premium finance structure would perform at a certain level without explaining the substantial risks associated with the Life Insurance Policies and the loans that funded their premiums.

359.   On various occasions since 2014, Gardner Defendants—wielding materials Insurance Defendants and Lender Defendants authorized Gardner Defendants to present and sell to the Stevenson Family—misrepresented

affirmatively or by omission the volatile nature of the relationship into which Gardner Defendants enticed the Stevenson Family to enter.

360. For example, in 2014, Gardner Defendants encouraged Todd to purchase two Mass Mutual policies and finance the premiums therefor, misrepresenting falsely and without caveat that "annual premium savings offsets the interest costs on the loans," and misrepresented further, falsely and without caveat, that Todd could surrender the policy right then and walk away with $10 million.

361. Gardner Defendants' misrepresentations—misleadingly omitting material information that the purported "offset" was not guaranteed, and that the "walk-away" amount was not guaranteed, either—were not statements about a future event or opinion, but rather an assurance of the purported truth regarding the stability of the tripartite structure Gardner Defendants' solicited and sold the Stevenson Family.

362. Gardner Defendants falsely represented that the premium financed structure was stable, with guaranteed elements, and combined that false representation with false promises about future events to sell the Stevenson Family on the big illusion—that the structure was sound, stable, and suitable for the Stevenson Family's low-risk estate and retirement planning goals.

363. Further, nowhere in Gardner Defendants promises about the stability of the scheme did Gardner Defendants disclose the risks of a hostile interest rate

environment. Instead, Gardner Defendants omitted material information about the substantial risks of the complex structure, falsely characterizing non-guaranteed elements as guaranteed results.



From: jggardner1 . [mailto:jggardner@gmail.com]
Sent: Wednesday, May 14, 2014 9:05 AM
To: Todd Stevenson; Jeannette Jones
Subject: Please respond

Hey there, wanted to run some new numbers by you.

Mass Mutual has the capacity now to take all of the 17.5 Million instead of the original 10M like we were planning on. This just happened yesterday, I talked to Todd last night and ran new numbers today that I want to share with you. We would need some more blood and updated financials but these numbers may warrant some work on our end if you agree.

This is the benefit of having it all with Mass
1.) The annual premium is $57,374 less per year, a savings of $573,740 on a 10 year policy, which in turn saves you $83,604 of interest over the 10 years.. The annual premium savings offsets the interest cost on the loan at Stockman.....

                                          1                        5/14/2014 10:42 AM
                                                                   Janette
                                                                   ST00016

2.) Mass allows the interest to accrue and not be paid annually.

3.) I was worried about the performance being diminished on less funding and that IS NOT the case. At age 80 if we put it all at Mass the cash value is over $2M greater and the death benefit is $3.1M greater than if we put some with Mass and some with Ohio. The loan balance would be approx $18.8M and the gross death benefit is over $38M, for a net $20M to the trust. The gross cash value at this point is over $28M so if you wanted to surrender the policy and walk away you would leave with $10M of cash...

Pretty strong when you consider that all this will be accomplished for the net difference between Stockman interest and the earnings at Geneva.

If we want to pursue this we should jump on it right now and get paperwork started for the additional $7.5M with Mass.......

Let me know your thoughts ASAP!
--
Josh Gardner
Summit Financial Group
312 Whitney Lane Suite 3
Sheridan Wyoming 82801

307-655-8393 office
406-698-7963 cell

364.  For yet another example, in 2017 Gardner Defendants encouraged the Stevenson Family to take out *more* life insurance, promising them that doing so would maintain the stability of the structure by "keep[ing] the loan balance from getting out of control."

365.   Again, Gardner Defendants' 2017 misrepresentation was not cabined by any opinion or caveat. Gardner Defendants assured the Stevenson Family of the purported truth of the stability and suitability of the structure—suitability and stability that would be maintained if the Stevenson Family took Gardner Defendants' advice and poured more money into the structure.

