IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| TODD F. STEVENSON, an individual on behalf of himself, and as grantor of the Todd Stevenson 2013 Irrevocable Family Trust and the Todd F. Stevenson Irrevocable Life Insurance Trust; TERRI L. STEVENSON, an individual on behalf of herself, and as grantor of the Terri L. Stevenson 2016 Irrevocable Family Trust; TODD J. STEVENSON, an individual; and JOSEPH D. STEVENSON, an individual on behalf of himself, and as grantor of the Joseph D. Stevenson Irrevocable Life Insurance Trust; JANETTE KRUTZFELDT JONES, on behalf of and as trustee for the Todd Stevenson 2013 Irrevocable Family Trust, the Todd F. Stevenson Irrevocable Life Insurance Trust, the Terri L. Stevenson 2016 Irrevocable Family Trust, and Joseph D. Stevenson Irrevocable Life Insurance Trust; and STEVENSON AND SONS FUNERAL HOMES, | CV 24–109–M–DLC<br><br><br>ORDER |

            Plaintiffs,

        v.

MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY; THE
PENN MUTUAL LIFE INSURANCE
COMPANY; THE PENN
INSURANCE AND ANNUITY

COMPANY; SUMMIT FINANCIAL
GROUP; GP CAPITAL PARTNERS
LLC; THE BURGESS GROUP, INC.;
JOSHOA Q. GARDNER, an
individual; SUCCESSION CAPITAL
ALLIANCE; WINTRUST LIFE
FINANCIAL, a Division of Lake
Forest Bank & Trust CO., N.A.;
BARRINGTON BANK & TRUST
CO., N.A., CMS NATIONAL
SERVICES, LLC; and JOHN DOES
1–5,

          Defendants.

Before the Court are: (1) Defendants Wintrust Life Finance and Barrington Bank & Trust Company, N.A.'s ("Wintrust") joint motion to dismiss (Doc. 138); Defendant CMS National Services, LLC's ("CMS") motion to dismiss (Doc. 144); Defendants GP Capital Partners LLC, Joshoa Q. Gardner, and Summit Financial Group's ("Gardner Defendants") motion to dismiss (Doc. 146); Wintrust's motion for protective order (Doc. 142); and Defendants Penn Mutual Life Insurance Company ("Penn Mutual") and Penn Insurance and Annuity Company's ("PIA") (collectively, "Penn Defendants") companion motions for judgment on the pleadings (Docs. 168, 170). For the reasons herein, Wintrust's motion to dismiss (Doc. 138), CMS's motion to dismiss (Doc. 144), and Gardner Defendants' motion to dismiss (Doc. 146) are DENIED IN FULL. Penn Defendants' motions for judgment on the pleadings (Docs. 168, 170) are GRANTED IN PART and DENIED IN PART. Wintrust's motion for protective order (Doc. 142) is DENIED AS MOOT.

## FACTUAL BACKGROUND[1]

## I.    The Parties

### A. Plaintiffs

The Stevenson Family are third-generation funeral home professionals. The Stevenson Family are not sophisticated financial professionals. The Stevenson Family's lawyer, Janette Jones, has advised the family on various legal matters.[2] Like the Stevenson Family, Ms. Jones was not a financial advisor or sophisticated financial professional. Ms. Jones was the trustee of the trusts used to apply for and buy the life insurance policies that form the basis of this lawsuit.

### B. Defendants

#### 1. Gardner Defendants

Joshoa Gardner is a licensed insurance agent and was the principal owner of Summit Financial. At some point, Gardner ceased doing business as Summit Financial and began operating as GP Capital. Summit Financial and/or GP Capital were insurance and financial services firms which provided professional advisory services for retirement and estate planning.

---

[1] The background section is taken from the Second Amended Complaint ("SAC") (Doc. 103). The facts are assumed to be true for the purpose of resolving the instant Motions.

[2] On July 7, 2025, Plaintiffs filed a "suggestion of death" notifying the Court that Ms. Jones passed away on or about July 5, 2025. (Doc. 197.) Plaintiffs have yet to file a motion to substitute the appropriate party, pursuant to Federal Rule of Civil Procedure 25, but have assured the Court that they will do so within the 90-day period Rule 25 prescribes. (*Id.* at 3.)

Over the course of a decade or more, Gardner Defendants developed a relationship of trust with the Stevenson Family. The Stevenson Family relied on Gardner Defendants to guide them in their financial, estate, and retirement planning affairs. Gardner Defendants led the Stevenson Family to and advised them to enter the technically complex tripartite structure of premium financed life insurance. Gardner Defendants assured the Stevenson Family that Gardner Defendants had the skill, expertise, and knowledge to engage in the detailed suitability and financial analysis required to plan the Stevenson Family's low-risk estate and retirement goals by way of premium financed life insurance.

### 2. Insurance Defendants

Defendants Mass Mutual, Penn Mutual, and Penn Annuity (collectively, "Insurance Defendants") appointed and authorized Gardner and/or Gardner Defendants to act as their respective agents to solicit their insurance policies, produce their insurance policies, prepare and accept policy applications, and sell their insurance policies to the Stevenson Family. Insurance Defendants also appointed and authorized Gardner and/or Gardner Defendants to act as their agent(s) to prepare life insurance product illustrations for the purpose of selling their life insurance policies to the Stevenson Family, present life insurance product illustrations to the Stevenson Family, and submit illustrations with the Stevenson Family's applications. Insurance Defendants sent letters and documents to the Stevenson Family which listed Gardner and/or Gardner Defendants as their

servicing producer(s) or the presenter(s) of the Insurance Defendants' policies sold to the Stevenson Family. Insurance Defendants prepared policy statements listing Gardner and/or Gardner Defendants as designated contacts.

Insurance Defendants granted Gardner and/or Gardner Defendants the authority to make representations on behalf of Insurance Defendants for purposes of soliciting policies, soliciting and preparing applications, acting as a point of contact between Insurance Defendants and the Stevenson Family, and preparing and presenting policy illustrations. Insurance Defendants appointed, authorized, and empowered Gardner and/or Gardner Defendants to solicit, produce, and sell to the Stevenson Family premium financing arrangements with premium finance companies. Gardner and/or Gardner Defendants earned commissions and other financial incentives and benefits from Insurance Defendants for soliciting, selling, supervising, and renewing Insurance Defendants' life insurance policies.

The Stevenson Family reasonably believed that Gardner and/or Gardner Defendants were acting within the authorized scope of their agency relationship with Insurance Defendants.

### 3. Lender Defendants

Succession is a premium financing brokerage firm that markets itself as the creator of premium financing for life insurance and advertises that it protects and maximizes wealth through financing policy premiums through a customized loan. Succession held itself out as a "strategic partner," on whom life insurance

customers can trust to create "tailored legacy plans," specifically with respect to financing life insurance premiums. Succession does business by soliciting, brokering, and packaging loans for premium financed insurance products.

Wintrust is a lending entity which loans insureds like the Stevenson Family sums to fund the premiums on life insurance policies.

Succession acted as the middleman between Wintrust and Gardner Defendants by brokering, securing, and explaining to Gardner Defendants the performance of the premium loans to fund the life insurance policies Gardner Defendants solicited and sold to the Stevenson Family. Gardner Defendants acted as the middlemen between Lender Defendants and the Stevenson Family. Prior to 2023, the only communication between Lender Defendants and the Stevenson Family came in the form of illustrations, promissory notes, and renewal letters. Prior to Wintrust sending materials to the Stevenson Family, Gardner Defendants would alert the Stevenson Family in advance so that Gardner Defendants could arrange a meeting with the Stevenson Family to explain Wintrust's materials.

Gardner Defendants collected signatures from the Stevenson Family for Wintrust's loan materials, including promissory notes, and then Gardner Defendants sent those materials back to Wintrust. Wintrust never required or requested that the Stevenson Family send any materials directly to Wintrust, nor did they object to Gardner Defendants sending the materials to Wintrust on the Stevenson Family's behalf.