366.   Again, Gardner Defendants falsely misrepresented that the premium financed structure was stable, with guaranteed elements, and combined that false misrepresentation with false promises about future events to assure the Stevenson Family of the big illusion—that the structure was sound, stable, and suitable for the Stevenson Family's low-risk estate and retirement planning goals.

| | |
|---|---|
| **From:** | Josh Gardner <jqgardner@gmail.com> |
| **Sent:** | Monday, January 23, 2017 5:16 PM |
| **To:** | Janette Jones; Todd Stevenson; Terri Stevenson - Stevenson & Sons |
| **Subject:** | Insurance Recap |

I got confirmation today that everything was finalized last week. We are all done!

It's pretty incredible when you think about it that between both policies you have 32 million of coverage that will be paid up in 10 years and your cost for that is $14k a year for the letter of credit! If you had term instead your premiums would be over $100k a year!

Taking the savings from what you had been paying for the LOC (12k a year) and what you paid for Terris term policies (40k a year) to service the interest on this loan is something I highly recommend that you do. Although not necessary it will make collateral come off the table sooner and keep the loan balance from getting out of control.

All the best,

JQG

367.   At no time, when Gardner Defendants made the misrepresentations and omissions and thereafter, were Gardner Defendants' misrepresentations and omissions about the stability and suitability of the premium financed structure true. At no time was it true that the loan balances were immune from "getting out of

control." At no time could Gardner Defendants truthfully represent that taking out massive Life Insurance Policies would yield a certain walk-away amount given the variability of interest rates. But Gardner Defendants made those promises anyway.

368.   Further, cloaked with the imprimatur of Lender Defendants' authority and materials, Gardner Defendants misrepresented and omitted material information about the risks and impact of interest rates less favorable than those illustrated and existent when the Stevenson Family entered into the tripartite relationship.

369.   Lender Defendants' misleading illustrations, schedules, and renewal letters—illustrating the loan packages' performance only in the most favorable interest rate environment—coupled with Gardner Defendants' explanations and assurances, were intended and did in fact lead the Stevenson Family to reasonably believe that the liability on the loans would not outpace the cash accretion on the Life Insurance Policies, and thus led the Stevenson Family to believe Gardner Defendants that the premium financed structure was well balanced, stable, and low-risk.

370.   Gardner Defendants' misrepresentations and omissions were significant and material, and went to the heart of the Stevenson Family's decision to enter into the volatile tripartite relationship—as they were led by Gardner Defendants to believe that the structure was anything but volatile.

371.  The Stevenson Family would not have entered into the structure, purchased the Life Insurance Policies, and taken out the premium loans absent Gardner Defendants' misrepresentations and omissions. Further, Gardner Defendants' representations were never made as subjective opinions, but instead as factual, expert assurances of the suitability, stability and propriety of the structure for the Stevenson Family.

372.  Gardner Defendants knew their misrepresentations and omissions about the structure's stability and suitability were false, because Gardner Defendants had access to the Stevenson Family's materials, statements, and goals (showing the Stevenson's low risk tolerance), as well as industry data and financial forecasts (showing the volatility and high-risk nature of the structure).

373.  As demonstrated through solicitation, pitching, selling, and monitoring, Gardner Defendants intended that their misrepresentations and omissions would induce the Stevenson Family to purchase the Life Insurance Policies and take out loans to pay for them, just as the Stevenson Family did.

374.  The Stevenson Family was unaware of the falsity of Gardner Defendants' misrepresentations and omissions about the premium financed structure, nor could the Stevenson Family have made themselves aware of the falsity based on their relative lack of informational access, knowledge, and power. Further, Defendants' misrepresentations did not run so contrary to the sweeping, boilerplate

"risk" disclosures in the Life Insurance Policies and vague disclaimers in Lender Defendants' materials as to put the Stevenson Family on notice of a problem. Instead, Gardner Defendants' misrepresentations purported to explain and bound the universe of "risk" ambiguously referenced in Insurance and Lender Defendants' written materials.

375. The Stevenson Family relied on Gardner Defendants' misrepresentations and omissions. The Stevenson Family would not have purchased the Life Insurance Policies or taken out the loans to pay for them absent Gardner Defendants' misrepresentations and omissions.