Wintrust authorized its broker, Succession, with the authority to present loan performance, stability, and suitability information to the Stevenson Family through Gardner Defendants. Wintrust attached Succession's illustrations to Wintrust's communications to the Stevenson Family, giving Succession's illustrations the imprimatur of Wintrust's approval and authorization to explain the stability of the loan structure. Succession authorized Gardner Defendants to act on and speak for Succession on its behalf with respect to communications about the loans and renewals to the Stevenson Family. Succession provided Gardner Defendants with copies of loan performance illustrations with Succession's logos and letterhead for the purpose of presenting, explaining, and selling the loans Succession brokered to the Stevenson Family on Succession's behalf.

Given the lack of direct communication between Lender Defendants and the Stevenson Family, the loan materials Lender Defendants provided directly to Gardner Defendants to then provide and explain to the Stevenson Family, and Gardner Defendants' representations about working with the Lender Defendants, the Stevenson Family reasonably understood Lender Defendants had authorized and appointed Gardner Defendants to act as their agents.

Gardner Defendants received substantial commissions by facilitating the relationship between the Stevenson Family and Lender Defendants. Lender Defendants also received substantial benefits by brokering and selling loan packages to the Stevenson Family.

## II.    The Premium Financed Life Insurance

The premium financed life insurance structure is complex, volatile, and interest-rate sensitive.

In or around 2013, Gardner Defendants purported to analyze the Stevenson Family's total financial and investment portfolio. Gardner Defendants purported to evaluate and recommend suitable life insurance options to achieve the Stevenson Family's retirement and estate planning goals. The Stevenson Family did not approach Gardner Defendants to procure premium financed life insurance for them. The Stevenson Family conveyed to the Gardner Defendants that they were risk-averse, at least with respect to retirement and estate planning. The Stevenson Family wished to protect the wealth they built for the benefit of their children, grandchildren, and their church. The Family was not seeking a complex, high-risk investment scheme that would jeopardize their business and family legacy. Nevertheless, Gardener Defendants pitched the Stevenson Family on structuring their retirement and estate planning goals on a highly complex and extremely volatile premium financed life insurance program.

The complexity of the tripartite structure Gardner Defendants constructed for the Stevenson Family went well beyond an insurance salesman procuring and selling auto coverage, as evidenced by the illustrations Josh Gardner provided to the Stevenson Family in 2013. Unlike the straightforward sale of insurance from insurance agent to insured, the structure Gardner Defendants built for the

Stevenson Family involved coordination with sophisticated Lender Defendants and Insurance Defendants, as well as the creation of irrevocable trusts. In order to sell the premium financed program urged on the Stevenson Family, Gardner Defendants promoted themselves to the Stevenson Family as experts in a variety of highly skilled professions, such as financial planning, life insurance, estate planning, banking, and trust law.

### A. Creation of Irrevocable Trusts

As early as 2013, but no later than 2014, Gardner Defendants advised and directed Todd F. Stevenson ("Todd") to create the Todd Stevenson 2013 Irrevocable Family Trust, an irrevocable life insurance trust that would own two of the whole life insurance policies Gardner Defendants sold Todd. Todd created the trust.

Then, in 2017, Gardner Defendants advised and directed Terri Stevenson to create the Terri L. Stevenson 2016 Irrevocable Family Trust that would own the whole life insurance policies Gardner Defendants sold Terri. Terri created the trust. Also in 2017, Gardner Defendants directed and advised Todd to create the Todd F. Stevenson Irrevocable Life Insurance Trust that would own additional whole life insurance policies Gardner Defendants sold Todd. Todd created the additional trust. The same year, Gardner Defendants advised and instructed that Joe Stevenson create the Joseph D. Stevenson Irrevocable Life Insurance Trust. Joe created the trust. Todd, Terri, and Joe would not have created the trusts but for Gardner

Defendants' direction that it was the appropriate and suitable course with respect to the Stevenson Family's estate planning goals.

## B. Life Insurance Policies

After Todd created the first Stevenson Family irrevocable life insurance trust, Gardner Defendants began the process of selling Mass Mutual, Penn Mutual, and Penn Annuity policies to the Stevenson Family. Josh Gardner started with Todd, by soliciting and selling him two Mass Mutual whole life insurance policies. The first policy had an initial face value of $7,500,000 and the second had an initial face value of $10,000,000.

Defendants did not appropriately analyze nor consider the suitability and size of the combined $17.5 million death benefit Gardner Defendants solicited and sold to Todd, given the Stevenson Family's net worth and other insurance underwriting factors and guidelines. Defendants were not focused on the suitability, stability, and security for the risk-averse Stevenson Family, but rather sold the large policies in order to generate the highest commissions and profits for themselves.

The 2014 Todd Policies' performance illustrations were produced by Mass Mutual and presented to the Stevenson Family by Gardner Defendants.

Gardner Defendants misrepresented the stability and suitability of the premium financed structure. For example, in 2014, Gardner Defendants sent an email to Ms. Jones and Todd stating that the Stevenson Family could surrender the

Mass Mutual Policies that day and walk away with $10 million. This statement was false or misleading, because Gardner Defendants were representing non-guaranteed values as guaranteed, without any caveat or disclaimer that the policies may not perform as Gardner Defendants represented they would. The purpose of the statement was to advance the illusion that the premium financed life insurance structure was a stable, certain, and safe estate and retirement planning program, rather than a volatile, high-risk investment scheme. Gardner Defendants also communicated to the Stevenson Family in writing that "the annual premium savings offsets the interest cost on the loan," without any disclosure or disclaimer that the promised "offset" was contingent on non-guaranteed elements.

Next, in 2017, Gardner Defendants solicited and sold Terri a Mass Mutual life insurance policy and a Penn Mutual life insurance policy. These policies were assigned to the Terri L. Stevenson 2016 Irrevocable Family Trust shortly after purchase. The first policy had an initial face value and initial supplement rider value totaling $10,000,000. The second had an initial face value plus initial supplement rider value totaling $5,000,000 and was apparently issued on January 18, 2017. The policies' performance illustrations were produced by Mass Mutual and Penn Mutual and presented to the Stevenson Family by the Gardner Defendants.

Gardner Defendants then solicited and sold Todd J. Stevenson ("T.J.") a Mass Mutual Life Insurance Policy and a Penn Annuity Accumulation Builder

Select Universal Indexed Life Insurance Policy (together, the "2017 T.J. Policies"). The 2017 T.J. Penn Annuity Policy No. 92433340 had an initial face value of $10,000,000. The 2017 T.J. Mass Mutual Policy No. 22486207 had an initial face value plus an initial supplement rider value totaling $2,000,000. The 2017 T.J. Policies' performance illustrations were produced by Mass Mutual and Penn Annuity and presented to the Stevenson Family by Gardner Defendants.

Also in 2017, Gardner Defendants recommended that Todd's other trust, the Todd F. Stevenson Irrevocable Life Insurance Trust, purchase a Penn Annuity Guaranteed Life Insurance Policy (the "2017 Todd Policy"). The 2017 Todd Policy No. 2746933 had an initial face value plus initial supplement rider value totaling $11,500,000. The 2017 Todd Policy's performance illustrations were produced by Penn Annuity and presented to the Stevenson Family by Gardner Defendants.

Finally, Gardner Defendants recommended that the Joseph D. Stevenson Irrevocable Life Insurance Trust purchase a Penn Mutual Guaranteed Life Insurance Policy (the "2017 Joe Policy"). The 2017 Joe Policy No. 2746927 had an initial face value plus initial supplement rider value totaling $11,500,000. The 2017 Joe Policy's performance illustrations were produced by Penn Mutual and presented to the Stevenson Family by Gardner Defendants.

The Stevenson Family purchased the 2014 Todd Policies, the 2017 Terri Policies, the 2017 T.J. Policies, the 2017 Todd Policy, and the Joe Policy (together, the "Life Insurance Policies") relying on evaluations, recommendations,

assurances, illustrations, projections, and instructions Gardner Defendants provided and presented to them. On every sale of every policy, Gardner Defendants were paid commissions and received other financial benefits and incentives from Insurance Defendants.