376. The Stevenson Family had a right to rely on Gardner Defendants' misrepresentations and omissions. Gardner Defendants held themselves out as insurance and financial professionals, estate planners and trust experts, banking experts and loan brokers, promising the Stevenson Family to care for their insurance and financial and estate planning needs.

377. But for Gardner Defendants' misrepresentations and omissions, the Stevenson Family would not have suffered the financial damages that flowed from pouring their money into a structure they believed to be stable and low-risk, but which was actually volatile and high-risk.

378. Gardner Defendants' misrepresentations and omissions were a substantial factor in causing the Stevenson Family's financial damages.

SECOND AMENDED COMPLAINT FOR DAMAGES AND JURY DEMAND - 104

379.   Gardner Defendants' misrepresentations and omissions increased the risk of harm to the Stevenson Family and/or reduced the Stevenson Family's chances of obtaining a better result with stable and suitable financial products appropriate for their low-risk goals.

380.   Defendants' misrepresentations and omissions arose from Gardner Defendants' failure to disclose all material facts relating to the stability of the premium financed life insurance structure, such that the Stevenson Family's consent to the structure was not based on an intelligent exercise of judgment.

381.   The Stevenson Family did not cause or contribute to their damages in any way.

382.   The Stevenson Family are entitled to compensation for the damages caused by Gardner Defendants' fraudulent conduct

<u>**COUNT NINE – UNJUST ENRICHMENT**</u>
**Direct (Gardner Defendants)**
**Vicarious (Lender Defendants and Insurance Defendants)**

383.   Plaintiffs hereby incorporate all other paragraphs of this Second Amended Complaint as though fully set forth herein.

384.   Insurance Defendants and Lender Defendants are vicariously liable for the acts, misrepresentations, and omissions of their ostensible or actual agents, Gardner Defendants.

385.   As alleged already, through Gardner Defendants' and Lender Defendants' misrepresentations, omissions, and/or negligence, the Stevenson Family conferred upon Defendants a substantial monetary benefit, including but not limited to monies to purchase the unsuitable Life Insurance Policies and commissions, fees, interest, and other costs.

386.   Defendants certainly knew or appreciated the benefit conferred on them by way of the Stevenson Family's purchase of the Life Insurance Policies and attendant payment of fees, interest, and other costs.

387.   Defendants retained the benefit the Stevenson Family conferred and continues to confer on them in a circumstance that would make it inequitable for Defendants to retain the benefit without payment of its value.

388.   The Stevenson Family is entitled to a remedy for Defendants' unjust enrichment, including but not limited to imposition of a constructive trust.

## COUNT TEN – PUNITIVE DAMAGES
### Direct (Gardner Defendants)
### Vicarious (Lender Defendants and Insurance Defendants)

389.   Plaintiffs hereby incorporate all other paragraphs of this Second Amended Complaint as though fully set forth herein.

390.   Insurance Defendants and Lender Defendants are vicariously liable for the acts, misrepresentations, and omissions of their ostensible or actual agents, Gardner Defendants.

391.   Gardner Defendants deliberately acted in conscious or intentional disregard of, or indifference to, the high probability of injury to the Stevenson Family, by ignoring the Stevenson Family's stated goals and risk aversion and soliciting and encouraging the Stevenson Family to place themselves at catastrophic financial risk with respect to the Life Insurance Policies and the volatile tripartite relationship of premium financed life insurance.

392.   Gardner Defendants acted with actual malice and oppression, because Gardner Defendants knew or should have known their conduct, acts, and omissions would cause the Stevenson Family harm.

393.   Gardner Defendants weaponized their close personal and professional relationships of trust to entice the Stevenson Family into putting their legacy and security in a high-risk, highly complex financial scheme. Gardner Defendants knew their close relationships with the Stevenson Family afforded them a position of trust and opened the Stevenson Family up to vulnerability that would not have been available to arms-length professionals. Other Defendants clothed themselves with that relationship to their benefit and to the Stevenson Family's detriment.