Gardner Defendants repeatedly—including at annual meetings with the Stevenson Family—assured the Stevenson Family that the Life Insurance Policies were a part of a suitable, stable, and safe estate and retirement planning paradigm, stably balanced against the loans that funded them, into which the Stevenson Family could safely pour their savings, rather than one leg of a volatile and high-risk and unstable financial structure. Gardner Defendants repeatedly omitted or misrepresented information about the high-risk, highly complex nature of funding the Life Insurance Policies through premium financing, which Gardner Defendants convinced the Stevenson Family was the appropriate and stable means of paying for the Life Insurance Policies.

### C. Loans to Fund the Policies

While Gardner Defendants solicited and sold the Stevenson Family on the Policies, Gardner Defendants and Lender Defendants worked in concert to package and secure loans that would purportedly pay the premiums on the Life Insurance Policies. Insurance Defendants knew about, condoned, and encouraged Gardner Defendants to invite the Stevenson Family into the volatile tripartite relationship with themselves and Lender Defendants. Lender Defendants knew their loans

funded the Policies, and Lender Defendants knew that without their loans funding the Policies, the Policies would not exist.

Coordinating with Gardner Defendants, Succession solicited and brokered loan packages from Wintrust Defendants to fund the premiums on the Life Insurance Policies. Lender Defendants created loan illustrations curated and customized for the Stevenson Family to purportedly demonstrate to the Stevenson Family how their loans would safely and stably pay the premiums on the Policies Gardner Defendants were selling or had already sold to them. Lender Defendants provided and presented loan package illustrations and other loan information and communications to the Stevenson Family through their agents, Gardner Defendants, all stamped with Lender Defendants' logos and names. Lender Defendants did not explain their illustration directly to the Stevenson Family; instead, they relied on agents to do that for them. For Wintrust Defendants, those downstream agents were Succession and Gardner Defendants. For Succession, the downstream agents were Gardner Defendants.

### D. The Tripartite Structure Collapse

In 2017, Gardner Defendants encouraged the Stevenson Family to increase their premium financed whole life insurance investment by dropping Terri's previously held term life insurance policies and purchasing the 2017 Terri Policies. Gardner Defendants further advised the Stevenson Family to roll the purported savings borne of entering the tripartite structure into the premium loans, to "keep

the loan balance from getting out of control." Gardner Defendants did not provide any caveat or disclaimer that the policies and loans may not perform as Gardner represented they would.

In 2023, interest rates rose from historically low levels. In May 2023, Gardner Defendants revealed to the Stevenson Family that due to an interest rate environment above 5%, the consequences of which were never disclosed to the Stevenson Family, the tripartite structure had sunk. The Stevenson Family's assets no longer matched their liabilities. In her July 2023 notes, Ms. Jones wrote "upside down by 2.5 million . . . wow." At the time the SAC was filed, the debt service of the premium had outpaced the valuation of the Policies by roughly $8,000,000. It is estimated that the Stevenson Family incurred damages that are three-to-ten times the outpaced loan balance when the Policies are compared to safer estate and retirement planning products.

### PROCEDURAL BACKGROUND

Plaintiffs filed this action on July 31, 2024. (Doc. 1.) Through the SAC—now the controlling pleading—Plaintiffs allege twelve causes of action. (Doc. 103.) Count 1 alleges ordinary and professional negligence against all Defendants directly, and vicariously through Lender Defendants and Insurance Defendants. (*Id.* at 66.) Count 2 alleges negligent misrepresentation against Gardner Defendants and Lender Defendants directly, and vicariously through Lender Defendants and Insurance Defendants. (*Id.* at 73.) Count 3 alleges breach of fiduciary duty against

Gardner Defendants directly and against Lender Defendants and Insurance Defendants vicariously. (*Id.* at 86.) Count 4 alleges a direct violation of Montana Code Annotated §§33-18-201, *et sec.* and 33-14-103, *et sec.* against Gardner Defendants and Insurance Defendants, and a vicarious violation of the statutes against Lender Defendants and Insurance Defendants. (*Id.* at 89.) Count 5 alleges direct negligence per se against Gardner Defendants and Lender Defendants and vicarious negligence per se against Lender Defendants and Insurance Defendants. (*Id.* at 95.) Counts 6, 7, and 8 allege direct constructive fraud, actual fraud, and fraudulent inducement, against Gardner Defendants and vicarious constructive fraud, actual fraud, and fraudulent inducement against Lender Defendants and Insurance Defendants. (*Id.* at 103.) Count 9 alleges direct unjust enrichment against Gardner Defendants and vicarious unjust enrichment against Lender Defendants and Insurance Defendants. (*Id.* at 105.) Count 10 alleges direct punitive damages against Gardner Defendants and vicarious punitive damages against Lender Defendants and Insurance Defendants. (*Id.* at 106.) Count 11 alleges vicarious recission and restitution against all Defendants. (*Id.* at 108.) Count 12 seeks an accounting against Gardner Defendants. (*Id.* at 109.)

In a remarkable display of what a cynic might view as "overlitigation," and despite the fact that the Court has yet to hold a preliminary pretrial conference, this

matter has just short of 200 docket entries.[3]  Amongst this swarm of filings are

Wintrust's Motion to Dismiss (Doc. 138) and Motion for Protective Order (Doc.

142), Succession's Motion to Dismiss (144), Gardner Defendants' Motion to

Dismiss (Doc. 146) PIA's Motion for Judgment on the Pleadings (168), and Penn

Mutual's Motion for Judgment on the Pleadings (Doc. 170). On June 27, 2025, the

Court heard argument on the Motions. (Doc. 191.) The Motions are now ripe for

ruling.

LEGAL STANDARDS[4]

## I.    Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell

Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Dismissal is appropriate "where there is no cognizable legal theory or an absence

of sufficient facts alleged to support a cognizable legal theory." *Los Angeles*

---

[3] For better or worse, this constitutes a record over the course of the undersigned's
13.5 years on the bench.

[4] Because this Court is exercising its diversity jurisdiction over this matter, the
Court applies federal procedural law and Montana's substantive law. *Feldman v.
Allstate Ins. Co.*, 322 F.3d 660, 666 (9th Cir. 2003).

*Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017) (internal quotation marks omitted).

## II.    Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) provides that, "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Like a motion for dismissal under Rule 12(b)(6), a Rule 12(c) motion examines whether the factual allegations of the complaint, together with all reasonable inferences, state a plausible claim for relief. *Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1054–55 (9th Cir. 2011). In analyzing a Rule 12(c) motion, the district court "must accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). "A judgment on the pleadings is properly granted when, taking all the allegations in the non-moving party's pleadings as true, the moving party is entitled to judgment as a matter of law." *Ventress v. Japan Airlines*, 603 F.3d 676, 681 (9th Cir. 2010).

However, if the court "goes beyond the pleadings to resolve an issue," a judgment on the pleadings is not appropriate and "such a proceeding must properly be treated as a motion for summary judgment." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989); Fed. R. Civ. P. 12(d).

**DISCUSSION**

## I.    Standing

To establish standing, Plaintiffs bear the burden of demonstrating "(1) [] an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1141 (9th Cir. 2010).

PIA argues that Terri, Todd, Joseph, Ms. Jones, and Stevenson and Sons lack standing to sue PIA because PIA did not issue a policy to insure the lives of Terri, Todd, or Joseph. (Doc. 169 at 15.) As such, according to PIA, all claims asserted against PIA, with the exception of the claims brought by T.J., must be dismissed. (*Id.* at 16.) Through Plaintiffs' response brief, Plaintiffs clarify that T.J. is the sole Plaintiff asserting claims against PIA. (Doc. 175 at 18.) However, Plaintiffs reserve the right to move for leave to amend if discovery reveals that additional injuries are traceable to PIA. (*Id.*) Pursuant to this concession, all claims asserted against PIA with the exception of those claims brought by T.J. Stevenson are DISMISSED WITHOUT PREJUDICE.

Penn Mutual, for its part, argues that T.J., Ms. Jones, and Stevenson and Sons lack standing to assert claims against Penn Mutual because the policies T.J. obtained were from MassMutual and PIA. (Doc. 171 at 17.) Penn Mutual further

19

argues that Terri, Todd, and Joseph lack standing because they are not the trustees of the Penn Mutual Policies. (*Id.*) Defendants contend that Plaintiffs "have not established actual injury fairly traceable to Penn Mutual that is likely to be redressed by a favorable decision against Penn Mutual." (Doc. 181 at 6.)