394.   Gardner Defendants made misrepresentations and omissions that did not run so contrary to the Life Insurance Policies' and Lender Defendants' materials' ambiguous disclaimers about risk, so that the Stevenson Family could not and would

not discover the nature of Defendants' misrepresentations and actual risks until the structure collapsed.

395.   In engaging in the conduct described herein, Gardner Defendants acted with utter and complete disregard for the rights and interests of the Stevenson Family.

396.   Gardner Defendants repeatedly placed their own interests ahead of the interests of the Stevenson Family.

397.   Gardner Defendants' conduct was so malicious, willful, and egregious as to justify an award of punitive or exemplary damages to punish Gardner Defendants and to serve as an example to other similarly situated entities that conduct of the kind engaged in by Gardner Defendants is unacceptable in society and will not be tolerated.

398.   Gardner Defendants should pay punitive damages in an amount sufficient to deter such conduct by Gardner Defendants and others similarly situated.

## COUNT ELEVEN – RESCISSION AND RESTITUTION
### DIRECT AND VICARIOUS
### (All Defendants)

399.   Plaintiffs hereby incorporate all other paragraphs of this Second Amended Complaint as though fully set forth herein.

400.   Insurance Defendants and Lender Defendants are vicariously liable for the acts, misrepresentations, and omissions of their ostensible or actual agents, Gardner Defendants.

401.   Consent to the terms of the Life Insurance Policies and premium loans and all other contracts entered into effect the purchase of the Life Insurance Policies was not real or free and was given under mistake, misrepresentations, or fraud.

402.   Through misrepresentation and omission, whether direct or through agents, Defendants improperly induced the Stevenson Family to contract.

403.   The Stevenson Family seek recission of the Life Insurance Policies and all other contracts, including promissory notes, entered into to effect the purchase thereof and restitution of all funds, fees, and interest charged by Defendants.

## COUNT TWELVE – FOR AN ACCOUNTING
### (Gardner Defendants)

404.   Plaintiffs hereby incorporate all other paragraphs of this Second Amended Complaint as though fully set forth herein.

405.   An action for an accounting is appropriate to pursue disgorgement of unjust gains and/or discovery of information necessary to evaluate one's rights.

406.   Gardner Defendants had a special relationship with the Stevenson Family, including a fiduciary relationship, as alleged herein.

407.   Through annual meetings since 2013 with Gardner Defendants, the Stevenson Family have repeatedly sought information about the suitability, stability,

and status of the Life Insurance Policies, payment of premiums and other costs, premium loan balances and fees, and the commission structure between the entities, but full information has never been produced.

408.  Gardner Defendants have engaged in lucrative business transactions while ignoring and contravening their contractual, fiduciary, professional, and ordinary obligations of care to the Stevenson Family, and refusing to provide the Stevenson Family with information about the financial benefits received by Gardner Defendants by way of pulling the Stevenson Family into the tripartite relationship.

409.  Gardner Defendants exercised exclusive control over much of the information and documents necessary for the Stevenson Family to ascertain and exercise the full extent of their rights and claims against Gardner Defendants.

410.  The Stevenson Family seek information regarding the payments, fees, and interest taken by Gardner Defendants.

411.  An accounting will demonstrate the amounts of payments, fees, and interest Gardner Defendants wrongfully took from the Stevenson Family, which the Stevenson Family are entitled to recoup.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.    For all damages, including treble, equitable, monetary, and punitive damages, proximately caused by Defendants' conduct;

2.	For Defendants to be held jointly and severally liable;

3.	For attorney's fees, costs, and interest as allowed by law without limitation;

4.	For pre-judgment and post-judgment interest at the highest rate allowed by law; and

5.	For any such other relief as may be permitted by law or equity or deemed appropriate by this Court.

**JURY DEMAND**

Plaintiffs request a jury trial of all matters appropriately tried to a jury.

DATED this 7th day of February 2024.

/s/ John L. Amsden
BECK AMSDEN & STALPES, PLLC

*Attorneys for Plaintiffs*

SECOND AMENDED COMPLAINT FOR DAMAGES AND JURY DEMAND - 111