First, as to the T.J. Policies, Penn Mutual is correct that T.J.'s policies were issued by Mass Mutual and PIA. However, that fact does not absolve Penn Mutual of the injuries it allegedly inflicted on Plaintiffs. Indeed, the SAC repeatedly alleges that Insurance Defendants—including Penn Mutual—worked with Gardner Defendants to solicit the policies, prepare applications, and present the policy illustrations that ultimately led to the injuries Plaintiffs suffered. (*See e.g.*, Doc. 103, ¶¶ 40–42, 105, 130, 131, 136–38, 143–44, 213–15, 217, 222–24, 225–34.)

Second, Penn Mutual is correct that Ms. Jones has standing as the trustee of the trusts. But Penn Mutual fails to explain why Terri, Todd, and Joseph lack standing. Penn Mutual's citation to *Morris v. Choicepoint Services, Inc.*, 2006 WL 2479122 at *3 (N.D. Cal. Aug 28, 2006) is unconvincing. There, the district court explained that under California state substantive law, only a trustee of a trust can sue in the name of the trust. *Morris*, 2006 WL 2479122 at *3. Penn Mutual does not provide any citation to—and the Court is unaware of—any authority that suggests Montana substantive law mirrors that of California on this issue. Absent law supporting Penn Mutual's argument, and accepting the facts pled in the SAC as

true, the Court finds that Terri, Todd, and Joseph have standing as real parties in interest to assert their tort claims against Penn Mutual.

## II.    Statute of Limitations

Wintrust, Succession, Gardner Defendants, and Penn Defendants all argue that Plaintiffs' claims are time barred. (Docs. 139 at 17; 145 at 14; 146-2 at 23; 169 at 18; 171 at 21.) According to Wintrust, and Succession, Plaintiffs' claims began to accrue—at the latest—in November 2019 when the last promissory note was executed. (Docs. 139 at 20; 145 at 15.) Gardner Defendants assert that Plaintiffs' claims began to accrue when Gardner procured the life insurance policies in 2014, 2017, and 2018. (Doc. 146-2 at 24, 27.) Penn Defendants contend that accrual began prior to or at the time the policies were issued in 2017. (Docs. 169 at 19–21; 171 at 22–23.) In response, Plaintiffs argue that the statute of limitations did not begin to accrue until Plaintiffs suffered damages and discovered their injuries. (Docs. 149 at 60; 154 at 37; 157 at 48; 175 at 29.) The Court agrees with Plaintiffs.

In Montana, "a claim or cause of action accrues when all elements of the claim or cause exist or have occurred, the right to maintain an action on the claim or cause is complete, and a court or other agency is authorized to accept jurisdiction of the action." Mont. Code Ann. § 27-2-102(1)(a). A negligence claim requires a plaintiff to prove four elements: "(1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the duty, (3) the breach was the actual and proximate cause of an injury to the plaintiff, and (4) damages resulted." *Peterson v.*

*Eichhorn*, 189 P.3d 615, 620–21 (Mont. 2008). Here, Plaintiffs did not suffer

damages until 2023. (*See* Doc. 103 ¶¶ 206–10, 234.) Because Plaintiffs filed this

action within the three-year limitation set out by Montana statute, Plaintiffs'

negligence claims are not time barred. *See* Mont. Code Ann. § 27-2-204.

     As to Plaintiffs' fraud claims, the Court finds that—pursuant to the discovery

doctrine—the claims did not begin to accrue until 2023. Under Montana law,

> The period of limitation does not begin on any claim or cause of action
> for an injury to person or property until the facts constituting the claim
> have been discovered or, in the exercise of due diligence, should have
> been discovered by the injured party if: (a) the facts constituting the
> claim are by their nature concealed or self-concealing; or (b) before,
> during, or after the act causing the injury, the defendant has taken action
> which prevents the injured party from discovering the injury or its
> cause.

Mont. Code Ann. § 27-2-102(3). "Whether there has been a discovery of facts

sufficient to start the running of the statute of limitations is a question of law."

*Cartwright v. Equitable Life Assur. Soc. of the U.S.*, 914 P.2d 976, 985 (Mont.

1996). However, "when material issues of fact exist about when a party

discovered or reasonably should have discovered all the facts necessary to

make out a claim, that issue is a question of fact for the jury." *Draggin' Y

Cattle Co. v. Addink*, 312 P.3d 451, 458 (Mont. 2013).

     Here, Plaintiffs allege that they discovered the "financial catastrophe"

in July 2023. (*See* Doc. 103 at ¶¶ 206–11.) July 2023, then, is when Plaintiffs'

fraud claims began to accrue. Defendants' citations to *Shiplet v. First Security*

*Bank*, 762 P.2d 242 (Mont. 1988) and *Pederson v. Rocky Mountain Bank*, 272 P.3d 663 (Mont. 2012) do not convince the Court otherwise. In *Shiplet*, the Montana Supreme Court found that plaintiffs had discovered facts sufficient to constitute fraud when they signed promissory notes that did not contain the terms that the plaintiffs alleged the defendant bank had promised. 762 P.2d at 247. In *Pederson*, the Montana Supreme Court held that plaintiffs' fraud claims against a defendant bank began to accrue when they signed loan agreements. 272 P.3d at 665–66. Both *Shiplet* and *Pederson* dealt with fraud claims that included damages that were readily apparent from the face of the promissory notes. Here, the nature of the damages could not be known to Plaintiffs until Gardner informed them that they were "upside down by $2.5 million." And, even if a reasonable individual would have discovered the damages sooner, the Montana Supreme Court has made it clear—through opinions that postdate *Shiplet* and *Pederson*—that issue is a question of fact for the jury. *See, e.g.*, *Draggin' Y Cattle Co*, 312 P.3d at 458.

### III. Direct Negligence and Negligent Misrepresentation (Counts 1 and 2 against all Defendants)

"To maintain an action in negligence, the plaintiff must prove four essential elements: duty, breach, causation, and damages." *Fisher v. Swift Transp. Co.*, 181 P.3d 601, 606 (Mont. 2008). Breach, causation, and damages are elements to be resolved by the jury. *Morrow v. Bank of Am., N.A.*, 324 P.3d 1167, 1181 (Mont.

2014). The question for the Court, then, is whether the Defendants owed Plaintiffs the duties alleged in the SAC.

### A. Wintrust

Wintrust argues that Plaintiffs do not allege that Wintrust owed them a fiduciary duty, that Wintrust never owed Plaintiffs the duties that Plaintiffs accuse Wintrust of breaching, and that Plaintiffs' direct liability claims should be dismissed because they are premised on a non-existent legal duty. (Doc. 139 at 21–26.)

Wintrust contends that the relationship between Plaintiffs and Wintrust was that of an ordinary bank and debtor, and therefore, Wintrust had no duty to ensure Plaintiffs were making prudent financial decisions. (*Id.* at 22–23.) In response, Plaintiffs argue that—according to the SAC—the complex and technical nature of the premium financed structure Wintrust sold to Plaintiffs is readily distinguishable from a straightforward consumer mortgage loan that form the basis of a typical bank debtor relationship. (Doc. 149 at 16.) Taking the facts pled in the SAC as true, the Court agrees with Plaintiffs.

"One generally owes a common law duty of care to another . . . only if the harm at issue is . . . reasonably foreseeable under the circumstances." *House v. U.S. Bank Nat'l Ass'n*, 481 P.3d 820, 828 (Mont. 2021). "[T]he existence of a duty turns primarily on foreseeability." *Fisher*, 181 P.3d at 607.

"In the consumer loan context, the nature of the relation between lender and borrower is generally a non-fiduciary, arms-length contractual relationship." *House*, 481 P.3d at 828. "However, extraordinary circumstances or interactions between a lender and borrower or applicant may nonetheless independently give rise to a general or fiduciary duty of care to the borrower or applicant." *Anderson v. ReconTrust Co., N.A.*, 407 P.3d 692, 697 (Mont. 2017). "[B]ased on the relative disparity of knowledge and the objectively reasonable expectation that the recipient should be able to trust and rely upon a professional advisor, the provision of professional advice intended to guide another in the conduct of the other's affairs regarding a technically complex subject matter generally gives rise to a fiduciary relationship, with attendant fiduciary duties of loyalty, trust, and competence owed to the recipient of the advice." *Id.*

In *Deist v. Wacholz*, 678 P.2d 188, 193 (Mont. 1984), the Montana Supreme Court set forth three scenarios in which special circumstances create a duty of care owed by a bank to a borrower:

> [O]n[e] who speaks must say enough to prevent his words from misleading the other party; one who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party; and one who stands in a confidential or fiduciary relation to the other party to a transaction must disclose other facts.

Here, through the SAC, Plaintiffs allege that "[i]t was reasonably foreseeable and knowable to all Defendants, given their knowledge, expertise, []

access to historical data, [and] access to the Stevenson Family's financial information and goals" that: "the premium financed structure sold to the Stevenson Family would collapse if interest rates rose above the 5% illustrated to the Stevenson Family"; "the Stevenson Family risked losing their net worth if the premium financed structure collapsed"; and "the Stevenson Family would not choose to invest their family's legacy into the premium financed structure if the Stevenson Family knew the volatility and interest-rate sensitivity of the premium financed structure risked the loss of the Stevenson Family's entire net worth." (Doc. 103 ¶¶ 241–43.)

The SAC further alleges that the Stevenson Family are not sophisticated financial professionals. (*Id.* ¶ 25.)  The SAC further provides that the tripartite structure sold to the Stevenson Family "is highly complex, highly volatile," and interest-rate sensitive, requiring coordination between insurers, lenders, and the customers. (*Id.* ¶¶ 21, 51.) According to the SAC, the Stevenson Family relied on illustrations provided by Wintrust in communications to the Stevenson Family "that misleadingly indicated the fictitious stability of positive balance between loan performance and policy performance." (*Id.* ¶¶ 57, 158–59.) These allegations are sufficient to establish that Wintrust owed a duty of care under *Anderson* and *Deist* and, therefore, Plaintiffs direct liability claims against Wintrust meet the 12(b)(6) pleading standard.

### B. Succession

Succession argues that "Plaintiff[s'] negligence [sic] fails because Succession did not owe Plaintiffs a professional duty nor breach a duty to Plaintiffs." (Doc. 145 at 16.) Interestingly, Succession goes on to concede that Plaintiffs' allegations regarding Succession's involvement with the Policies "is consistent with Succession's duty under the law[,] which was to provide Plaintiffs with lending options that met their financial situation." (*Id.* at 17.) Succession further concedes, "Succession's obligation was therefore a reasonable standard of care in carrying out those responsibilities." (*Id.*) According to Succession, this duty "is not the duty the SAC alleges Succession owed [Plaintiffs]." (Doc. 172 at 4.)

Succession appears to argue that making fraudulent representations about the tripartite structure does not fall within Succession's duty to exercise reasonable care in soliciting and packaging the loans on the policies. (*See* Doc. 145 at 18 ("[T]he claims against Succession relate only to purported fraudulent misrepresentations in the illustrations Succession provided to Plaintiffs in connection with the financing. However, Plaintiffs do not allege that Succession failed to meet its standard of care soliciting or packaging the loans on the policies.").) Successions' arguments are unavailing.

As highlighted above, "the existence of a duty turns primarily on foreseeability." *Fisher*, 181 P.3d at 607. "[D]uty is measured by the scope of the risk which negligent conduct foreseeably entails." *Camen v. Glacier Eye Clinic,*

27

*P.C.*, 539 P.3d 1062, 1068 (Mont. 2023). The Montana Supreme Court has explained that a party is subject to liability for harm when rendering services to another where the party "fail[s] to exercise reasonable care to perform [its] undertaking if (a) the failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking." *Maryland Cas. Co. v. Asbestos Claims Ct.*, 460 P.3d 882, 897 (Mont. 2020).

The Court finds that the facts alleged in the SAC fall squarely within this definition. Succession does not dispute—nor could it—the complexity and volatility of the tripartite structure. Succession likewise does not dispute that such a structure is "inappropriate for low-risk estate and retirement planning goals." (*See* Doc. 244.) Therefore, it was foreseeable that Succession would cause harm to Plaintiffs by presenting Plaintiffs with illustrations that represent the structure as stable, low-risk, and appropriate for Plaintiffs' financial situation.

According to the SAC, Succession's advertising represents that Succession "'protects' and 'maximizes' wealth through 'financing policy premiums through a customized loan." (Doc. 103 ¶ 46.) Through custom illustrations provided to Plaintiffs, Succession "misleadingly indicated the fictious stability of positive balance between loan performance and policy performance." (*Id.* ¶ 158.) The illustrations "were customized for the Stevenson Family and designed and intended by Succession for Gardner Defendants to use it to pitch and sell the Stevenson Family on the loan package." (*Id.* ¶ 160.) The illustration represented interest rates

that varied from 3.04%–5% but never exceeded 5%. (*Id.* ¶ 162.) "[T]he Stevenson Family would not have borrowed any money or purchased the Policies" if the illustration had represented "that the tripartite structure would destabilize and collapse, and take the Stevenson Family's net worth with it, if interest rates rose above 5%." (*Id.* ¶ 166.) These allegations establish that Succession's failure to exercise reasonable care increased the risk of harm to the Stevenson Family and resulted in harm to the Stevenson Family because of the Stevenson Family's reliance on Succession's undertaking. *See Maryland Cas. Co.*, 460 P.3d at 897.

Succession relies on *Galea v. Burgess*, 685 F. App'x 561, 563 (9th Cir. 2017) (unpublished), a Ninth Circuit memorandum disposition which applied California state law, for the proposition that the SAC fails to establish that Succession owed Plaintiffs a "professional duty of care." (Doc. 145 at 18.) However, the Court finds *Galea* readily distinguishable. In *Galea*, the Ninth Circuit panel explained that "without some indication of the professional capacity in which [the defendant] was acting, we cannot conclude that he owed a professional duty of care" to customers. *Id.* at 563. In comparison, here, Plaintiffs repeatedly explain Succession's professional capacity. (*See* Doc. 103 ¶¶ 46–48, 52, 57.)

In sum, taking the facts alleged in the SAC as true, Succession owed both ordinary and professional duties of care to Plaintiffs.

### C. Gardner Defendants

Gardner Defendants argue that Plaintiffs' claims for ordinary and professional negligence must fail because Gardner Defendants had no duty "to advise on the suitability and structure of, and to supervise, the premium finance structure." (Doc. 146-2 at 27–29.) In response, Plaintiffs highlight that "Insurance agents are not immune from the duty imposed on us all to avoid causing foreseeable harm." (Doc. 157 at 11.) Therefore, the scope of an insurance agent's duty is not limited to the duty to procure. (*Id.*) Plaintiffs are correct.

As the Montana Supreme Court has explained, "[i]n addition to the duty created by committing to obtain the additional insurance coverage after being directed to do so, [an insurance agent] owe[s], as all parties do, a general common law duty to use reasonable care under the circumstances to avoid causing foreseeable harm to others." *TCF Enters., Inc. v. Rames, Inc.*, 544 P.3d 206, 217 (Mont. 2024). "Imposing a duty on an insurance business to act with reasonable care and not misinform its customers regarding their insurance coverage clearly comports with public policy considerations." *Id.* at 218. Furthermore, as this Court has explained,

> The Montana Supreme Court has emphasized repeatedly that the duty an insurance agent owes to an insured proves fact-dependent—that is, an agent's duty in one situation may differ from an agent's duty in another situation. On the most basic level, an agent has the duty to obtain for an insured the insurance coverage that the insured requests. An agent's duty changes from insured to insured based on the coverage requested. The inquiry becomes more complicated when additional

factors get added, such as a business owner's general request for coverage that adequately will cover her business assets.

*Pedersen v. State Farm Mut. Auto. Ins. Co.*, 2020 WL 2850137, at *5 (D. Mont. June 2, 2020), *aff'd sub nom. Tarum v. State Farm Mut. Auto. Ins. Co.*, 2023 WL 7040320 (9th Cir. Oct. 26, 2023). To the extent that a dispute exists as to the scope of the duty Gardner Defendants owed to Plaintiffs, that dispute is a question of fact for the jury.

### D. Penn Defendants

Penn Defendants argue that they had no duty to "(1) disclose 'all material facts' relating to the risks associated with using premium financing to pay premiums and (2) conduct a suitability analysis prior to issuing policies." (Docs. 169 at 25; 171 at 28.) Penn Mutual also argue that, as to the Terri Policy, Terri and Ms. Jones signed an acknowledgement which specifically disclosed the risks Plaintiffs now complain of. (Doc. 171 at 28–29.)

The Court finds Penn Defendants' arguments unpersuasive. The Court is unaware of any authority that suggests insurance companies do not owe a duty of reasonable care to avoid causing foreseeable harm to others. As Plaintiffs highlight in response, Plaintiffs may need to hire a qualified expert to establish the standard of care applicable to Penn Defendants. But that possibility does not beget the conclusion that Penn Defendants—as a matter of law—had no duty to exercise any care in regard to Plaintiffs. Penn Defendants' citation to Montana Code Annotated

§ 33-20-801—governing suitability in annuity transactions—is likewise unpersuasive, as annuity transactions are not at issue in this case. Finally, as to the disclosure, the Court believes what Terri and Ms. Jones knew or should have learned from the policy disclaimers is a question of fact to be resolved by the jury.

Penn Defendants next argue that Plaintiffs' negligent misrepresentation claims are barred because all challenged misrepresentations or omissions made by Gardner Defendants in relation to Penn Mutual Policies were about future events. (Docs. 169 at 27; 171 at 31.) However, a review of the SAC reveals that Plaintiffs repeatedly challenge the misrepresentations and omissions made about the stability of the premium financing arrangement at the time the misrepresentations and omissions were made. (*See* Doc. 103 ¶¶ 217–34.) While the SAC also challenges misrepresentations and omissions made as to future interest rates, "[f]alse representations of existing or current facts are actionable even if combined with promises as to future events." *Morrow*, 324 P.3d at 1182.

## IV.    Vicarious Liability, Agency, and Fiduciary Relationship (Counts 3–11 against Wintrust, Succession and Penn Defendants)

Wintrust, Succession, and Penn Defendants all argue that they cannot be held vicariously liable for any alleged acts or omissions of the Gardner Defendants because there was no agency relationship between these Defendants and the Gardner Defendants. (Docs. 139 at 32; 145 at 22–24; 169 at 21–24; 171 at 24–26.)

In determining whether an actual agency relationship exists, courts consider four factors: "(1) direct evidence of right or exercise of control; (2) method of payment; (3) furnishing of equipment; and (4) right to fire." *Butler v. Domin*, 15 P.3d 1189, 1195 (Mont. 2000). An ostensible agency relationship, on the other hand, exists where "the principal intentionally or by want of ordinary care causes a third person to believe another to be the principal's agent when that person is not really employed by the principal." *Youderian Constr. v. Hall*, 945 P.2d 909, 912 (Mont. 1997) (citing Mont. Code Ann § 28-10-103(1)). An ostensible "agency relationship may be implied from the conduct and from all the facts and circumstances in the case and it may be shown by circumstantial evidence." *Id.*

The Montana Supreme Court has recognized that allegations of agency generally "involve questions of fact" and therefore cannot be resolved summarily. *Semenza v. Kniss*, 189 P.3d 1188, 1191 (Mont. 2008). This Court routinely preserves questions of agency in diversity cases for the trier of fact. *See, e.g.*, *Butler v. Unified Life Ins. Co.*, 2019 WL 5302491, at *12 (D. Mont. Aug. 9, 2019), *report and recommendation adopted*, 2019 WL 4745065 (D. Mont. Sept. 30, 2019).

Here, Plaintiffs allege that Wintrust alerted Gardner Defendants when Wintrust sent direct communications to Plaintiffs so that Gardner Defendants could arrange a meeting with Plaintiffs to explain those materials. (Doc. 103 ¶ 55.) Wintrust's loan materials included Wintrust's letterhead and logos, and Gardner

Defendants provided those materials to Plaintiffs. (*Id.* ¶ 73.) Gardner Defendants collected Plaintiffs' signatures for Wintrust and sent signed paperwork back to Wintrust. (*Id.* ¶ 56.) The Court finds these facts sufficient to support a plausible claim that Gardner Defendants acted as Wintrust's agents.

As for Succession, Plaintiffs allege that "Succession provided Gardner Defendants with copies of loan performance illustrations—covered with Succession's logos and letterhead—for the purpose of presenting, explaining, and selling the loans Succession brokered to the Stevenson Family on Succession's behalf, entrusting Gardner Defendants to explain the function, suitability, stability, and performance of the loan packages in view of the insurance policies the loans funded and to entice the Stevenson Family to buy into the loan program." (*Id.* ¶ 64.) Plaintiffs further allege that based on email communications between Gardner Defendants and Succession that Gardner Defendants provided to the Stevenson Family, the Stevenson Family "reasonably understood Succession had authorized the Gardner Defendants to communicate with the Stevenson Family with respect to Succession's brokered loans." (*Id.* ¶ 65.) According to the SAC, Succession provided Gardner Defendants with Succession branded loan illustration and plans to assist Gardner Defendants in selling the premium financed structure loans to Plaintiffs. (*Id.* ¶¶ 63–66.) The Court finds these facts sufficient to support a plausible claim that Gardner Defendants acted as Succession's agents.

Regarding the alleged agency relationship between Gardner Defendants and PIA and Penn Mutual, Plaintiffs allege that Penn Defendants appointed and authorized Gardner to act as their agents to solicit insurance policies, produce their policies, prepare and accept applications, and sell their policies to Plaintiffs. (*Id.* ¶¶ 37, 127–42.) Plaintiffs further allege that Penn Defendants "knew about, condoned, and encouraged Gardner Defendants to invite the Stevenson Family into the volatile tripartite relationship with themselves and Lender Defendants." (*Id.* ¶ 144.) Penn Defendants paid Gardner "substantial commissions and other financial incentives and benefits for soliciting, selling, supervising, and renewing" Penn Defendants' life insurance policies. (*Id.* ¶ 43.) Penn Defendants sent Plaintiffs letters and documents which listed Gardner as the servicing producer or presenter of the Penn Defendants' policies, and listed Gardner on statements as the designated point of contact. (*Id.* ¶ 39.) The Stevenson Family reasonably believed that Gardner and/or Gardner Defendants were acting within the authorized scope of their agency relationship with Penn Defendants. (*Id.* ¶ 44.) The Court finds these facts sufficient to overcome Penn Defendants' motions for judgment on the pleadings as to the vicarious liability claims.

Related to the question of agency is Plaintiffs' claim for direct breach of fiduciary duty against Gardner Defendants and vicarious breach of fiduciary duty against Lender Defendants and Insurance Defendants (Count 3). Each Defendant challenges this claim, alleging an absence of a fiduciary relationship. As a

threshold matter, Gardner Defendants and Penn Defendants' claim that Montana does not recognize a fiduciary relationship between an insurance agent and a customer is false. Rather, in *Bailey v. State Farm Mut. Auto. Ins. Co.*, 300 P.3d 1149, 1153 (Mont. 2013), the Montana Supreme Court explained "this Court has *not yet* recognized a fiduciary relationship between an insurance agent and a client." (emphasis added). This language falls short of foreclosing the possibility of such a relationship in any circumstances. Confusingly, prior to *Bailey*, the Montana Supreme Court affirmed a jury verdict finding breach of fiduciary duty by an insurance agent for misrepresentations made during the sale of premium financed life insurance policies. *See Cartwright*, 914 P.2d at 987. The Court cannot conclude, based on *Bailey* and *Cartwright*, that there are no factual circumstances under which an insurance agent creates a fiduciary relationship with its customer. This claim, like Plaintiffs' claims of vicarious liability, must be considered by the trier of fact. As such, the motions to dismiss Count 3 and motions for judgment on the pleadings as to Count 3 must be DENIED.

## V.    Statutory Violations and Negligence Per Se (Counts 4 and 5)

Gardner Defendants and Penn Defendants challenge Plaintiffs' claims for violations of the Montana Unfair Trade Practices Act ("UTPA"), the Montana Consumer Protection Act ("MCPA"), and negligence per se. (Docs. 146-2 at 38–40; 169 at 28–30; 171 at 32–34.)

Penn Defendants argue that "although Plaintiffs purport to explain what the Insurance Defendants are prohibited from doing under the MCPA, they do not allege that [Penn Defendants] actually breached any provision by engaging in an unfair or deceptive act or practice. (Docs. 169 at 29; 171 at 33.) Rather, "the only allegations of breach are expressly against Gardner Defendants." (*Id.*)

In response, Plaintiffs frame the omission of allegations against Penn Defendants as a "typographical error" and request leave to amend the complaint by specificizing the statutory breaches against Penn Defendants under the MCPA. (Doc. 175 at 58.) The Court declines this request and will therefore dismiss Counts 4 and 5 as to Penn Defendants.

Gardner Defendants argue that no section of the UTPA can apply because Plaintiffs have made no claim for settlement. (Docs. 146-2 at 39–40.) Gardner Defendants highlight the title of § 33-18-201, "Unfair claim *settlement* practices prohibited." (emphasis added). The Court agrees that the plain language of the title of the statute suggests that § 33-18-201 of the UTPA applies only where a settlement claim has been made.

Gardner Defendants likewise challenge—albeit unconvincingly—the alleged violations of two additional statutes under the UTPA. (Doc. 146-2 at 38–39.) The first statute, Montana Code Annotated § 33-18-202 provides:

> No person shall make, issue, circulate, or cause to be made, issued, or circulated any estimate, illustration, circular, sales presentation, omission, comparison, or statement which: misrepresents the benefits,

advantages, conditions, or terms of any insurance policy . . . or is a misrepresentation for the purpose of . . . effecting a loan against any insurance policy.

The second statute, Montana Code Annotated § 33-18-203 provides:

A person may not make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in a newspaper, magazine, or other publication or in the form of a notice, circular, pamphlet, letter, or poster or over any radio or television station or in any other way, an advertisement, announcement, or statement containing any assertion, representation, or statement with respect to the business of insurance or with respect to any person in the conduct of the person's insurance business that is untrue, deceptive, or misleading.

Gardner Defendants contend that they did not "draft any insurance product but rather presented Plaintiffs with . . . options after soliciting the aforementioned from" Insurance Defendants and therefore cannot be liable under these statutes. (Doc. 146-2 at 39.) However, the language in these statutory sections clearly extends beyond the "drafting" of a product.

Here, the SAC alleges that Gardner Defendants "falsely represent[ed] the premium financed structure as suitable and stable for the Stevenson Family's circumstances and stated goals and falsely represent[ed] [that] the structure would perform at a certain level without explaining the substantial risks associated therewith, including premium-financed interest rate risk, policy performance risk, bank financing risk, carrier risk, lapse risk, and tax audit risk." (Doc. 103 ¶ 330.) The SAC further alleges that Gardner Defendants "withheld material facts from the

Stevenson Family related to the stability and suitability of the tripartite structure, including but not limited to: whether the Life Insurance Policies were appropriate for the Stevenson Family in the first instance; whether the Life Insurance Policies were appropriately sized; whether premium financing was the appropriate means for paying for the Life Insurance Policies under the Stevenson Family's circumstances; the nature and details of the loan packages; and other Defendants' involvement in the Life Insurance Policies." (*Id.* ¶ 331.) The Court finds that these allegations support a plausible claim for violation of Montana Code Annotated §§ 33-18-202 and 33-18-203. As such, Gardner Defendants' motion to dismiss count 4 is DENIED. For the same reasons, Gardner Defendants' motion to dismiss count 5 is also DENIED.

## VI.   Constructive Fraud, Fraud, and Fraudulent Inducement (Counts 6, 7, and 8)

Gardner Defendants argue that Plaintiffs' claim for constructive fraud fails as a matter of law because insurance agents are not fiduciaries. (Doc. 146-2 at 40.) Because the Court has already rejected this legal conclusion, Gardner Defendants' motion to dismiss Count 6 must also be denied.

Next, Gardner Defendants argue that Plaintiffs claims for fraud and fraudulent inducement fail as a matter of law because Gardner Defendants made "no representation of past o[r] present material fact" and Plaintiffs cannot establish

reasonable reliance on the alleged misrepresentations. (*Id.* at 45–48.) The SAC reveals otherwise.

Plaintiffs allege that Gardner "made material misrepresentations and omissions to the Stevenson Family about the Life Insurance Policies, including but not limited to: misrepresenting that the premium finance structure was stable and suitable for the Stevenson Family's circumstances and stated goals; and misrepresenting that the premium finance structure would perform at a certain level without explaining the substantial risks associated with the Life Insurance Policies and the loans that funded their premiums." (Doc. 103 ¶ 358.) For example, in 2014, "Gardner Defendants encouraged Todd to purchase two Mass Mutual policies and finance the premiums therefor, misrepresenting falsely and without caveat that "annual premium savings offsets the interest costs on the loans," and misrepresented further, falsely and without caveat, that Todd could surrender the policy right then and walk away with $10 million." (*Id.* ¶ 360.) The SAC provides many other specific allegations of misrepresentations of past or present material facts. (*See id.* ¶¶ 361–70.)

Plaintiffs likewise establish that they reasonably relied on these misrepresentations. For example, the SAC alleges that Gardner Defendants "fostered and developed an exclusive relationship with the Stevenson Family of trust and reliance," and "[t]he Stevenson Family reasonably relied on the professional advice of Defendants when they decided to buy the Life Insurance

Policies and to fund their premiums through financing." (*Id.* ¶¶ 31, 230.) These facts, taken as true, support plausible claims for fraud and fraudulent inducement.

Penn Defendants also challenge Plaintiffs' fraud-based claims. (Docs. 169 at 30, 171 at 34.) According to Penn Defendants, the SAC fails to allege sufficient facts with particularity. (*Id.*) The Court disagrees.

"To allege fraud with particularity, . . . a plaintiff must set forth what is false or misleading about a statement, and why it is false." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994). Here, Plaintiffs allege that Gardner Defendants encouraged Plaintiffs to take out additional life insurance—including Penn Defendants' policies—and represented that these additional policies would "keep the loan balance from getting out of control." (Doc. 103 ¶¶ 140–44, 364.) Plaintiffs further allege that the representations and omissions of the stability of the tripartite structure were false, because the structure was not stable nor suitable for the Stevenson Family's low-risk estate and retirement planning goals. (*Id.* ¶¶ 365–66.) The Court finds that these facts are sufficiently particular to state plausible claims for constructive fraud, actual fraud, and fraudulent inducement. Therefore, Penn Defendants' motion for judgment on the pleadings as to Counts 6, 7, and 8 must be DENIED.

## VII.  Unjust Enrichment (Count 9)

Gardner Defendants argue that Plaintiffs' unjust enrichment claims fail as a matter of law because Plaintiffs did not pay commissions and Plaintiffs fail to state

facts to support the nonexistence of a contract, and Plaintiffs were compensated for the benefits they allegedly conferred upon Gardner Defendants. (Doc. 146-2 at 48–49.) Penn Defendants argue that they cannot be vicariously liable for unjust enrichment because Plaintiffs do not allege that they paid any premiums to Gardner Defendants. (Docs. 169 at 31, 171 at 34–35.) The Court finds these arguments unpersuasive.

The doctrine of unjust enrichment is an equitable means of preventing one party from benefitting from his or her wrongful acts, and in the absence of a contract between parties, it may create an implied contract in law. "[A] claim for unjust enrichment requires proof of three elements: (1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." *N. Cheyenne Tribe v. Roman Cath. Church ex rel. Dioceses of Great Falls/Billings*, 296 P.3d 450, 456–57 (Mont. 2013).

The SAC satisfies these elements. First, Plaintiffs allege that Gardner earned commissions through Plaintiffs' participation in the tripartite scheme. (Doc. 103 ¶¶ 43, 76, 119, 126, 132, 138–39, 216.) The Court rejects Gardner Defendants' position that because Plaintiffs did not pay that commission to Gardner Defendants, Plaintiffs did not confer the benefits onto Gardner Defendants. The Court likewise rejects Penn Defendants' mirroring argument regarding the payment

of premiums. Acceptance of these arguments would encourage the use of complicated multiparty schemes—like the one that is alleged here—to avoid liability for one's wrongdoing. The Court further rejects Gardner Defendants' argument that Plaintiffs received value in return for the benefits conferred on Gardner Defendants. At risk of stating the obvious, to view the loss of millions of dollars as a "benefit" to the party that suffered the loss would require a spectacular sequence of mental gymnastics, an exercise this Court is unwilling to participate in.

As to the second element, the SAC alleges that Gardner was aware of the benefits he gleaned from Plaintiffs participation in the tripartite structure. (*Id.*) And finally, the acceptance and retention of those benefits Gardner Defendants incurred is inequitable. (*Id.*)

Gardner Defendants cite to *Filler v. United Parcel Service, Inc.*, 2021 WL 5106461 (D. Mont. Sept. 21, 2021), in support of their argument that a Plaintiff asserting an unjust enrichment claim must plead the nonexistence of a contract. (Doc. 146-2 at 49.) However, a thorough review of that order fails to support Gardner Defendants' theory. In *Filler*, United States District Court Judge Brian M. Morris of this Court found—at the summary judgment stage—that the *Filler* plaintiff had not presented evidence that the duties that formed the basis of his claims were not contractual duties. 2021 WL 5106461 at *3. The *Filler* order is void of language that would suggest that a Plaintiff asserting an unjust enrichment

claim must plead the nonexistence of a contract in order to survive a motion to dismiss.

## VIII.  Punitive Damages (Count 10)

Gardner Defendants and Penn Defendants argue that Plaintiffs' claim for punitive damages fails as a matter of law. (Docs. 146-2 at 50, 169 at 31–32, 171 at 35.) Specifically, Gardner Defendants contend that "there was no fraud and insurance agents are not fiduciaries." (Doc. 146-2 at 50.)

Under Montana law, punitive damages may be awarded "when the defendant has been found guilty of actual fraud or actual malice." Mont. Code Ann. § 27-1-221(1). "A defendant is guilty of actual malice if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of harm to the plaintiff and: (a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or (b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff." Mont. Code Ann. § 27- 1-221(2). "A defendant is guilty of actual fraud if the defendant: (a) makes a representation with knowledge of its falsity; or (b) conceals a material fact with the purpose of depriving the plaintiff of property or legal rights or otherwise causing injury." *Id.* § 27-1-221(3).

Here, Plaintiffs allege that Gardner Defendants deliberately acted with conscious disregard of the high probability of financial injury to Plaintiffs, by ignoring Plaintiffs' financial goals and risk aversion and instead selling them on

volatile high-risk financial products that were unsuitable for Plaintiffs' needs. (Doc. 103 ¶¶ 389–93.) Plaintiffs further allege that Gardner Defendants knowingly made misrepresentations and omissions which caused Plaintiffs' injuries. (*Id.* ¶¶ 394–98.) Taking these allegations as true, the Court finds it plausible that Plaintiffs could prove actual malice and actual fraud. Because the Court has already rejected Gardner Defendants' argument regarding a fiduciary relationship and Penn Defendants' argument regarding agency, their respective requests to dismiss Count 10 must be DENIED.

## IX.    Recission and Restitution (Count 11)

Gardner Defendants argue that Count 11 should be dismissed because there was no contractual relationship between Gardner Defendants and Plaintiffs. (Doc. 146-2 at 51-52.) Plaintiffs counterargue that Count 11 remains valid irrespective of the existence of a contract. (Doc. 157 at 45.) Plaintiffs are correct.

"The theory of unjust enrichment and restitution is brought into play when no contract between the parties exists and the court implies a contract in law." *Maxted v. Barrett*, 643 P.2d 1161, 1164 (Mont. 1982). Indeed, unjust enrichment is a prerequisite to restitution, because "there can be no restitution without unjust enrichment." *Lawrence v. Clepper*, 865 P.2d 1150, 1156 (Mont. 1993). This law contradicts Gardner Defendants' position and forecloses a ruling in their favor as to Count 11.

Penn Defendants argue that Count 11 should be dismissed because Plaintiffs have not pled with specificity any "duress, menace, fraud, or undue influence" and Plaintiffs have not pled a plausible claim for unjust enrichment. (Docs. 169 at 32–33, 171 at 36.) Because the Court found that Plaintiffs' pled fraud and unjust enrichment with particularity, Penn Defendants' motion for judgment on the pleadings as to Count 11 must be DENIED.

## X.    Claim for an Accounting (Count 12)

Gardner Defendants argue that Plaintiffs' claim for an accounting should be dismissed because there is no relationship between Gardner Defendants and Plaintiffs requiring an accounting. (Doc. 146-2 at 52–53.)

"In Montana, a cause of action for accounting requires the plaintiff to plead facts demonstrating the plaintiff is unable to procure an accounting for herself." *Redman v. Bank of Am.*, 2016 WL 406334, at *1 (D. Mont. Feb. 2, 2016) (citing *Johnston v. Silver*, 196 P. 515, 517 (Mont. 1921)). The "plaintiff must plead facts establishing that she previously demanded that the defendant produce an accounting, and that the defendant refused to do so." *Id.* The Plaintiff must also "show that there is some relationship between the parties requiring an accounting, and that the plaintiff is entitled to a balance that can only be ascertained by such relief." *Pfau v. Mortenson*, 858 F. Supp. 2d 1150, 1161 (D. Mont. 2012).

Plaintiffs allege that they had a special relationship, including a fiduciary relationship, with Gardner Defendants. (Doc. 103 ¶ 406.) Plaintiffs allege that they

"have repeatedly sought information about the suitability, stability, and status of the Life Insurance Policies, payment of premiums and other costs, premium loan balances and fees, and the commission structure between the entities, but full information has never been produced." (*Id.* ¶ 407.) These allegations, accepted as true, support a plausible claim for accounting. Therefore, Gardner Defendants' motion to dismiss Count 12 is DENIED.

## XI.    "Sham Pleadings"

As a last-ditch effort, Gardner Defendants—without citing to any controlling authority—argue that "the sham pleading doctrine precludes Plaintiffs' new and inconsistent allegations in the SAC." (Doc. 146-2.) However, "[t]here is nothing in the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations." *PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 158 (9th Cir. 2007). "We do not call this process sham pleading: we call it litigation." *Id.* As such, the Court rejects Gardner Defendants' argument.

## CONCLUSION

Under Montana law, Defendants owed Plaintiffs a duty of care. Taking the allegations in the SAC as true, Plaintiffs have pled sufficient facts to support plausible claims of relief against Gardner Defendants, Wintrust, CMS, and Penn Mutual. Pursuant to Plaintiffs' concession, all claims against PIA—with the exception of those claims brought by T.J. Stevenson—are dismissed without

prejudice. Because the Court denies Wintrust's motion to dismiss, Wintrust's

motion for protective order is denied as moot.

Accordingly, IT IS ORDERED that Wintrust's motion to dismiss (Doc. 138),

CMS's motion to dismiss (Doc. 144) and Gardner Defendants' motion to dismiss

(Doc. 146) are DENIED.

IT IS FURTHER ORDERED that Penn Defendants' motions for judgment

on the pleadings (Doc. 168, 170) are GRANTED IN PART and DENIED IN PART.

Counts 4 and 5 are DISMISSED as to Penn Defendants. All other claims against

PIA, with the exception of claims asserted by T.J. Stevenson, are DISMISSED.

IT IS FURTHER ORDERED that Wintrust's motion for protective order

(Doc. 142) is DENIED AS MOOT.

Dated this 13th day of August, 2025.

Dana L. Christensen, District Judge
United States District Court